IN THE UNITED STATES DISTRICT COURT
OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE NEZ PERCE TRIBE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 06cv02239-JR |
| | ) | |
| DIRK KEMPTHORNE, | ) | |
| Secretary of the Interior, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS ACTION CERTIFICATION AND FOR
APPROVAL OF CLASS NOTICE**

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................2

       I.      ALLEGATIONS IN COMPLAINT .................................................2

       II.     TRIBAL TRUST ACCOUNTS MANAGED BY INTERIOR  ......4

       III.    THE TRIBAL RECONCILIATION PROJECT.............................5

ARGUMENT ..........................................................................................................8

  I.     INDIAN TRIBES ARE SOVEREIGN NATIONS AND CANNOT BE
       FORCED INTO A LAWSUIT AS CLASS MEMBERS ........................................8

      A.     INDIAN TRIBES ARE SOVEREIGN ENTITIES AND ARE
            THEREFORE IMMUNE FROM LAWSUITS UNLESS CONGRESS
            OR A TRIBE HAS EXPRESSLY WAIVED ITS IMMUNITY ................8

      B.     A WAIVER OF TRIBAL SOVEREIGN IMMUNITY MUST BE BOTH
            EXPRESS AND STRICTLY CONSTRUED, AND FEDERAL RULE
            OF CIVIL PROCEDURE DOES NOT CONSTITUTE SUCH A
            WAIVER......................................................................................10

      C.     JUST AS SOVEREIGN TRIBES CANNOT BE JOINED PURSUANT
            TO FEDERAL RULE OF CIVIL PROCEDURE 19, SOVEREIGN
            TRIBES CANNOT BE MADE CLASS MEMBERS ..............................12

      D.     MERELY PROVIDING A SOVEREIGN TRIBE AN OPPORTUNITY
            TO OPT-OUT OF A CLASS DOES NOT PROVIDE THE REQUISITE
            EXPRESS WAIVER OF SOVEREIGN IMMUNITY TO MAKE A
            CLASS CERTIFICATION PROPER .......................................................16

  II.    PLAINTIFFS HAVE NOT SHOWN THAT CLASS CERTIFICATION IS
       APPROPRIATE UNDER FEDERAL RULE OF CIVIL PROCEDURE
       RULE 23 ........................................................................................................17

      A.     PLAINTIFF CANNOT SHOW THAT THIS ACTION IS MAIN-
            TAINABLE UNDER RULE 23(a)........................................................18

          1.     *Plaintiffs Have Failed to Establish That the Proposed Class
               Satisfies the Numerosity Requirement* ...........................................18

          2.     *Plaintiffs Have Not Shown There are Questions of Law or Fact*

    *Common to the Proposed Class* .......................................................21

  3. *Plaintiffs Have Not Carried Their Burden to Establish That Their Claims are Typical of Those of the Proposed Class* .....................24

  4. *Plaintiffs Have a Conflict of Interest with the Putative Class Members, and Therefore, They Cannot Adequately Represent the Proposed Class* .......................................................................31

 B. PLAINTIFF CANNOT SHOW THAT THIS ACTION IS MAIN-TAINABLE UNDER RULE 23(b)..........................................................35

  1. *Because Plaintiffs are Predominately Seeking Monetary Relief, They Are Not Entitled to Class Status Under Rule 23(b)(2)* ..........35

  2. *Plaintiffs' Claims Are Not "Generally Applicable To the Class"* .39

  3. *Rule 23(b)(2) Opt-out Is Improper* ................................................40

  4. *Plaintiffs Have Not Demonstrated Predominance and Super-iority as Required for Class Status Under 23(b)(3)* ......................41

   (a) *Individual questions predominate over questions that are common to the class* ........................................................42

   (b) *A class action is not a superior method of adjudicating these highly individualized claims* ....................................44

  5. *Plaintiffs Have Not Met The Certification Requirement of 23(b)(1)* ..........................................................................................45

 C. IT IS PREMATURE FOR THE COURT TO CONSIDER PLAINTIFFS' PROPOSED NOTICE .............................................................................46

CONCLUSION ........................................................................................................47

ii

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997)..........................................18, 35, 42, 45, 46

*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.,* 179 F.3d 1279 (11th Cir.1999) ...............17

*Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970 (5th Cir. 2000) ......................................................37

*Brown v. Artery Organization, Inc.,* 1987 WL 9044 (D.D.C. Mar. 19, 1987) .............................45

*Bynum v. D.C.*, 214 F.R.D. 27 (D.D.C. 2003) .............................................................................42

*Chang v. U.S.,* 217 F.R.D. 262 (D.D.C. 2003) ...............................................................18, 22, 24

*Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489 (D.C. Cir. 1997) ...............................13

*Christina v. Del. Mort. Bankrs. Assn.,* 136 F.R.D. 372 (D. Del. 1991) .......................................38

*Confederated Tribes of Chehalis Indian Reservation v. Lujan,*
    28 F.2d 1496 (9th Cir. 1991) ...........................................................................................13, 14

*Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*,
    276 F.3d 1150 (9th Cir. 2002) ............................................................................................14

*Disability Rights Council of Greater Washington v. Washington*, 2006 WL 3704656
    (D.D.C. Dec. 14, 2006)........................................................................................................25

*DL v. District of Columbia*, 237 F.R.D. 319 (D.D.C. 2006).........................................................21

*Does I through III v. D.C.,* 2006 WL 2864483 (D.D.C. Oct.5, 2006)...............................18, 42, 44

*E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774 (9th Cir. 2005) ........................................16

*Enterprise Mgmt. Consultants v. United States*, 883 F.2d 890 (10th Cir. 1989)...........................14

*Eubanks v. Billington,* 110 F.3d 87 (D.C. Cir. 1997) .................................................36, 38, 40, 41

*Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447 (D.C. Cir. 1988)...........................................19

*Garcia v. Veneman*, 211 F.R.D. 15 (D.D.C. 2002)..................................................30, 36, 38, 42, 45

iii

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ........................................................24

*In re School Asbestos Litig.,* 789 F.2d 996 (3d Cir. 1986) ........................................37

*In re U.S.A. ex rel. Hall*, 825 F. Supp. 1422 (D. Minn. 1993) .....................................15

*In re Veneman,* 309 F.3d 789 (D.C. Cir. 2002) ..........................................18, 36, 38, 42

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ........................24, 43, 44

*International Union v. Clark*, 2006 WL 2687005 (D.D.C. Sept. 12, 2006) ...............20

*Johnson v. D.C.,* 248 F.R.D. 46 (D.D.C. 2008) ....................................................21, 44

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt,*
    43 F.3d 1491 (D.C. Cir. 1995) .........................................................................14, 16

*Kiowa Tribe v. Mfg. Tech., Inc.*, 523 U.S. 751 (1998) ..................................................9

*Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667 (S.D. Ohio 1995)........................................33

*Love v. Veneman*, 224 F.R.D. 240 (D.D.C. 2004) ......................................................38

*Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594 (4th Cir. 1976) ..................37

*Marable v. Dist. Hosp. Partners, L.P.*, 2006 WL 2547992 (D.D.C. Aug. 31, 2006)..................24

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996) ............................10

*Mycka v. Celotex Corp.,* 1988 WL 80042 (D.D.C. Jul. 18, 1988)................................46

*Nez Perce Tribe of Idaho v. U.S.,* 228 Ct. Cl. 924 (Ct. Cl. 1981)................................29

*Ortiz v. Fireboard Corp.,* 527 U.S. 815 (1999) ....................................................41, 46

*Phillips v. Shutts*, 472 U.S. 797 (1985).......................................................................11

*Pigford v. Glickman,* 182 F.R.D. 341 (D.D.C. 1998) ..................................................25

*Pueblo of Sandia v. Babbitt*, 47 F. Supp.2d 49 (D.D.C. 1999)........................10, 13, 14

*Pueblo of Zuni v. United States*, 243 F.R.D. 436 (D.N.M. 2007)................................31

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687 (D.Colo. 1998) ...........31

iv

*Quileute Indian Tribe v. Lujan*, 1992 WL 605423 (W.D. Wash. Aug. 28, 1992) .................13, 16

*Richards v. Delta Air Lines, Inc.,* 453 F.3d 525 (D.C. Cir. 2006)........................................ passim

*Rodriguez v. Department of the Treasury*, 108 F.R.D. 360 (D.D.C. 1985) .....................18, 19, 20

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) .......................................8, 9, 10, 15

*Seneca Nation of Indians v. New York*, 383 F.3d 45 (2d Cir. 2004) ...........................................14

*Smith v. D.C.,* 2006 WL 1126816 (D.D.C. Apr. 26, 2006)...........................................................41

*Taylor v. D.C. Water and Sewer Auth.,* 241 F.R.D. 33 (D.D.C. 2007)...................................18, 39

*Thomas v. Albright*, 139 F.3d 227, 233 (D.C. Cir. 1998) ..........................................36, 39, 41, 42

*Three Affiliated Tribes of Fort Berthold Reservation v. World Eng'g*,
    476 U.S. 877 (1986)..............................................................................................................9

*United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506 (1940) ...........................9

*United States v. Wheeler,* 435 U.S. 313 (1978) .............................................................................9

*Watters v. Washington Metro. Area Transit Auth.*, 295 F.3d 36 (D.C. Cir. 2002) ......................17

*Wichita and Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765 (D.C. Cir. 1986) 10, 13, 14, 15

*Williams v. Glickman,* 1997 WL 33772612 (D.D.C. Feb. 4, 1997)........................................17, 38

*Wolfchild v. United States*, 72 Fed. Cl. 511 (2006) .......................................................................9

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) ......10, 17

## FEDERAL STATUTES AND APPROPRIATIONS ACTS

5 U.S.C. § 701 *et seq.* (Administrative Procedure Act) ........................................................ *passim*

25 U.S.C. §§ 155 and 155b.............................................................................................................2

25 U.S.C. § 564q...........................................................................................................................30

25 U.S.C. § 566.............................................................................................................................30

25 U.S.C. §§ 161a-162a, §§ 4001 *et seq.*, 108 Stat. 4239 (1994) (American Indian Trust Fund Management Reform Act) ............................................................ *passim*

## FEDERAL RULES AND OTHER REFERENCES

25 C.F.R. Part 1200.........................................................................................................4

25 C.F.R. § 89.41 ........................................................................................................21

1 H. Newburg, Class Actions   1105 (1977) ...........................................................20

5 Moore's Federal Practice § 23.02 (Matthew Bender 3d Ed.) .....................................17

## PENDING CASES

*Confederated Tribes of the Colville Reservation v. Kempthorne*, Civ. No. 05-cv-2471 (D.D.C.) ....................................................................................................34

*Hoopa Valley Tribe v. United States,* No. 08-cv-72 (C.F.C. Feb. 1, 2008)  …………………..32

## INTRODUCTION

Twelve named Plaintiffs (Nez Perce, Mescalero Apache, Yakama, Tule River, Klamath, Yurok, Cheyenne-Arapaho, Sac and Fox, Tlingit-Haida, Hualapai, Pawnee Nation of Oklahoma and the Santee Sioux of Nebraska) have filed suit in this Court challenging whether the Department of the Interior ("Interior") has provided "full and complete" accountings for their tribal trust accounts throughout all time periods.  The Plaintiffs have asked this Court to certify a class action, by which the named Plaintiffs would represent other Indian tribes that do not have such accounting suits pending in the District Courts.  In doing so, Plaintiffs would have this Court decide that sovereign Indian nations need representation in court – a premise that goes against the very core of sovereignty and self-determination.   Indian tribes cannot be brought into court absent a waiver of tribal sovereign immunity; such a waiver can only be effectuated by Congress or the Indian tribe.  Federal Rule Civil Procedure 23 does not act as such a waiver.

Moreover, Plaintiffs have not set forth sufficient facts or legal basis to justify class certification under Rule 23.  As discussed below, each named Plaintiffs is unique and has different accounting needs from the other named Plaintiffs and members of the class.  They are geographically disbursed throughout the United States and engage in different income generating activities than the putative class, meaning that how Interior has kept track historically and how they currently keep track of the different tribes' accounts varies.  Some of the named Plaintiffs received previous accounting pursuant to their Indian Claims Commission ("ICC") cases; others did not.  In short, this Court would be forced to adjudicate many mini-trials (which is contrary to the very purpose of class certification) in order to determine whether the named Plaintiffs have ever received a "full and complete" accounting.   This Court must deny Plaintiffs' Motion for

Class Certification.

**BACKGROUND**

**I.    ALLEGATIONS IN COMPLAINT**

At the heart of the Amended Complaint filed by the twelve named Plaintiffs in this case

is the broad allegation that Defendants, as trustees of tribal trust funds and assets, have

committed "continuing breaches of inherent and statutory fiduciary accounting and management

duties owned to Plaintiffs, including, but not limited to: the duty to provide full and complete

accountings of Plaintiffs' trust funds and the duty to correct trust fund accounts improperly

accounted for and/or improperly managed and make those accounts whole." Amended

Complaint ¶¶ 1, 5, 56.[1] Plaintiffs' allegations challenge Defendants' stewardship over and

accounting for Plaintiffs' trust funds for all time periods and in all respects.  *Id.*  The three-count

Amended Complaint seeks declaratory, injunctive and monetary relief.  *See id.* at ¶¶ 70-86.

In Count One, Plaintiffs seek a declaration as to what the standards are that govern the

"full and complete accountings" that Plaintiffs believe Defendants owe them.  *See id.* at ¶ 70-75.

 Along these lines, Plaintiffs seek a declaration that the TRP Reports are not "full and complete

accountings" and that Defendants have never provided Plaintiffs with "full and complete

accountings of each of their trust funds as required by law."  *Id.* at ¶ 73.  In Count Two,

Plaintiffs seek injunctive and monetary relief for the breaches of trust, including a demand that

---

1 In support of their allegation that Plaintiffs' longstanding trust relationship between the United States and the
United States' resulting fiduciary duties are derived from "inherent and statutory fiduciary accounting and
management duties," *see* Amended Complaint ¶¶ 1, 4, 5, 39, 40, 56, 71, Plaintiffs refer to "various acts of
Congress" and cite the following statutes: 25 U.S.C. §§ 155 and 155b; 25 U.S.C. §§ 161, 161a, 161b and 162a, along
with the American Indian Trust Fund Management Reform Act, 25 U.S.C. §§ 4011 *et seq.  See, e.g.*, Complaint ¶¶
5, 33, 34, 35, 41.  In addition, Plaintiffs cite a number of Interior appropriations acts.  *Id.* at ¶¶ 5, 40.

2

the Court compel Defendants to produce accountings "pursuant to accounting standards ordered by this Court" and an injunction ordering the government to adjust the account balances "to make their accounts whole."[2]  *Id.* at ¶¶ 76-80.  In Count Three, Plaintiffs set forth an Administrative Procedures Act ("APA") challenge, claiming they have been "aggrieved because of final agency action" but do not set forth which specific "final agency action" they challenge.  Plaintiffs also allege they have "suffered legal wrongs and adverse effects" due to Defendants' unlawfully withholding action and unreasonably delaying agency action.  *Id.* at ¶¶ 81-86.

As part of their prayer for relief, Plaintiffs demand certification of a class action for "all American Indian and Alaska Native Tribes which have or which have had trust fund accounts that are or were administered by the Defendants; which have received [TRP] Reports; which have not received full and complete accounting of their trust funds; and which do not have actions pending on December 31, 2006 seeking accounting of their trust funds."  *Id.* at Prayer for Relief ¶ 1.  Plaintiffs further demand "a determination that Defendants are in violation of the APA, and that Defendants are amenable to suit in this action either under the APA or because Defendants' actions are contrary to law and outside the scope of their authority."  *Id*. at Prayer for Relief ¶ 3. Plaintiffs seek declarations that Defendants are in breach of trust, negligent or engaged in wrongful conduct, that the TRP Reports are not "full and complete accountings" and that Defendants have never provided "full and complete accountings."  *Id.* at Prayer for Relief ¶¶ 4-6.  Plaintiffs also seek an injunction ordering Defendants to "provide Plaintiffs with full

---

2 Plaintiffs also request injunctive relief "directing the Defendants to preserve any and all documents concerning Plaintiffs' trust accounts and funds."  Amended Complaint ¶¶ 79, 85.  Defendants do not address herein the lack of merit underlying this request because they have already done so in their memorandum in opposition to Plaintiffs' request. *See* Dkt. 63.

and complete accountings of their trust funds." *Id.* at Prayer for Relief ¶ 7.  Moreover, Plaintiffs

demand monetary relief in the form of a "correct[ion] [of] Plaintiffs' trust fund account balances

[to] make the accounts whole." *Id.* at Prayer for Relief ¶ 9.

## II.    TRIBAL TRUST ACCOUNTS MANAGED BY INTERIOR

Interior presently maintains approximately 1,800 tribal trust fund accounts, for over 250

different tribal entities.  *See* Declaration of Richard P. Fielitz, Jr. at ¶ 3.  As of September 30,

2007, the total trust fund balances held for tribes were almost $2.9 billion.  *Id.*  Tribes may

request their funds be taken out of trust, and, under specified conditions, also may request any

remaining withdrawn funds to later be taken back into trust status (see 25 C.F.R. Part 1200).  *Id.*

Other differences between tribal trust fund accounts result from the fact that some tribes have

considerable assets that generate trust income, while others may have very few.  *Id.*  Some tribes

have only a single trust account, consisting perhaps of a judgment fund; others have multiple

types of accounts, dating from different times and containing funds from different sources (such

as timber or other natural resource revenues).  *Id.*  Tribes also play significant roles in leasing

and other asset management decisions, many through their own corporations, and they reside in

close proximity to their assets (unlike individuals, who can live thousands of miles away from

their often-fractionated assets). *Id.*

Over the years, Interior has developed and implemented specialized policies, regulations,

business systems and forms for handling trust funds and maintaining and reporting its records of

account.  *Id.* at ¶ 5.  Prior to 1951, each BIA Agency Office (typically located on Indian

reservations) accounted for financial activity using handwritten ledgers and journals.  *Id.*  In the

early 1950s, Interior installed a more centralized accounting system in the BIA Area (Regional)

4

Offices that integrated all fund types, such as IIM and Tribal.  *Id.*  Beginning in 1965, BIA began

further centralizing its accounting functions on a mainframe computer, with that conversion

completed in the late 1960s.  *Id.*  The Trust Funds Management System (TFMS or Finance) was

developed and implemented in 1968 and modified in 1974.  *Id.*  The Office of Trust Funds

Management ("OTFM") used TFMS until it converted to the Omnitrust system, a commercial

off-the-shelf ("COTS") trust management system used by private-sector trust entities, for activity

in tribal trust fund accounts in April 1995.  *Id.*  OTFM converted tribal trust fund accounts from

Omnitrust to Trust 3000, another COTS trust management system, on March 1, 1999.  *Id.*

## III.    THE TRIBAL RECONCILIATION PROJECT

The Tribal Reconciliation Project (TRP) performed by Andersen was an engagement to

perform certain agreed-upon procedures with respect to each individual tribe's trust account

transactions for the period of July 1972 through September 1992.  The primary objective of the

TRP was to "reconstruct historical transactions, to the extent practicable, for all years for which

records are available for all tribal trust accounts managed by the Bureau."  *See* Declaration of

Chavarria at ¶ 6 (citing to Agreed Upon Procedures and Findings Report of Independent Public

Accountants issued by Andersen (December 31, 1995)).  The agreed upon procedures performed

can be summarized as follows for significant tasks under the project:

**Basic Reconciliation –** This process was a verification of all tribal trust transactions to
supporting financial documents.  For example, receipt transactions were verified against
deposit tickets and/or related collection vouchers and/or other relevant documentation.
Disbursement transactions were verified against U.S. Treasury processed SF 1166 documents
(Voucher and Schedule of Payments), Agency Confirmation Reports reflecting processed SF
1166's, journal vouchers and/or other relevant disbursement documentation.  Exceptions and
proposed adjustments were reported to each tribe based on each individual tribe's
transactions and accounts only.

**Investment Yield Analysis –** This process was a calculation of investment yields on each

5

tribe's individual trust accounts for comparison to benchmark rates for the purpose of identifying any potential accounting errors in interest earnings. Based on established parameters, unusual fluctuations from the benchmark rates as determined for each individual account were investigated in order to determine if there were accounting errors. Results of the calculation and any proposed adjustments were reported to each tribe based on each individual tribe's results.

**Treasury Interest Recalculation –** This was a detailed recalculation for each individual tribe's accounts of Treasury interest on cash balances based on the Treasury overnight investment or statutory interest as applicable based on the time period. Prior to January of 1985, interest was earned on cash balances held in trust at statutory rates (4% or 5%) and subsequent to December 1984 interest was earned based on each day's short term Treasury investment rate ("Overnighter rates"). All variances as a result of each tribe's calculations were quantified and reported separately.

**Systems Reconciliation –** This was a comparison and reconciliation of transactions and balances reported in multiple systems to each other. The primary accounting system used by Interior for management and accounting for trust funds was the Finance System during the period covered by the TRP. The government also used a subsidiary system (MoneyMax) for tracking the detail investment purchase and maturities, individual investment rates, maturity dates, etc. The two systems were maintained separately and were reconciled to each other as part of the TRP. As part of the TRP, each transaction posting was compared between the Finance System and the Treasury System for fiscal year 1992. Subsequently Andersen completed and reported similar results for fiscal years 1991 and 1990 as well as a balance comparison as of June 30, 1972 between the Finance System balances and the balances in the Combined Statement of Receipts, Expenditures and Balances of the United States Government. The results of the system reconciliation procedures were summarized in total in the TRP reports, however proposed adjustments were only reported to those specific tribes affected.

**Fill the Gap Procedures –** This procedure was a verification of selected receipts to lease agreements, sales agreements, contracts, permits or other documentation creating an obligation to pay. This work was performed on a sample basis with an emphasis on contracts with collections greater than $5,000. A total of 692 leases were tested, not including more extensive scopes for five (5) selected tribes.[3] Not all tribes received this test, and the sample

---

3 **Five Tribe Pilot Project –** Five tribes including Confederated Tribes and Bands of the Yakama Indian Nation were subject to much more extensive testing than any of the other tribes, particularly with regard to Fill the Gap Procedures. The other tribes, which were part of this project, were: The Confederated Tribes and Bands of the Flathead Reservation, Hopi Tribe of Arizona, Three Affiliated Tribes of the Fort Berthold Reservation and Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation. These five tribes received customized procedures considering the specific revenue sources, dollar value of activity and/or any specific concerns raised by the tribes through consultation and a memorandum of understanding between each of the five tribes and Interior. As an example, these tribes received extensive Fill the Gap work designed to provide significant individual tribal dollar coverage; these tribes also received compliance testing procedures, specific judgment award testing, tests of accounts maintained in the IIM system, process flow diagrams of accounting related functions and recommendations

was not intended to be representative of all tribes. For those tribes, who did receive this testing, results were reported individually.

**Analytical Review –** Andersen prepared graphs of receipt and disbursement activity for fiscal years 1978 through 1992 for the purpose of considering for investigation any unusual fluctuations in receipts and disbursements during the time period. The graphs were provided to each tribe as information for consideration, but only 15 tribes were selected for follow-up investigation of any unusual fluctuations. The results of any follow-up investigation were reported to those individual tribes.

**Pro Forma Procedures –** This was a calculation performed for informational purposes of the tribes. What is meant by informational purposes is that the calculation was not a quantification of an accounting error, but purely a hypothetical calculation not requiring a correction/adjustment to the accounts. The hypothetical calculation considered the assumption that no liquidity or cash balances were required in an account and that instead all such balances could have been invested immediately upon receipt. The calculation quantifies what would have been earned had all cash balances been invested and earned a yield equivalent to a stated benchmark rate in comparison to actual interest earnings on cash balances for fiscal years 1978 through 1992. The results were reported individually to each tribe for accounts held during the period.

**Deposit Lag Time –** This procedure was also performed for information purposes only. It was the summarization of the amount of time between the apparent receipt date of collections to the deposit date posted in the tribes' trust accounts. The lag time specific to each tribe was summarized and reported individually.

In early 1996, Interior provided the results of the TRP reports to tribes. The information and deliverables provided to tribes as part of the TRP generally included: (1) transaction by transaction account statements (receipts, interest earnings, disbursements, balances, etc.) for tribal trust fund accounts for the period from July 1, 1972 (Fiscal Year 1973), to September 30, 1995 (Fiscal Year 1995); (2) a report describing the procedures performed for the fiscal years 1973 through 1992 period and the results thereof; and (3) electronic images of source documents[4] that supported certain transactions for fiscal years 1972 through 1992.

---

for improving such processes and other specific procedures specified in individual tribe's memorandum of understanding.

4 Source documents are the various trust-fund related financial documents, including those related to non-investment receipt transactions (e.g., deposit ticket, schedule of collections, and journal voucher), investment transactions (e.g.,

**ARGUMENT**

**I.** **INDIAN TRIBES ARE SOVEREIGN NATIONS AND CANNOT BE FORCED INTO A LAWSUIT AS CLASS MEMBERS**

Despite representations that they are seeking to preserve the sovereignty of the putative class members, Plaintiffs ask this Court to forcibly bring sovereign tribes into this lawsuit through the class certification process. *See* Pls. Brief at 44-46. Plaintiffs opine, without citing legal authority, that the class members' sovereignty will be protected merely by the issuance of a "notice" to each of them through the U.S. mail. *Id.* As detailed herein, a notice, no matter what entitled or how delivered, cannot be held by this Court to be the legal equivalent of an explicit tribal waiver of sovereignty, which is the only viable method, absent an act of Congress, that can compel the sovereign putative class members to join this suit.

**A.** **INDIAN TRIBES ARE SOVEREIGN ENTITIES AND ARE THEREFORE IMMUNE FROM LAWSUITS, UNLESS CONGRESS OR A TRIBE HAS EXPRESSLY WAIVED ITS IMMUNITY**

It is well-recognized that Indian tribes enjoy sovereign immunity. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56 (1978) ("Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government.") (citation omitted). Tribal sovereign immunity is not a delegated power of Congress, but flows from the "inherent powers of a limited sovereignty which has never been extinguished." *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978) (citation omitted). Indian tribes are immune

---

accounts distribution sheet and Treasury market securities purchase form), and non-investment disbursement transactions (e.g., request for withdrawal and voucher and schedule of payment).

8

from lawsuits unless "Congress has authorized the suit or the tribe has waived its immunity."

*See Kiowa Tribe v. Mfg. Tech., Inc.*, 523 U.S. 751, 754 (1998) (citing *Three Affiliated Tribes of*

*Fort Berthold Reservation v. World Eng'g.*, 476 U.S. 877, 890 (1986); *Santa Clara Pueblo*, 436

U.S. at 58; *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512 (1940));

*Wolfchild v. United States*, 72 Fed. Cl. 511, 536 (2006) ("Indian tribes are immune from lawsuits

or other process in federal courts unless 'Congress has authorized the suit or the tribe has waived

its immunity.'") (citation omitted).

While Congress may alter the scope of tribal sovereign immunity through explicit

legislation, subject to constitutional limitations, *see Kiowa Tribe*, 523 U.S. at 759, courts have

recognized that sovereignty cannot be lightly abridged.  In *Kiowa Tribe*, for example, the

Supreme Court, in deference to Congress, ruled that Indian tribes "enjoy immunity from suits on

contracts, whether those contracts involve governmental or commercial activities and whether

they were made on or off a reservation."  523 U.S. at 760.  Here, Plaintiffs are asking this Court

to stray from the two above described methods of limiting tribal sovereignty by seeking to

certify a class of sovereign tribes that have not provided express waivers and where there has

been no act of Congress.  In essence, Plaintiffs want the Court to regulate tribal sovereignty by

finding that sovereignty can be abridged through receipt of a class action notice.  Defendants

know of no law or authority (and Plaintiffs have cited to none) that permits such an expansive

reading of the above Supreme Court jurisprudence.  That this matter is an affirmative class

litigation seeking to include sovereign tribes instead of a proceeding against sovereign tribes is

of no consequence to the scope of tribal sovereignty.  "Sovereign immunity from suits" should

not be read to apply only to cases where tribes are sued.  On the contrary, sovereign immunity

should extend to matters where a sovereign is forced into a suit as a class member, and therefore

subjected to a court's jurisdiction.  Accordingly, because the class members' sovereignty cannot

be limited in the manner Plaintiffs suggest, their motion must fail.

**B.    A WAIVER OF TRIBAL SOVEREIGN IMMUNITY MUST BE BOTH EXPRESS AND STRICTLY CONSTRUED; FEDERAL RULE CIVIL PROCEDURE 23 DOES NOT CONSTITUTE SUCH A WAIVER**

An Indian tribe's sovereign immunity shields it from claims for declaratory and

injunctive relief, as well as for money damages.  *See Santa Clara Pueblo*, 436 U.S. at 58.  While

Indian tribes may consent to be sued, *Wichita and Affiliated Tribes of Oklahoma v. Hodel*, 788

F.2d 765, 772-73 (D.C. Cir. 1986), any waiver of tribal sovereign immunity "cannot be implied

but must be unequivocally expressed."  *Santa Clara Pueblo*, 436 U.S. at 58.  The scope of such a

waiver must be strictly construed.  *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296

F.3d 1154, 1162 (D.C. Cir. 2002) ("In general, explicit waivers of sovereign immunity are

narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the language

requires.'"); *Pueblo of Sandia v. Babbitt*, 47 F. Supp.2d 49, 52 (D.D.C. 1999) (citations omitted).

It is axiomatic that all parties to a class action lawsuit are generally bound by the rulings

and judgments in that case.  *See Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 379

(1996) ("Under Delaware Rule 23, as under Federal Rule of Civil Procedure 23, '[a]ll members

of the class, whether of a plaintiff or a defendant class, are bound by the judgment entered in the

action unless, in a Rule 23(b)(3) action, they make a timely election for exclusion.'") (citation

omitted).  Indeed, this enables the class action device to fulfill one of its main purposes, namely

to preserve the courts' and the parties' resources.  The class proposed by Plaintiffs here would

not promote judicial efficiency because the purported class comprises independent sovereigns

that have not expressly waived their sovereignty and therefore have not expressly consented to be bound by whatever rulings or judgments that this court may issue.  Thus, Defendants cannot be assured that any such rulings or judgments would preclude the sovereign tribes from later instituting their own suits, thereby wasting the court's and Defendants' resources, as well as subjecting Defendants to potentially incompatible rulings:

> As a class-action defendant petitioner is in a unique predicament.  If Kansas does not possess jurisdiction over this plaintiff class, petitioner will be bound to 28,100 judgment holders scattered across the globe, but none of these will be bound by the Kansas decree.  Petitioner could be subject to numerous later individual suits by these class members because a judgment issued without proper personal jurisdiction over an absent party is not entitled to full faith and credit elsewhere and thus has no *res judicata* effect as to that party.  Whether it wins or loses on the merits, petitioner has a distinct and personal interest in seeing the entire plaintiff class bound by *res judicata* just as petitioner is bound.  The only way a class action defendant like petitioner can assure itself of this binding effect of the judgment is to ascertain that the forum court has jurisdiction over every plaintiff whose claim it seeks to adjudicate, sufficient to support a defense of *res judicata* in a later suit for damages by class members.

*See*, *e.g.*, *Phillips v. Shutts*, 472 U.S. 797 (1985).  Thus, to the extent that any sovereign tribes are included as members in the proposed class here, and to the extent that the tribes are deemed to be bound by any judgments issued by this Court, class certification would be improper because judgments issued by this Court, if any, would violate the sovereign immunity of all those tribes.  Conversely, if the tribes are not bound by the Court's judgments, any such judgments would not provide sufficient *res judicata* protection for Defendants.  This is so because Congress has not limited or waived the sovereign immunity of the tribes that purportedly would become members of Plaintiffs' proposed class.  Further, Plaintiffs have not shown that any of the approximately 220 tribal class members have expressly waived their sovereignty for purposes of pursuing, or being bound by the outcome of, this lawsuit.

Indeed, four tribes, namely, the Pueblo of Laguna, the Jicarilla Apache Nation, the Delaware Tribe of Indians and the Delaware Trust Board and the Navajo Nation, have expressly stated to the named Plaintiffs in a declaration attached as part of the Amended Complaint that Plaintiffs may not represent the four tribes before this Court.  *See* Ex. 1, Pls. Amended Compl. at ¶ 5.  In particular, the four tribes stated that each of them is "a sovereign American Indian Nation, tribe or Pueblo and as such is entitled to make its own choices with respect to litigation affecting the trust funds and trust property of each.  They each have done so as an exercise of their respective sovereign powers." *Id*; *see also* http://www.itmatrustfunds.org/MainPages/Trust_Legislation%20%20Litigation%20.htm#Tribal _Trust_Fund_Cases_  (December 20, 2006 letter from Ernest Stensgar, President, Affiliated Tribes of Northwest Indians, to John E. Echohawk, Executive Director, NARF, expressing tribal views that Indian tribes, as sovereign nations, should decide who represents them in litigation, that a class action runs counter to this principle, and that opt-out does not address the sovereign issue).  Plaintiffs simply have not carried its burden to show that class certification is proper here by obtaining the requisite express waivers from each purported sovereign class member.

### C.    JUST AS SOVEREIGN TRIBES CANNOT BE JOINED PURSUANT TO FEDERAL RULE CIVIL PROCEDURE 19, SOVEREIGN TRIBES CANNOT BE MADE CLASS MEMBERS

Class action lawsuits under Rule 23 and joinder pursuant to Rule 19 both serve similar purposes, including that of preserving the courts' and the parties' limited resources.  In both situations, courts have to weigh a number of factors to determine whether joinder or class certification would further that purpose.  Rule 19 governs the joinder of necessary and indispensable parties.  *See* Fed. R. Civ. P. 19.  Determining whether a party is necessary and

indispensable to a lawsuit under Rule 19 is a multi-step analysis. *See Pueblo of Sandia*, 47 F. Supp.2d at 52; *Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489, 1497 (D.C. Cir. 1997); *Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991). First, the court must determine whether a party is necessary, in which case the party must be joined if it is feasible to do so. *See Confederated Tribes of Chehalis*, 928 F.2d at 1498. If the party cannot be joined in the action, the court must determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed. R. Civ. P. 19(b); *see also Quileute Indian Tribe v. Lujan*, 192 WL 605423, *1 (W.D. Wash. Aug. 28, 1992); *Wichita and Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 771-72 (D.C. Cir. 1986) ("[I]f the tribe is an indispensable party, and cannot be joined due to its immunity, the claim may not proceed. Therefore, we must consider whether all the interested tribes in the case were actually parties, and if not, whether they were indispensable so that the claims should not have proceeded in their absence."); *Peabody Western Coal Co.*, 400 F.3d at 781 ("In many cases in which we have found that an Indian tribe is an indispensable party, tribal sovereign immunity has required dismissal of the case.").

In the context of a Rule 19 analysis, courts consider four non-exclusive factors, and there are currently two distinct lines of cases with respect to the impact of tribal sovereign immunity on this four-part analysis. *See Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991). First, "[s]ome courts have noted . . . that when the necessary party is immune from suit, there is very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." *Id*. (citation omitted). Second, the

13

Ninth Circuit has "nonetheless consistently applied the four-part test to determine whether Indian tribes are indispensable parties." *Id.* (citation omitted); *Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 276 F.3d 1150 (9th Cir. 2002) (same). The D.C. Circuit has clearly stated that it follows the first line of cases:

> While Rule 19(b) sets forth four non-exclusive factors for the court to consider, this court has observed that "there is very little room for balancing of other factors" set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit because immunity may be viewed as one of those interests "compelling by themselves." Thus, notwithstanding the discretion generally accorded to the district court to consider "which factors to weigh and how heavily to emphasize certain considerations," the district court was confronted with a more circumscribed inquiry when it assessed whether the Tribe's lawsuit could proceed "in equity and good conscience" in the absence of Kansas, which was both a necessary party and immune from the lawsuit."

*Kickapoo*, 43 F.3d at 1496-97 (citing *Wichita*, 788 F.2d at 777 n.13); *see also Pueblo of Sandia*, 47 F. Supp.2d at 52 (finding that "the State of New Mexico is an indispensable party without which this case may not proceed."); *Seneca Nation of Indians v. New York*, 383 F.3d 45, 47-49 (2d Cir. 2004) (noting that the trial court did not abuse its discretion when it dismissed an action against the State of New York, even though plaintiffs were left without a remedy); *Enterprise Mgmt. Consultants v. United States*, 883 F.2d 890, 894 (10th Cir. 1989).

Not only do Rules 19 and 23 serve similar purposes, but Rule 23(a)(1) continues where Rule 19 ends and provides that a party may file a class action where the "class is so numerous that joinder of all members is impracticable . . . ." Fed. R. Civ. P. 23(a)(1). Accordingly, the analysis of the impact of tribal sovereign immunity on the inclusion of class members under Rule 23 should be the same as for the joinder of a necessary and indispensable party under Rule 19. Thus, just as courts will dismiss claims where plaintiffs fail to obtain express waivers of immunity from sovereign entities in the context of joinder pursuant to Rule 19, Plaintiffs are not

allowed to infringe upon the sovereign powers of Indian tribes by including tribes as class

members unless the tribes have expressly waived their sovereign immunity.  *See Santa Clara*

*Pueblo*, 436 U.S. at 58.

Plaintiffs' failure to obtain express waivers of sovereign immunity for each tribe

comprising the purported class is analogous to the failure of the Caddo Tribe, while pursuing a

cross-claim against the government in *Wichita*, 788 F.2d at 772-73, to obtain a waiver of

sovereign immunity from the Wichita tribe, which was deemed a necessary and indispensable

party pursuant to Federal Rule of Civil Procedure 19.  According to the U.S. Court of Appeals

for the District of Columbia, Wichita did not voluntarily become a party to Caddo's cross-claim

and could not have been made a party against its will.  *See Wichita*, 788 F.2d at 774; *see also In*

*re U.S.A. ex rel. Hall*, 825 F. Supp. 1422, 1428 (D. Minn. 1993) ("However, the absent tribes

cannot be involuntarily joined because they enjoy sovereign immunity from suit.") (citing *Santa*

*Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)).  The D.C. Circuit concluded that the

Wichitas "were indispensable parties who could not be joined because of their tribal immunity,

which they never waived . . . ."  *Wichita*, 788 F.2d at 774.  Thus, the D.C. Circuit ruled that

Caddo's cross-claim should have been dismissed.  *See id.*; *see also* 788 F.2d at 771-72 ("[I]f the

tribe is an indispensable party, and cannot be joined due to its immunity, the claim may not

proceed.  Therefore, we must consider whether all the interested tribes in the case were actually

parties, and if not, whether they were indispensable so that the claims should not have proceeded

in their absence."); *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43

F.3d 1491, 1493 (D.C. Cir. 1995) (holding that the State of Kansas was an indispensable party

under Rule 19 and that the case should have been dismissed); *E.E.O.C. v. Peabody Western Coal*

15

*Co.*, 400 F.3d 774, 781 (9th Cir. 2005) ("In many cases in which we have found that an Indian tribe is an indispensable party, tribal sovereign immunity has required dismissal of the case."); *Quileute Indian Tribe v. Lujan*, 1992 WL 605423, *1 (W.D. Wash. Aug. 28, 1992) (noting that, if a court determines that it is not feasible to join an indispensable party because the party is immune to suit, it must dismiss the lawsuit).

### D.    MERELY PROVIDING A SOVEREIGN TRIBE AN OPPORTUNITY TO OPT-OUT OF A CLASS DOES NOT PROVIDE THE REQUISITE EXPRESS WAIVER OF SOVEREIGN IMMUNITY TO MAKE A CLASS CERTIFICATION PROPER

Plaintiffs know that Congress has not limited the purported tribal class members' sovereign immunity and that the tribes have not expressly waived their immunity for purposes of this lawsuit. Accordingly, Plaintiffs recognize, as they must, that a class action would impinge on the putative tribal class members' sovereign immunity. They seek to avoid the issue by requesting that the Court certify an opt-out class. *See* Pls. Brief at 26 ("[B]ecause the putative class members are sovereign tribes, the Rule 23(d)(2) discretionary notice and opt-out procedures should be available to the class certified under Rule 23(b)(2)."); 44 ("In this case notice and opt-out should be made available to putative class members because they are sovereign tribes. . . . This sovereignty compels opt-out rights so that tribes can choose to have their claims addressed outside the context of this litigation."); 46 ("The opt-out request is based on recognition of and respect for tribal sovereignty."). However, an option to opt out is not the legal equivalent of an express waiver, or a clear and unequivocal waiver. *See*, *e.g.*, *Watters v. Washington Metro. Area Transit Auth.*, 295 F.3d 36, 40 (D.C. Cir. 2002) ("We may find a waiver of sovereign immunity 'only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable

16

construction.'") (citations omitted); *World Wide Minerals*, 296 F.3d at 1162 ("A foreign

sovereign will not be found to have waived its immunity unless it has clearly and unambiguously

done so." (citing *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1292

(11th Cir.1999) ("An express waiver under section 1605(a)(1) must give a clear, complete,

unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity."

(internal quotation marks omitted)).   An opt-out class, as suggested by Plaintiffs, simply is not a

substitute for an express waiver of the tribal sovereign immunity at stake here, and class

certification is therefore improper.  *See supra*, Section II.B.3.


II.    **PLAINTIFFS HAVE NOT SHOWN THAT CLASS CERTIFICATION IS
       APPROPRIATE UNDER FEDERAL RULE CIVIL PROCEDURE RULE 23**

       Rule 23 of the Federal Rules of Civil Procedure permits individual litigants to file suit on

behalf of a class.  *Williams v. Glickman*, 1997 WL 33772612 at * 8 (D.D.C. Feb. 4, 1997).  As

noted above, a "primary purpose [of Rule 23] is to promote judicial economy and efficiency by

avoiding multiple adjudications of the same issues."  5 Moore's Federal Practice § 23.02

(Matthew Bender 3d ed.).  To obtain class certification, "[a] putative class representative must

satisfy the four prerequisites of Rule 23(a): (1) that the class is so numerous that joinder of all

members is impracticable; (2) that there are questions of law or fact common to the class; (3) that

the claims or defenses of the representative parties are typical of the claims or defenses of the

class; and (4) that the representative parties will fairly and adequately protect the interests of the

class."  *Taylor v. D.C. Water and Sewer Auth.*, 241 F.R.D. 33, 36 (D.D.C. 2007).  The

representative has to also show that the case "falls into one of the three categories of class

actions described in Rule 23(b)."  *In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002) *accord*

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-616 (1997).  The burden of establishing that

the Rule 23 requirements have been satisfied falls to the moving party, *Does I through III v.*

*D.C.,* 2006 WL 2864483, *1 (D.D.C. Oct. 5, 2006), and the court must undertake a "rigorous

analysis" to determine if this burden has been met.  *Chang v. U.S.,* 217 F.R.D. 262, 268 (D.D.C.

2003) (citations omitted).  In so doing, the "court may consider matters beyond the pleadings to

ascertain whether the asserted claims or defenses are susceptible of resolution on a class wide

basis." *Does I through III v. D.C.,* 2006 WL 2864483 at *1.

> **A.   PLAINTIFFS CANNOT SHOW THAT THIS ACTION IS MAINTAINABLE UNDER RULE 23(a).**
>
> > ***1.   Plaintiffs Have Failed to Establish That the Proposed Class Satisfies the Numerosity Requirement***

The first threshold issue that Plaintiffs have to overcome with respect to class

certification is that the putative class be so large that joinder of all class members would be

impracticable.  *See* Fed. R. Civ. P. 23(a)(1); *Rodriguez v. Department of the Treasury*, 108

F.R.D. 360, 362 (D.D.C. 1985) ("The first requirement, that the class be so numerous that joinder

of all members would be impracticable, is the requirement that plaintiff most clearly fails to

satisfy. . . .  Practicability of joinder is the crucial factor, and this depends on the size of the class

and the ease of identifying its members.") (citation omitted).  The courts have not set a specific

number of class members to be surpassed to satisfy the numerosity requirement.  *See Does I*

*through III v. District of Columbia*, 232 F.R.D. 18, 25-26 (D.D.C. 2005); *Rodriguez*, 108 F.R.D.

at 362 ("There are no arbitrary rules concerning how many members a class must have to satisfy

this requirement. ").  Instead, each certification analysis turns on the circumstances of the case.

See id.  Nevertheless, "conjecture alone is not sufficient to establish numerosity . . . ." *Does I*

18

*through III*, 232 F.R.D. at 25-26; *Rodriguez*, 108 F.R.D. at 362 ("But beyond the bare assertions

of counsel on this point, plaintiff has submitted only a very general affidavit . . . .  The affidavit

is conclusory and ambiguous."); *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1456 (D.C.

Cir. 1988) ("Finally, the district court correctly refused to consider hypothetical future

employees for purposes of numerosity analysis.").

Plaintiffs claim that the purported class would encompass some 220 sovereign tribes.  As

shown above, *see supra* Section I.B, at least four tribes have already advised Plaintiffs that they,

as sovereign tribes, refuse to be part of the class here.  Similarly, as also noted above, the

President of the ATNI, a group representing over 50 tribes, have seemingly expressed opposition

or resistance, in a letter to Plaintiffs' counsel that the ATNI tribes thought that a class action

lawsuit purporting to represent hundreds of Indian tribes runs counter to the principle that Indian

tribes, as sovereign governments, should decide "who, or what entity, will represent their

interests in litigation."  Letter from Ernest Stensgar, President, Affiliated Tribes of Northwest

Indians to John E. Echohawk, Executive Director, NARF,

http://www.itmatrustfunds.org/MainPages/Trust_Legislation%20%20Litigation%20.htm#Tribal

_Trust_Fund_Cases_ (December 20, 2006).  In short, while Plaintiffs may speculate that their

class will consist of over 200 class members, a class here may in reality comprise a much smaller

number.  *See Rodriguez*, 108 F.R.D. at 362 (ruling that class certification was improper because

the plaintiff had failed to satisfy the numerosity requirement, that the plaintiff's assertions "that

the class may have over one thousand members" were based solely on "bare assertions of

counsel" and "a very general affidavit" that was "conclusory and ambiguous," and that the class

would likely consist of a much smaller number.)

19

In addition to the number of class members, Plaintiffs have to satisfy other factors that are relevant in determining the impracticability of joining all members. *See* 1 H. Newburg, Class Actions § 1105 (1977) (noting that, in determining the practicability of joinder, courts have considered, in addition to size of the class, the ability of individual claimants to institute separate suits and the type of relief sought.). For example, courts look at whether class action would promote judicial economy because it prevents a large number of plaintiffs from filing multiple actions. *See International Union v. Clark*, 2006 WL 2687005, *1, *5 (D.D.C. Sept. 12, 2006) ("[Rule 23(a)(1)] gives courts discretion to decide whether using the class action mechanism would serve the interests of judicial economy and efficiency.") (citation omitted). As explained above, the tribes here are sovereign entities, and Plaintiffs have not shown that they have obtained express waivers from each purported class member tribe to allow this Court to exercise jurisdiction over the tribes. Thus, it is not clear that any of the unnamed class member tribes would be bound by a class action. Also, Plaintiffs have not established that any of the purported class member tribes would forego filing individual actions at a later stage if the Tribes were dissatisfied with the final outcome of this case. Thus, Plaintiffs have not shown that a class action would promote judicial economy and would in fact run counter to a fundamental principal of government-tribal relations.

Courts also look to the financial resources of the class members. *See DL v. District of Columbia*, 237 F.R.D. 319, 321 (D.D.C. 2006). As is evident by the large number of lawsuits filed by a variety of tribes against Defendants in different courts, Plaintiffs have not shown that the sovereign tribes which Plaintiffs seek to represent do not have the financial wherewithal to pursue their own claims against the government. Moreover, to the extent Plaintiffs were able to

20

show financial hardship on the part of some tribes, those tribes could seek assistance from a variety of legal foundations and other sources of legal representation, including Plaintiffs' counsel here.  In fact, tribes can even seek funding from the Department of Interior for certain litigation expenses.  *See* 25 C.F.R. § 89.41 (allowing the Assistant Secretary-Indian Affairs to authorize payment to a tribe for private attorney's fees to bring a court action to protect its trust resources).  Similarly, tribes could decide to waiver their sovereign immunity and move to join in other tribes' lawsuits that better represent their particular factual and/or legal situations. Plaintiffs have failed to satisfy its burden to show that numerosity weighs in favor of class certification.

> ### 2.      *Plaintiffs Have Not Shown There are Questions of Law or Fact Common to the Proposed Class*

The commonality requirement of Rule 23(a)(2) states that there must be "questions of law or fact common to the class."  *Johnson v. D.C.,* 248 F.R.D. 46, 53 (D.D.C. 2008) (*quoting* Fed. R. Civ. P. 23(a)(2)).  This requirement "serves the dual purposes of promoting: (1) fair and adequate representation of the interests of absentee class members; and (2) practical and efficient case management."  5 Moore's Federal Practice § 23.23[1] (Matthew Bender 3d ed.).  As with numerosity, "the primary concern in assessing the commonality and typicality requirements of Rule 23(a) is to ensure that maintenance of a class action is economical and that the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Chang v. U.S.,* 217 F.R.D. 262, 269 (D.D.C. 2003) (citations and internal quotations omitted).  Here, Plaintiffs contend that there are common questions of law as to whether Defendants have an accounting duty to trust account

holders, whether any such duty has been satisfied and whether and how the accounts must be

corrected.  *See* Pls. Brief at 49.

Defendants do not dispute that this and other tribal trust cases have raised an issue

generally as to what, if any, accounting duty Defendants owe to Tribes.  Whether that issue

applies evenly to each named Plaintiff and each putative class member is subject to further

adjudication.  The remaining issues of whether Defendants have met any accounting duty and

whether and how any accounts must be corrected (*i.e.*, whether Defendants are liable to

individual class members and whether any particular class member is entitled to damages)

comprise tribe specific inquiries.  Plaintiffs fail to acknowledge the scale and depth of the

individual analyses that will be required to answer these questions, painting their claims in the

broadest of strokes.  As set forth in the Declaration of Ross O. Swimmer, the Special Trustee for

American Indians, there are a litany of factors that must be considered to provide any historical

accountings.  *See Nez Perce, et. al v. Kempthorne,*  Dkt. 38 (Aug. 11, 2007) Swimmer Decl. at

¶¶ 22-26.  For example, each tribe has a potentially different date from which any historical

accounting should commence depending on such matters as (1) when the account was opened;

(2) the effect of the Indian Claims Commission Act; and (3) whether any tribal rights to an

accounting as to any specific tribal account have been extinguished through litigation.  *See id.*

Moreover, some tribes have only one account, while others have many accounts with revenues

derived from oil and gas development, grazing leases, and timber harvesting.  *See id.*  Likewise,

some tribes have never had any land held in trust, other tribes have had land and assets in trust

continuously, and others yet have land based assets which are not now or, at various times have

not been, under trust government management, but, instead, are, or have been, under the control

of, and are entirely managed by, the tribes themselves. *See id.* As stated in the Declaration of

Richard P. Fielitz, JR., the Chief of Staff of the Office of the Special Trustee for American

Indians (the "Fielitz Decl."):

> Tribal trust holdings are vastly different not only in how they are
> invested, but also in the nature of cash flows, balances held, and
> requirements that must be met per the governing trust document
> (e.g., public law, statutory restriction, judgment ruling, settlement
> agreement). … Each tribe has a unique combination of tribal trust
> accounts that require specific management decisions in order to
> properly receipt, invest and disburse funds. Not only does the
> accounting work for each type of trust account vary widely, but the
> investment strategy is vastly different based on the type of account
> as well as the associated needs of the tribe (at least, as those needs
> are made known to Interior from time to time by a tribe).

*See* Fielitz Decl. at ¶ 4.

    While the foregoing partial list undoubtedly illustrates the uniqueness of many of the

tribal trust funds and the enormity of the undertaking needed to determine any accounting

liability and damages for each tribe, there is more for this court to consider. As set forth in the

declaration of Gregory J. Chavarria, from an accounting perspective, the day-to-day trust fund

operations during the TRP period, including collection processing, budgeting, and disbursement

processing, occurred at 87 Agency offices and 12 Regional offices of the Bureau of Indian

Affairs ("BIA") that are dispersed throughout the United States. *See* Chavarria Decl. at ¶ 20-21,

26. Indeed, withdrawals from certain unrestricted Proceeds of Labor accounts were based on

each tribe's unique operational needs and revenue expectations reflected in tribal budgets

adopted by each individual tribal council. *Id.* at ¶ 26.

    The implications of these individual trust practices are clear: any accounting would have

to be made on an individual tribal basis and any determination of liability or damages could only

be achieved via individual trials. Surely, the class representatives would not have the knowledge

or ability needed to advance the individual account holder concerns during these trials. At the same time, the court would be overburdened with hundreds of lengthy and costly adjudications. Accordingly, because of the highly individualized trust management processes, there is not sufficient commonality among the class to enable this court to ensure "fair and adequate representation of the interests of absentee class members" and "practical and efficient case management," as is required for class certification. *Chang v. U.S.,* 217 F.R.D. 262, 269 (D.D.C. 2003).

### 3.    *Plaintiffs Have Not Carried Their Burden to Establish That Their Claims are Typical of Those of the Proposed Class*

The question of typicality requires a class representative to establish that its claims are typical of the proposed class. The commonality and typicality requirements of Rule 23(a) tend to merge. *See Marable v. Dist. Hosp. Partners, L.P.*, (D.D.C. 2006) (citing *General Tel. Co. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)). According to the D.C. Circuit, the purpose of the typicality requirement is to ensure that a class representative has "suffered injuries in the same general fashion as absent class members." *Id.* (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002)). Although courts have liberally construed this requirement to satisfy the typicality requirement, *see Disability Rights Council of Greater Washington v. Washington*, 2006 WL 3704656, *1, *17 (D.D.C. Dec. 14, 2006), a class representative must nevertheless show that "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Id.* (citing *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998)).

Plaintiffs claim that the typicality requirement is met because their claims "arise from the same acts of Congress and the same actions of Defendants." Pls. Brief at 37. In other words,

24

Plaintiffs claim they have not received a "full and complete accounting" spanning all time frames for the same reasons other class members have not received such an accounting. Plaintiffs simplistic view ignores the unique facts that this Court would need to apply in fashioning the relief sought here – a "full and complete" accounting for every class member for all time periods. Indian tribes, today and historically, maintain different relationships with Interior, and Interior provides different services to different tribes. *See* Declaration of Amy Dutschke at ¶ 2. (explaining that although the services are the same in principle; in practice, the scope and range of services provided are different). For example, the Court would need to consider the legal and factual implications of any previous accounting work (both the TRP and any accounting done pursuant to any ICC cases), along with the legal effect of any previous accounting cases and how the doctrines of collateral estoppel/res judicata apply to any claims here. Additionally, most of the named Plaintiffs are considered direct-pay; Interior does not collect monies on their behalf, and therefore, Interior should not have to "account" for any such monies received by the tribes.

Plaintiffs characterize the TRP reports received by the twelve named Plaintiffs as "typical" of the TRP reports "produced under the Project and representative of the tribal trust account transactions … examined." Plfs. Brief at 23. Plaintiffs then attempt to show uniformity based on the TRP reports received. *Id.* at 38 (citing to Declaration of Kevin W. Nunes). While certain standardized documentation policies, reporting, testing and reporting procedures made up the TRP, the content and substance of each report is still unique to each individual tribe. Declaration of Chavarria at ¶ 23-24 (discussing how standardized forms are common to the accounting field, but also discussing how the underlying resource or business entity inevitably results in a different product).

25

For example, the Yakama Tribe (a named Plaintiff) was one of only two (2) tribes subject to "Fill the Gap" testing.  *Id.* at ¶ 31.  Although the work performed for this tribe was significant, as it was one of five (5) pilot tribes selected for extensive work, this was the only tribe under the responsibility of the BIA Yakama Agency Office; hence, all of the accounting procedures, functions and documentation subject to the reconciliation procedures for Yakama were designed to address the specific concerns of this tribe as documented in a memorandum of understanding between Yakama and the BIA.  *Id.*  The Yakama Fill the Gap testing cannot be extrapolated to other tribes, meaning that the Fill the Gap work for Yakama is not typical of the rest of the class. Of the five Fill the Gap tribes, three of them (Hopi Tribe of Arizona, Confederated Salish and Kootenai Tribes of the Flathead Reservation and Three Affiliated Tribes of Fort Berthold Reservation) do not have pending accounting claims in the district courts.  *Id*. at Attach. B.

Likewise, there are significant differences in management and accounting needs and unique accounting requirements among tribes not represented by the twelve named Plaintiffs. *See* Declaration of Gregory J. Chavarria at ¶ 4 (basing his opinion on review of the data and transactions underlying the 222 TRP's for the putative class members).  For example, each tribal is managed individually by Interior and accounting considerations are unique to each tribe based on the resources and operational needs of the individual tribes.  *Id*.; Declaration of Feilitz at ¶ 4. From an accounting perspective the resources, collection processing, budgeting and disbursement processing for these accounts occur at the Agency and Regional Offices of the BIA.[5]  Declaration of Chavarria at ¶ 20.  These Agencies and Regional Offices are separate

---

5 There were approximately 87 Agency Offices and 12 Regional Offices responsible for managing and accounting for tribes' trust funds during the time period of July 1972 through September 1992; the period covered by the TRP. Declaration of Chavarria at ¶ 21.  Only 12 Agency Offices and 7 Regional Offices are represented by the twelve named plaintiff tribes in this case. *Id.*

accounting and management locations designed to address the needs of the tribes and individual

accountholders for which they are responsible.  *Id.*  Agency and Regional Offices are spread

geographically and are in relatively close proximity to the tribes they serve.  *Id.*  While one

Agency Office may exclusively serve a tribe whose primary resource is timber, another Agency

Office may serve a tribe whose primary source of revenue is coal, making the operations of each

substantially different.  *Id.*

     Moreover, Plaintiffs attempts to show that the account types and underlying trusts of the

twelve named Plaintiffs are typical of other class members fails.  Pls. Brief at n. 21.  Tribal trust

holdings are vastly different not only in how they are invested,[6] but also in the nature of cash

flows, balances held, and requirements that must be met per the governing trust document (e.g.,

public law, statutory restriction, judgment ruling and/or settlement agreement).  Declaration of

Fielitz at ¶ 4.  For instance, Proceeds of Labor accounts are generally unrestricted flow-through

accounts that are used for various tribal projects and/or individual member per capita distribution

purposes, whereas Judgment Accounts must follow the distribution requirements of the

applicable court ruling, statute, agreement or other governing document.  *Id.* Water Rights

accounts generally are for funding certain water-related projects as stipulated by the settlement

agreement.  *Id.*  Escrow and Economic Recovery accounts may also be governed (along with

Judgment and Water Rights accounts) by certain statutory requirements regulating the amount of

disbursements, e.g., whether those disbursements come from the principal portfolio and/or

---

6 The investment objectives of each tribal account are individually determined. Declaration of Fielitz at ¶ 7. OST attempts to determine tribal investment needs and objectives in consultation with each tribe.  *Id.* Account investment objectives are based upon applicable requirements and restrictions; information provided by the tribe on the use, timing and possible future distribution of the funds; tribal budget data, if available; the integration of tribal trust assets into the overall asset allocation of the tribe; and historical account activity.  *Id.*

27

income portfolio, and precisely in what manner the disbursements may be used.  *Id.*  Many tribes have Proceeds of Labor accounts, but some do not.  *Id.*  Most tribes have Judgment accounts, but some do not.  *Id.*  Some tribes have Escrow or Forestry accounts, but many do not.  *Id.*  Some tribes have Infrastructure Development and Economic Recovery funds, but most do not.  *Id.*

Each tribe has a unique combination of tribal trust accounts that require specific management decisions in order to properly receive, invest and disburse funds.  *Id.*  Not only does the accounting work for each type of trust account vary widely, but the investment strategy is vastly different based on the type of account as well as the associated needs of the tribe (at least, as those needs are made known to Interior from time to time by a tribe). *Id.*  Plaintiffs opening brief (and declarations) only discuss Proceeds of Labor and Judgment accounts.  *See generally* Pls. Brief and accompanying declarations.  Clearly, Plaintiffs have not shown they cover all typical accounts for all time periods.

As discussed in Defendants' Motion to Dismiss on Jurisdictional Grounds, Dkt. 59, at 51-57, the Indian Claims Commission Act is a jurisdictional bar, and thus, Interior does not have any accounting duty, at a minimum, before 1946.   In 1946, Congress established the ICC to settle all tribal claims against the Government which existed prior to August 13, 1946.  *See* Indian Claims Commission Act of 1946 § 12, 60 Stat. 1049.  Tribes were given until August 13, 1951 to file claims before the Commission or they were deemed to have waived their historic claims.  *Id.*  Congress included claims against the United States for accountings as well as mismanagement of tribal trust funds within the jurisdiction of the ICC.  *Id*. § 2.  For purposes of class certification, the impact and collateral estoppel of any previous accounting adjudications, including those before the ICC, defeats Plaintiffs' claim of similar injury.  For example, the Nez

28

Perce tribe brought a general accounting action against the United States for both pre-1951 and later claims. *Nez Perce Tribe of Idaho v. United States*, 586 F.2d 192, 196 (1978). The Nez Perce accounting case settled in 1981, *Nez Perce of Idaho v. United States*, 228 Ct.Cl. 924 (1981). Surely, any accounting claim the Nez Perce can currently pursue is limited by their recovery up and through 1981. Regardless, this is yet another issue the Court will need to decide in order to dispose of just the named Plaintiffs' claims (not to mention the putative class), and weighs in favor of not certifying a class.

Moreover, most of the named Plaintiffs have contracted or compacted some, if not all, of their income-generating activities, meaning that the tribe directly collects the funds and the monies do not go through Interior. *See* declarations. As this Court has held, "[d]irect payments, by definition, are never "held" in trust," and therefore Interior should not have to account for such payments. *Cobell v. Kempthorne*, 532 F. Supp.2d 37, 77 (2008) (Cobell XX). As set forth in some of the declarations, the named Plaintiff Tribes took over the different programs at different times. *See* Declaration of Dutschke at ¶ 2-3. The results of any new accounting or remedy ordered by this Court would contain a different stop date for each tribe, i.e., the date the program became direct-pay.[7]

Plaintiffs also attempt to characterize Defendants' Motion for Remand as somehow showing that tribal trust fund accounts are treated uniformly. Pls. Brief at 37-38. Plaintiffs leave out the most important part of the basis behind the Remand motion though – that Interior, as the administrative agency, is the best entity to decide and take into account the unique attributes of

---

[7] Another issue the Court will need to consider, specific to the Klamath Tribe, is the effect of the Klamath Termination Act on liability and any remedy. Congress ended the trust relationship with the Klamath Tribe from 1954 to 1986. *Compare* 25 U.S.C. § 564q (1954) (declaring the trust relationship between the United States and the Klamath Tribe to have ended) with 25 U.S.C. § 566 (restoring Federal recognition of the Klamath tribe); Declaration

tribes and their accounts, and having Interior set forth a plan reduces the potential for conflicts. *See* Memorandum in Support of Defendants' Motion for Remand and Stay of Litigation, Dkt. No. 38 (August 11, 2007) at 2, 16-19.

In short, it's clear that "[t]he instant case, if allowed to proceed as a class action, would quickly devolve into hundreds or perhaps thousands of individual inquires about each claimant's particular circumstances." *Garcia v. Veneman*, 211 F.R.D. 15, 24 (D.D.C. 2002). And that, even if liability were established, "individual issues would be much more important to any claimant's recovery." *Id.* Plaintiffs have not met their burden under the typicality prong for Rule 23 class certification; hence, the Court must deny class certification.

### 4. *Plaintiffs Have a Conflict of Interest with the Putative Class Members, and Therefore They Cannot Adequately Represent the Proposed Class*

Rule 23(a)(4) requires that the representative party must fairly and adequately represent the interests of the class. There are two aspects of adequate representation, namely that of the named class representative and that of class counsel. *See Pueblo of Zuni v. United States*, 243 F.R.D. 436, 449 (D.N.M. 2007) (holding that tribal plaintiffs could not meet the adequacy of representation prong as had different financial interests). Courts generally will find adequacy of representation where the named plaintiffs have no antagonistic or conflicting interests with those of the class and where class counsel is qualified, experienced and able to conduct the proposed litigation. *See id.* Adequacy of representation is unique in that it has a constitutional dimension, "since it would violate due process to bind a class member to a ruling against inadequate class

---

of Stanley Speaks at ¶ 3.

representation." *Id.* (quoting *Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 183 F.R.D. 687, 694 (D.Colo. 1998)).

Defendants do not challenge the legal competency of Plaintiffs' counsel.  Defendants disagree, however, with Plaintiffs' characterization that the named Plaintiffs have no conflicts of interest with the putative class.  Plaintiffs claim that "the overriding interests of the named Plaintiffs and the interests of putative class in this action are the same; both seek to prove the existence and scope of Defendants' fiduciary accounting duties, whether those duties have been met by the AA reports or otherwise, and if they have not been met then what standards govern Defendants' fiduciary accounting or accounting-alternative duties; and whether and how generally the trust fund accounts of Plaintiffs must be corrected."  Pls. Brief at 40.  As set forth below, there are known conflicts of interest between some of the named Plaintiffs and the putative class members.  Additionally, because of the broad relief Plaintiffs seek – adjustments to account balances and injunctive relief – Defendants believe there are other potential conflicts of interest that could arise between the named Plaintiffs and the putative class members.  As such, Plaintiffs have failed to meet their burden of showing adequate representation.

Tribes routinely disagree about which tribe is entitled to distribution of a trust fund or how a particular fund should be distributed.  For example, the Yurok Tribe (a named Plaintiff) and the Hoopa Valley Tribe (a putative class member, as it has not filed a case in the District Court seeking a trust accounting)[8] both claim the right to distribution of the same settlement

---

8 Hoopa has a pending trust accounting and trust mismanagement case in the Court of Federal Claims (CFC), *see Hoopa Valley Tribe v. United States,* Civ. No. 06-cv-00908-LMB.  Clearly, the Hoopa Valley Tribe was obviously aware of its rights and could have filed an action in District Court if it had wanted.  Instead, as an exercise of its sovereignty, it chose to only file in the CFC.  Importantly, for our purposes of class certification here, the Hoopa is not represented by NARF and any accounting it would receive in aid of judgment from the CFC could conflict with any relief ordered by this Court.

fund. *See Hoopa Valley Tribe v. United States*, Civil No. 08-CV-72 (CFC Feb. 1, 2008); *see also* Declaration of Amy L. Dutschke at ¶ 5. The Yurok/Hoopa dispute has been ongoing for many years. *See Hoopa Valley Tribe v. Special Trustee for American Indians*, 44 IBIA 210, 2007 WL 1456035 (March 27, 2007); *Hoopa Valley Tribe v. Special Trustee for American Indians*, 44 IBIA 247, 2007 WL 1724010 (April 20, 2007). This is a known conflict of interest directly related to a trust fund, which would presumably be part of any accounting relief ordered by this Court; in short, the Yurok simply cannot represent the Hoopa. Another example, of a known conflict of interest, is the distribution of the Black Hills judgment fund. Since 1980, this fund has not been distributed as most of the beneficiaries have refused to accept the judgment award. *See* Declaration of Ernest Pourier at ¶ 4; *see also* Declaration of Feilitz at ¶ 9. The Santee Sioux Nation (a named Plaintiff), however, has requested that the funds be distributed. *Id.* Of the other beneficiaries of the Black Hills Fund, the Flandreau Santee Sioux Nation has not filed an accounting action in District Court and would therefore be part of this class. *Compare* Declaration of Feilitz at ¶ 9 *with* Declaration of Chavarria, Attach. B.

Additionally, Plaintiffs' proposed class definition is overly broad, *see* Pls. Brief at 46 ("Plaintiffs do not seek to include those tribes that have filed their own separate actions in *federal district court* for full and complete accountings") (emphasis added), and would have this Court certify a class that would include those sovereign tribes who have chosen, or may choose, to file actions in the Court of Federal Claims but not in a district court.[9] Such a certification by this Court creates potential conflict of interests, especially as NARF does not represent any of

---

9 As explained by Plaintiffs, Plfs Brief at n. 14, twenty-two sovereign nations decided to only file in the Court of Federal Claims.

those tribes in the CFC.  *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678-679 (S.D. Ohio

1995) (noting a conflict of interest in case in which named plaintiffs were bringing state court

action that was parallel to class action because parallel action posed potential conflict with

respect to settlement and dismissal decisions and may have removed incentive for plaintiffs to

investigate class claims diligently).

      Since the TRP, Interior has been working with tribes regarding any concerns about their

account balances.  For example, in 2004, Interior began to consult with tribes on the

development of regulations intended to establish an administrative agency process for resolving

trust account holders' questions or concerns about their trust funds accountings.  *See*

Declaration of Ross Swimmer (in favor of Remand Motion) at ¶ 19.  Additionally, in 2003,

Interior approached the Inter-tribal Monitoring Association on Indian Trust Funds ("ITMA") to

work on a cooperative undertaking to resolve tribal-related claims.  *See Confederated Tribes of*

*the Colville Reservation v. Kempthorne*, Civ. No. 05-cv-2471, Dkt. 39 (D.D.C.  July 7, 2008),

Joint Status Report at 1-3 (discussing the project).  The ITMA project involves seven "pilot"

tribes working to negotiate a methodology.  *Id.*  Of those seven, three (Sac and Fox, Yakama and

Nez Perce) are named Plaintiffs here.  After five years, only three of the seven pilot tribes have

agreed to the methodology.  *Id.* at 3-4.  In short, as of today's date, Interior and the tribes have

not been able to reach agreement about what further accounting methods would be necessary for

all tribes to accept their account balances in full.   For this reason, it's hard to see how class

certification is the appropriate mechanism by which such decisions should be made.  *See also*

*Confederated Tribes of the Colville Reservation v. Kempthorne*, Civ. No. 05-cv-2471, Dkt. 30,

(D.D.C. Oct. 22, 2007) Plaintiff's Supplemental Memorandum in Opposition to Defendants'

Motion for Remand and Stay of Litigation at 3-4 (arguing in favor of a collaborative effort by tribes and Interior as the best approach for resolving tribes concerns).

Moreover, following presentment of the TRP to the tribes, the Trust Reform Act, 25 U.S.C. § 4044, required Interior to obtain attestations as to whether the tribes agreed or disagreed with their account balances, as set forth in the TRP's. Some tribes returned affirmative attestations, others disputed the TRP account balances, some asked for more time to respond and other did not return the attestation. Thus, if this Court were to reach the question of whether the TRP constitute accountings – which Plaintiffs believe is an issue for this Court to decide, *see* Pls. Brief at 25 (stating "the threshold merits question raised in this action is whether these reports by AA and Defendants constitute the full and complete accountings required by law) – the Court would need to decide what legal impact the TRP attestations have on whether a tribe accepted or disputed its account balance as of that report. With regard to the named Plaintiffs, the Sac and Fox, Tlingit-Haida, Klamath, Yurok, Tule River and Cheyenne-Arapaho disputed their account balances. Declaration of Richard P. Fielitz, Jr. at ¶ 8. Three tribes (Hualapai, Pawnee Nation of Oklahoma and the Santee Sioux of Nebraska) requested additional time to consider the matter and three tribes (Nez Perce, Mescalero Apache and Yakima) chose to not respond. *Id.* Importantly, none of the twelve named Plaintiffs in this action were among the tribes who returned attestations accepting their balances. As no named plaintiff accepted their account balance in their TRP attestations, they cannot represent those putative class members who did.

## B.    PLAINTIFFS CANNOT SHOW THAT THIS ACTION IS MAINTAINABLE UNDER RULE 23(b).

In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Prods., Inc.*

*v. Windsor,* 521 U.S. 591, 614 (1997).  Although Plaintiffs move for certification under Rule

23(b)(2), they also rely on the fallback positions that this matter can also be certified under

23(b)(1) or 23(b)(3).  As addressed below, Plaintiffs fall woefully short of meeting the demands

of any of these three subsections.

### 1.    *Because Plaintiffs Are Predominantly Seeking Monetary Relief, They Are Not Entitled to Class Status under Rule 23(b)(2)*

Recognizing that class status is only achievable through satisfaction of a Rule 23(b)

subdivision, Plaintiffs attempt to shoehorn what are in effect monetary claims into a Rule

23(b)(2) class action by alleging that they are primarily seeking declaratory and injunctive relief.

*See* Pls. Brief at 25.  While Rule 23(b)(2) does permit certification in actions for final

injunctions or corresponding declaratory relief that is applicable to the entire class, *Thomas v.

Albright*, 139 F.3d 227, 233 (D.C. Cir. 1998), 23(b)(2) treatment "does not extend to cases in

which the appropriate final relief relates exclusively or predominantly to money damages."  Fed.

R. Civ. P. 23(b)(2) advisory committee notes; *Richards v. Delta Air Lines, Inc.,* 453 F.3d 525,

530-531 (D.C. Cir. 2006) (hereinafter *Delta Air); In re Veneman,* 309 F.3d 789, 792 (D.C. Cir.

2002)*; Thomas v. Albright*, 139 F.3d at 233; *Garcia v. Veneman,* 211 F.R.D. 15, 22-23 (D.D.C.

2002).  Because, as explained below, Plaintiffs' monetary claims predominate over all other

claims, certification is unavailable to them under 23(b)(2).[10]

At their core, Plaintiffs' declaratory and injunctive relief claims are nothing more than a

---

[10] Defendants are cognizant of the split among circuit courts on the method courts should employ to determine whether monetary relief predominates in a Rule 23(b)(2) case.  The D.C. Circuit has not ruled squarely on this issue.  *See Eubanks v. Billington,* 110 F.3d 87 (D.C. Cir. 1997); *Delta Air,* 453 F.3d at 531, FN 8.  This however is of no consequence, because, under any applicable test, the result will be the same: that the Plaintiffs are predominantly seeking monetary damages over any type of declaratory or injunctive relief.  *See Garcia v. Veneman,* 211 F.R.D. 15, 23 (D.D.C. 2002) (Robertson, J.) (The outcome of the debate on measuring

thinly veiled attempt to obtain a money judgment. (*See* Memorandum in Support of Dismissal Motion at 38-50.) Indeed, the very first paragraph of Plaintiffs' Amended Complaint confirms that Plaintiffs are ultimately looking to "make [their trust] accounts whole." Likewise, paragraph nine of Plaintiffs' Prayer For Relief states that "Plaintiffs pray...[f]or a mandatory injunction compelling Defendants to correct Plaintiffs' trust fund account balances [sic] make the accounts whole as if there had been no breaches of trust, negligence, or wrongdoing by Defendants,..." This recurring theme is pervasive throughout the Amended Complaint. *See* Amended Compl. at ¶¶ 63, 80, 86. Perhaps most tellingly, the final paragraphs in two of Plaintiffs' three asserted causes of action allege that "[p]laintiffs are entitled to mandatory injunctive relief <u>compelling Defendants to correct Plaintiffs' trust fund account balances</u> in accordance with the standards for full and complete accountings, <u>and to make their accounts whole</u>." *Id.* at ¶¶ 80, 86 (emphasis added). Plaintiffs' moving papers are no different. Despite their painstaking effort to avoid such words as "damages" and "monetary relief", Plaintiffs repeatedly ask this court for an injunction to "correct the balances" of the trust accounts. *See* Pls. Brief at 26, 48. Utilizing an injunction for such purposes has been expressly prohibited in this jurisdiction in the Rule 23(b)(2) context. *Delta Air,* 453 F.3d at 531 ("[T]he rule has long been that '[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money.'") (citations omitted). Courts throughout the country have routinely denied class certification under similar circumstances.[11]

---

predominance "would not affect the instant case, because in this case the monetary relief plaintiffs seek predominates under any applicable test.").

[11] The cases denying 23(b)(2) certification, where, as here, plaintiffs seek money damages under the guise of injunctive or declaratory relief are legion. *See, e.g., In re School Asbestos Litig.,* 789 F.2d 996, 999-1000 (3d Cir. 1986) (district court properly denied (b)(2) certification in action seeking restitution for expenses already

The D.C. Circuit's July 2006 decision in *Delta Air* is instructive on this point. In that action, the plaintiff sought declaratory and injunctive relief to deem the defendant airline in violation of the law for the manner in which it calculated its own liability for damaged baggage and to force it to recalculate (and then pay) the amount it owed passengers. *Delta Air,* 453 F.3d at 530. The Circuit Court affirmed the lower court's denial of 23(b)(2) certification because, "[t]hough framed in terms of declaratory and injunctive relief, [the] class claim [was] for monetary damages." *Id.* The case at bar is no different. Here, as in *Delta Air*, Plaintiffs are seeking to "make their accounts whole" through a monetary award under the auspices of declaratory and injunctive relief. This reality defeats the applicability of Rule 23(b)(2) to Plaintiffs' claims.[12] *Id.* at 530 ("thus, when the relief sought would simply serve as a foundation for a damages award, or when the requested injunctive or declaratory relief merely attempts to reframe a damages claim, the class may not be certified pursuant to Rule 23(b)(2)") (internal citations omitted); *In re Veneman,* 309 F.3d at 792 (23(b)(2) (ruling that certification is not

---

incurred because "despite the ingenuity of plaintiffs' claims for limited equitable remedies, this case remains at bottom, one for legal damages."); *Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 978 (5th Cir. 2000) (23(b)(2) certification denied where declaratory relief would only serve as a foundation for money damages); *Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594, 595-596 (4th Cir. 1976) (plaintiffs were not entitled to 23(b)(2) class treatment where it was obvious that they were seeking monetary relief and their request for equitable remedies was "simply [ ] a predicate" for a monetary judgment).

[12] Plaintiffs state at FN 24 that "to the extent there is any question about the nature or predominance of the relief sought," this court should certify a hybrid class under 23(b)(2) and 23(b)(3). First, a hybrid certification is unavailable because, as set forth below, Plaintiffs cannot satisfy the requirements of 23(b)(3). *See Garcia v. Veneman,* 211 F.R.D. at 24-25 (hybrid certification inappropriate where 23(b)(3) not satisfied). Second, Plaintiffs have not demonstrated entitlement to a hybrid class action under the directives established in *Eubanks v. Billington,* 110 F.3d 87 (D.C. Cir. 1997) and its progeny. In any event, hybrid certifications are generally reserved for matters where the court certifies claims for declaratory and injunctive relief under 23(b)(2) and also certifies claims for money damages under 23(b)(3). Plaintiffs' request for a hybrid certification further demonstrates that Plaintiffs are seeking monetary relief, despite their representations to the contrary. Plaintiffs also suggest at FN 24 that the court should provisionally certify this case under 23(b)(2) on liability grounds, ignore the predominance issue, and then "reconsider the class certification category at a later stage". This approach has been seriously questioned by the Court of Appeals in *In re Veneman,* 309 F.3d 789, 795 (D.C. Cir. 2002) and flatly rejected by this Court in *Love v. Veneman,* 224 F.R.D. 240, 245 (D.D.C. 2004) (Robertson, J.).

proper where the appropriate final relief relates exclusively or predominately to money damages); *accord Garcia v. Veneman,* 211 F.R.D at 22-23; *Williams v. Glickman*, 1997 WL 33772612, at *9 (D.D.C. 1997).

To the extent that Plaintiffs' injunctive or declaratory relief claims are something more than a clever pretense to a damages claim, 23(b)(2) certification would still be prohibited, because, under any scenario, the injunctive and declaratory relief claims are still secondary to Plaintiffs' ultimate monetary goals. *See Williams v. Glickman*, 1997 WL 33772612, at *9 (D.D.C. 1997) *relying upon Christina v. Del. Mort. Bankrs. Ass'n,* 136 F.R.D. 372, 381-82 (D. Del. 1991) ("[W]hen the realities of the litigation demonstrate that the suit has been brought primarily for money damages, it may not be maintained as a (b)(2) class action, even if injunctive relief may be appropriate at some point during the litigation.") (internal quotations omitted); 15 Moore's Federal Practice § 23.43[3][b] (Matthew Bender 3d ed.) ("It is not sufficient that injunctive or corresponding declaratory relief be among the remedies sought by the parties. In most cases, class certification under Rule 23(b)(2) is improper if the primary relief sought by the action is monetary damages.").

### 2.    *Plaintiffs' Claims Are Not "Generally Applicable To The Class"*

Even if this Court finds that Plaintiffs' monetary claims do not predominate, certification under 23(b)(2) would still be improper. As set forth above, 23(b)(2) certification is only permitted where (1) the defendant's action or inaction is generally applicable to the class and (2) the plaintiffs seek final injunctive relief or corresponding declaratory relief. *See, e.g., Thomas v. Albright,* 139 F.3d at 234; *Taylor v. D.C. Water & Sewer Auth.,* 241 F.R.D. at 47. In this case,

---

Therein, this Court observed that "[i]f declaratory and injunctive relief were all that plaintiff sought in this case, class certification would be unnecessary anyway." *Id.* at 245.

Plaintiffs state that "Defendants' principal action at issue here—failure to provide Plaintiffs with full and complete accountings of their trust fund accounts—is an action generally applicable to the class." Pls. Brief at 42. Plaintiffs also allege that issues such as "whether Defendants must correct the balances of Plaintiffs' trust fund accounts—are issues subject to generalized proof" and that "proof for [the alleged trust breaches] will not vary among class members." *See* Pls. Brief at 48-49. These matters are clearly not generally applicable to the class, but instead are case specific issues that can only be decided on an individual basis. Indeed, as set forth above, an accounting is not something that can be completed on a class wide basis due to the nuances of each tribe's trust property and operations. Accordingly, Rule 23(b)(2) certification should be denied because Plaintiffs' requested relief is not subject to general, class wide resolution. *See* 5 Moore's Federal Practice § 23.43[2][b] (Matthew Bender 3d ed.) (noting that a class action may not be certified under Rule 23(b)(2) if relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant.)

### 3. *Rule 23(b)(2) Opt-Out Is Improper*

As part of their request for 23(b)(2) certification, Plaintiffs ask this Court to sanction an "opt-out" to allow putative sovereign tribal class members to withdraw from this case. *See* Pls. Brief at 25, 44-46. Keenly aware that this class action will infringe on certain fundamental tribal rights, Plaintiffs contend that the opt-out will somehow preserve the sovereignty interests of each individual class member. *See* Pls. Brief at 46 ("The opt-out request is based on recognition and respect for tribal sovereignty."); *id.* at 44 ("opt-out should be made available to putative class members because they are sovereign tribes," "sovereignty compels opt-out rights."). As set forth in Section I above, because an opt-out is not the functional equivalent of an explicit waiver, it

will not achieve its stated purpose and thus, cannot be used to cure Plaintiffs' fatally deficient class certification request.

Even if this court were to decide that an opt-out class is otherwise viable, it would still be improper under Rule 23(b)(2).  In *Eubanks v. Billington,* 110 F.3d 87, 96 (D.C. Cir. 1997), the Circuit Court held that opt-outs are permissible primarily in two ways.  First, if the "assumption of cohesiveness" of a 23(b)(2) class becomes inapplicable to the individual members' claims, then a hybrid 23(b)(2) and 23(b)(3) class certification can be instituted, and opt-outs can be granted.  *Id.*  Second, if particular plaintiffs' claims are unique or sufficiently distinct from the claims of the class, opt-outs can be granted "on a selective basis."  *Id; see also Thomas v. Albright,* 139 F.3d 227, 234-35 (D.C. Cir. 1998).  Plaintiffs do not contend that the class cohesiveness has broken down or the opt-out is intended to allow members with unique or distinct claims to remove themselves.  On the contrary, Plaintiffs' proposed opt-out, apparently under the premise of protecting sovereignty, allows any member to opt-out for any reason.  *See* Pls. Brief at 44.  Thus, an opt-out to protect sovereignty does not fall under either category.  This is not allowed in 23(b)(2) class actions.  *See Smith v. D.C.,* 2006 WL 1126816, at *2 (D.D.C. Apr. 26, 2006) (recognizing that courts should not permit opt-outs where doing so would undermine the policies behind class actions and noting that opt-outs should only be permitted selectively and under limited circumstances).

Plaintiffs' opt-out proposal is also without merit because it improperly uses a procedural device to overcome a substantive right—i.e. sovereignty—and therefore runs afoul of 28 U.S.C. § 2072(b).  Also known as the Rules Enabling Act, the statute forbids the Federal Rules from being used to "abridge, enlarge or modify any substantive right."  *See Ortiz v. Fireboard Corp.,*

527 U.S. 815, 845 (1999) (observing that no reading of a Federal Rule can ignore the Rules

Enabling Act's mandate that "rules of procedure 'shall not abridge, enlarge or modify any

substantive right'").  Simply put, Plaintiffs have not demonstrated that an opt-out can overcome

their admitted "recognition and respect for tribal sovereignty," or otherwise protect the interests

of the absent tribal class members.

### 4.    *Plaintiffs Have Not Demonstrated Predominance and Superiority as Required for Class Status under 23(b)(3)*

Plaintiffs alternatively argue that certification is available under Rule 23(b)(3).  As an

initial matter, Rule 23(b)(3) class actions are generally reserved for damages cases, which

Plaintiffs vehemently deny is the situation here.  *See, e.g., Amchem Prods., Inc.* 521 U.S. at 614-

615 ("Rule 23(b)(3) added to the complex-litigation arsenal class actions for damages designed

to secure judgments binding all class member . . . .").  In any event, 23(b)(3) certification is

appropriate only upon the satisfaction of "two separate requirements: (1) that factual and legal

questions common to the class members predominate over any such questions affecting only

individual class members, and (2) that maintaining the class action will be superior to other

available methods of adjudication."  *Bynum v. D. C.*, 214 F.R.D. 27, 39 (D.D.C. 2003); *accord

Thomas v. Albright*, 139 F.3d 227, 234 (D.C. Cir. 1998); *In re Veneman* 309 F.3d 789, 792 (D.C.

Cir. 2002).  "The matters pertinent to these findings include: (A) the class members' interests in

individually controlling the prosecution or defense of separate actions; (B) the extent and nature

of any litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum;

and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

(a)        *Individual questions predominate over questions that are common to the class*

The predominance inquiry implicates the commonality requirement of 23(a)(2) and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Does I through III v. D.C.,* 2006 WL 2864483, at *3 (D.D.C. oct. 5, 2006) *quoting Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997). Rule 23(b)(3)'s predominance criteria is "more stringent" and "far more demanding" than the commonality requirement of 23(a). *Amchem Prods., Inc.,* 521 U.S. at 609, 623; *Garcia v. Veneman,* 211 F.R.D. 15, 23 (D.D.C. 2002). However, there is no definitive test for determining whether common issues predominate. *See In re Vitamins Antitrust Litigation,* 209 F.R.D. 251, 262 (D.D.C. 2002).

As set forth in the above sections on "commonality" and "typicality," Defendants have shown that individualized issues of both law and fact abound among the named Plaintiffs and putative class members' claims and that adjudication is only possible through highly individualized liability and damages trials. Although it is Plaintiffs' burden to establish that class certification is proper, they have not (and cannot) do so here because the BIA's trust account operations was, at least during the TRP timeframe, decentralized with respect to the day-to-day operations of the tribal assets, and the management of the trust accounts was dependent, in part, on the individual tribe's cash flow needs and the type of natural resources from which the tribe may have generated income (e.g., oil, gas, grazing or timber). *See* Chavarria Dec. at ¶ 4, 19-20, 24, 26. The trust fund accounts were operated locally, often by one of the 87 BIA agency offices and withdrawals from unrestricted accounts were based on each tribe's unique operational needs and revenue expectations. *Id.* at ¶ 21, 26. Additionally, some tribal trust

property is or was subject to specific legislation, Interior appropriations riders, or other settlement agreements with the government. *See* Swimmer Dec. at ¶¶ 22-26. As detailed in the Fielitz Declaration, "tribes may request their funds be taken out of trust, and, under specified conditions, also may request any remaining withdrawn funds to later be taken back into trust status." *See* Fielitz Decl. at ¶ 3. These factors must be taken into account on an individual tribal basis to determine whether the government was derelict in the exercise of its trust duties and whether a trust account balance needs to be "corrected." Under no reasonable circumstance will a class representative be in a position to parse through these individual issues on a case by case basis, let alone on a class-wide basis. As such, Plaintiffs' conclusory assertion that "proof for these [accounting and trust] issues will not vary among class members" is flat wrong. *See* Pls. Brief at 49. Accordingly, because individual issues undeniably predominate, Plaintiffs' request for 23(b)(3) certification must be denied. *See Does I through III v. D.C.,* 2006 WL 2864483 at *3 ("when computation of damages will require separate mini-trials, then the individualized damages determinations predominate over common issues and a class should not be certified.") (internal quotations and citations omitted).

> ### (b)        *A class action is not a superior method of adjudicating these highly individualized claims*

A case can only be certified under 23(b)(3) when a class action is superior to other available means of adjudication and when a class action would promote judicial efficiency and uniformity of decisions as to persons similarly situated. *In re Vitamins Antitrust Litigation,* 209 F.R.D. at 270; Fed. R. Civ. P. 23(b)(3) advisory committee notes. "A case will often meet this standard when common questions of law or fact permit the court to consolidate otherwise identical actions into a single efficient unit." *Johnson v. D.C.,* 248 F.R.D. 46, 57 (D.D.C. 2008) (internal quotations and citations omitted).

Here, Plaintiffs have failed to show judicial efficiency or uniformity would be served by a class action. On the contrary, Defendants have explained above how the putative class members' claims are highly individualized. Thus, if certified, the Court would be compelled to conduct hundreds of full blown liability and damages trials to determine if any class member is entitled to judgment and recompense. This would necessarily involve hundreds of expert opinions, countless witnesses, the introduction of thousands of documents, and it would take years to complete, rendering the case virtually unmanageable. *See Garcia v. Veneman,* 211 F.R.D. at 24 (denying 23(b)(3) certification, in part, because the class action would "quickly devolve" into hundreds of individual inquiries about each claimant's particular circumstances).

As previously discussed, approximately 75 tribes have already filed their own lawsuits. Clearly, these sovereign tribes maintain an interest in individually controlling their actions. Thus, even if this class case proceeds, dozens of separate actions will be litigated before judges in other jurisdictions, defeating the goal of uniformity and judicial economy as envisioned by Rule 23. Plaintiffs have not established, as is their burden, that a class action here would promote judicial economy in light of these individualized lawsuits. Similarly, as noted above, Plaintiffs have offered no support for their conclusion that a class action is necessary because individual tribes lack the resources to bring their own claims. *See* Pls. Brief at 49. Plaintiffs can simply not show that a class action is "superior" in any way to individual adjudications.

### 5.     *Plaintiffs Have Not Met The Certification Requirements of 23(b)(1)*

Plaintiffs also allege entitlement to certification under 23(b)(1). Under subsection (b)(1)(A), a class action may maintained if the prosecution of separate actions would create a risk of inconsistent or varying adjudications which would establish incompatible standards of

44

conduct for the party opposing the class. *Brown v. Artery Organization, Inc.,* 1987 WL 9044 (D.D.C. Mar. 19, 1987); *accord Amchem Products, Inc.* 521 U.S. at 614. In this case, certification would not prevent the risk of "varying adjudications" because, as stated above, that risk is already established and will continue to be omnipresent due to the ninety-eight (98) different cases already pending before twenty-six (26) separate judges in multiple jurisdictions (Plaintiffs agree that those cases will proceed regardless of class certification). Moreover, due to the highly individualized nature of the cases already filed by the various tribes, the class mechanism could not create any uniform standards or practices for Defendants to follow that are capable of application to the entire class.

As under Rule 23(b)(1)(A), under Rule 23(b)(1)(B), certification is appropriate where separate actions would "as a practical matter be dispositive of the interests" of nonparty class members "or substantially impair or impede their ability to protect their interests." *Amchem Products, Inc.,* 521 U.S. at 614 (citations omitted). Thus, Rule 23(b)(1)(B) actions generally arise where plaintiffs have to recover from a limited fund and the recovery of one plaintiff would affect the remaining plaintiffs' potential recovery from the same limited source. *See Mycka v. Celotex Corp.,* 1988 WL 80042, at *1, * 4 (D.D.C. July 18, 1988); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 817 (1999) ("Among the traditional varieties of representative suits encompassed by Rule 23(b)(1)(B) is the limited fund class action). Here, Plaintiffs have not asserted that they are seeking recompense from any particular fund or demonstrated that there is a limited fund available to them, that is insufficient to satisfy their claims. *See Ortiz v. Fibreboard Corp.*, 527 U.S. at 834. For these reasons, certification under 23(b)(1)(B) is improper.

C.    **IT IS PREMATURE FOR THE COURT TO CONSIDER PLAINTIFFS' PROPOSED NOTICE**

Plaintiffs have submitted a [Proposed] Notice of Class Action (the "Proposed Notice") with their motion for class certification. *See* Pls. Brief at 45. The Proposed Notice sets forth, among other things, the manner in which Plaintiffs want to allow the putative class members to opt-out of this case. Defendants assert that the Proposed Notice is objectionable, as written, on a variety of grounds, and that it is premature. If the Court were to grant certification (which it should not), it will necessarily have to consider a variety of factors in preparing any notice, including, but not limited to, which Rule 23(b) subsection the class should be certified under, and whether there are any opt-out limitations. Thus, in the event that the Court finds that this case is suitable for class status (which, again, Defendants believe would run counter to applicable law), Defendants request that Plaintiffs be directed to configure their Proposed Notice to any future class certification ruling, and that the parties be given an opportunity to discuss and agree on the language thereof, if possible. If the parties cannot agree, they should be permitted to seek judicial intervention as to the form and substance of any class notice.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion For Class Action Certification And For Approval Of Class Notice.

46

Respectfully submitted this 14th day of July, 2008,

RONALD J. TENPAS
Assistant Attorney General

*/s/ Maureen E. Rudolph*
MAUREEN E. RUDOLPH
ANTHONY P. HOANG
E. KENNETH STEGEBY
MICHAEL D. THORP
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0479
Tel: (202) 305-0241
Tel: (202) 616-4119
Tel: (202) 305-0456
Fax: (202) 353-2021

Attorneys for Defendants

OF COUNSEL:

PAUL SMYTH
ELISABETH BRANDON
THOMAS BARTMAN
MICHAEL BIANCO
Office of the Solicitor
United States Department of the Interior
Washington, D.C. 20240

THOMAS KEARNS
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C. 20227