# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Nez Perce Tribe, et al. | ) | Civil Action No. 06cv02239-JR |
| | ) | |
| | ) | |
| Plaintiffs, | ) | **DECLARATION OF** |
| v. | ) | |
| | ) | **ERNEST F. POURIER** |
| KEMPTHORNE, et al. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

I, Ernest F. Pourier, pursuant to 28 U.S.C. § 1746 and based on my personal knowledge or upon information provided to me in my official capacity, do hereby declare and state:

1. I am the Deputy Superintendent of the Winnebago Agency for the Bureau of Indian Affairs ("BIA"). In that capacity I am responsible for managing Agency operations for Trust programs and oversee, support and provide technical assistance to the three tribal governments within our jurisdiction. As the Deputy Superintendent, I am generally responsible for the management of trust assets, property and natural resources. I have held this position since February 3, 2008, and I have been at the Winnebago Agency since December 1994. My responsibilities as Deputy Superintendent also include serving as the line office responsible for the planning, implementing, directing, monitoring and evaluating BIA's trust responsibilities and program services within the Agency. I make this Declaration on the basis of personal knowledge or information that has been reported to me in the course of my official duties as Deputy Superintendent.

2. The Winnebago Agency services the Winnebago Tribe of Nebraska, the Omaha Tribe of Nebraska and the Santee Sioux Nation. The services the Agency provides to each Tribe include: Aid to Tribal Government; Social Services; Indian Child Welfare Act; Natural Resources; Agricultural' Forestry; Wildlife & Parks; Probate; Adult Education; Tribal Court; Economic Development; Law Enforcement and Road Maintenance.

3. The services the Agency provides to each of these three Tribes are the same, in principle. For example, the Agency serves as the resource for tribally-contracted programs. Agency staff recognize that tribal self-determination under P.L. 93-638 is a right, and the Agency does not dictate how a Tribe's 638 program should be designed to meet that Tribe's stated objectives. The Santee Sioux contracts all of the trust activities on its tribal trust land, including conservation plans, leasing and the determination of what rents to charge. The Tribe has a tribal member preference policy in the leasing of tribal lands, and that policy generally deters non-members from bidding since a tribal member just needs to match the high bid in order to be awarded the contract. Also, the Tribal Council has passed Resolution 2005-52 (copy attached as Exhibit A) to waive the bonding requirement for tribal members. In addition, I am aware of at least two Tribal agricultural leases in which the appraised value was well in excess of the amount the Tribe decided to accept as yearly rental income. In one case, the appraisal was for $3904.00 per year and the rent is $1700.00 per year. In the other, the appraisal was for $3137.00 and the rent is $672.00 per year. In my experience, all of the Santee Sioux leases of tribal land are made on a direct pay basis. The Agency has never collected any rents on Santee Sioux tribal land of which I am aware (and it has not collected any rents in the time I have been working here).

07/14/2008 11:58 FAX
JUL-14-2008 10:27    FROM-Bureau of Indian Affairs    402-878-2943    T-420  P.004/005  F-802
07/11/2008 19:14 FAX

4. Another significant difference that distinguishes the Santee Sioux Nation from the other tribes this Agency services is its status as one of the beneficiaries of the Black Hills judgment fund. As recently as this year, the Santee Sioux asked the Agency for information concerning the distribution of this judgment fund. Attached as Exhibit B is a copy of the materials the Agency then sent to Tribal Chairman Trudell on April 29, 2008, which were the same materials we sent to the tribal council in January 2008 in response to a similar question from Council member Jones. As explained in those materials, all of the Sioux tribes who are beneficiaries of the Black Hills judgment fund must agree on the distribution of the funds, or else Congress must pass legislation to distribute the money. However, some of the Sioux tribes have refused to accept the judgment award, because they want the land to be returned to them, instead. I do not know of any other Black Hills judgment fund beneficiary tribe that has asked for these funds to be distributed. As an enrolled member of the Oglala Sioux Nation, for example, I believe I would have been informed if the Oglala Sioux had requested such a distribution of the Black Hills funds.

5. Attached as Exhibit C is a true and correct copy of the constitution and bylaws of the Santee Sioux Nation. Both its officers and its tribal council are elected at large by popular vote. This contrasts with the other two Tribes this Agency services. For both of those tribes, after the tribal council is elected it then selects the officers by vote only of the tribal council members.

6. I am unaware of any instance in which the Santee Sioux Nation has brought suit on behalf of anyone other than itself or its tribal members. I know of no authority, either in the Santee Sioux constitution and bylaws, or anywhere else, for it to do so. I previously worked for the Oglala Sioux Tribe, and I have worked for the BIA at seven different agencies and one regional office. I have never

known of a situation in which a Tribe filed a lawsuit (or tried to take any similar action) except on its own behalf, or where a Tribe allowed any other tribe to sue or act for it in such a manner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of July, 2008.

Ernest F.Pourier

# DECLARATION OF

# Ernest F. Pourier

# July 14, 2008

# EXHIBIT A

Santee Sioux Nation 382 2384

### COUNCIL HEADQUARTERS / MUSEUM



Chairman: Roger Trudell
Vice Chairman: Don LaPointe, Sr.
Treasurer: Robert Campbell
Secretary:

108 Spirit Lake Avenue West
Niobrara, NE 68760-7219
Phone: (402) 857-2772
FAX: (402) 857-2779

2005 AUG 29 AM 6 31 RECEIVED

# RESOLUTION
# OF THE
# SANTEE SIOUX NATION

## RESOLUTION 2005-52

**Whereas:** The Santee Sioux Nation is a Federally recognized Indian Tribe organized pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984), codified at 25 USC 476, et. Seq., as amended by the Act of June 15, 1935, (49 Stat.378), and as amended on August 30, 2002 by Secretarial Election, and

**Whereas:** Article VII-Land Section 4 Tribal lands may be leased by the tribal council with the approval of the Secretary of the Interior in accordance with law. Preference shall be given, first, to Indian cooperative associations and secondly, to individual Indians who are members of the Santee Sioux Nation. No lease of tribal lands to a nonmember shall be made by the tribal council unless it shall appear that no Indian cooperative association or individual member of the nation is able and willing to use the land and to pay a reasonable fee for such use, and

**Whereas:** The Santee Sioux Tribal Council approves a waiver on Letter of Credit/Bond for all enrolled tribal members, in regards to Land Leases, and

**THEREFORE BE IT RESOLVED:** That the Tribal Council hereby enacts Letter of Credit/Bond waiver effective August 1, 2005 on all land leases for tribal members.

# DECLARATION OF

# Ernest F. Pourier

# July 14, 2008

# EXHIBIT B

07/10/2008 14:17 FAX
JUL-10-2008 11:25      FROM-Bureau of Indian Affairs

402-878-2943          T-399   P.004      ☑009/043
                                         F-747

Dave St. Cyr/Aberdeen/BIA/DOI        To   Karen Joseph/Aberdeen/BIA/DOI@BIA
08/11/2006 02:57 PM                  cc   Tammie Poitra/Aberdeen/BIA/DOI
                                    bcc
                                 Subject   Black Hills Judgment Funds

Karen:  In response to our phone conversation today Santee Sioux Nation Tribal Council has made an unofficial request regarding the "Tribe's share" of these funds.  Any information that you may be able to share is appreciated.

Thanks, Dave

8/29/06

Dave,

FYI

The Results of Research Report for Docket 148-78 (74B) has not been issued.

Santee's share is 5.11% in Docket 74 (74A) See Results of Research Report.

I don't have the latest figures of the dollar amounts but enclosing what I do have, March 2005 figures.

Page: 1  Document Name: Untitled

2005 AUG 31  AM 10 44

```
                    ACCOUNT CHARACTERISTICS                    PAGE 1 OF 16
   JA9018696  ¬( IOUX NATION DKT 74-NBH 9018-69-6
   COMMAND ===>

   ****** ADMINISTRATIVE SECTION ******    (74A)
       ACCOUNT LONG TITLE: SIOUX NATION DOCKET 74 JULY 19, 1978
                           NON-BLACKHILLS RECEIPT OF AWARD
                           ACCOUNT LANDS OUTSIDE OF BLACKHILLS
                           ORIGINAL AWARD $40,245,807.02
                           DTD 6/5/89
            ADMINISTRATOR:   18: PETER FREDERICKS
     BACKUP ADMINISTRATOR:   22: RAE PADILLA
     SENIOR ADMINISTRATOR:    1: GREAT PLAINS REGION
          INVESTMENT MGR:    15: SONNY HOLLADAY - GREAT PLAINS
   BACKUP INVESTMENT MGR:     0: * NONE *
               ACCOUNTANT:    2: NONE ASSIGNED
                 ATTORNEY:    1: NONE ASSIGNED
              R/E OFFICER:    1: NONE ASSIGNED
               CONTROL ID:  437
            CONTROL GROUP:    1: GREAT PLAINS REGION
                   BRANCH:  998: MULTIPLE AWARDS


       F1-HELP  F2-HINT  F3-END  F5-RFIND  F6-PRINT  F7-UP  F8-DOWN  F10-LEFT
   4-©             1     Sess-1   192.168.161.210           T0900BB1      3/15
```

Name: GW25N - Date: 03/14/2005  Time: 10:22:34

Page: 1   Document Name: Untitled

```
                          BALANCES SUMMARY                          PAGE 1 OF 3
     JA9018696  ¬SIOUX NATION DKT 74-NBH 9018-69-6
     COMMAND ===>

                      CURRENT    LAST MNTH 02/28   LAST STMT 02/28   LAST TAX YEAR
          PRIN CSH:      0.00          0.00             0.00             0.00
        INCOME CSH:      0.00          0.00             0.00             0.00
       INV INC CSH:      0.00          0.00             0.00             0.00
         TOTAL CSH:      0.00          0.00             0.00             0.00

         PRIN INV: 37,263,372.49   37,263,372.49    37,263,372.49    37,075,495.04
      INV INC INV: 61,124,102.66   61,110,428.64    61,110,428.64    59,138,748.70
        TOTAL INV: 98,387,475.15   98,373,801.13    98,373,801.13    96,214,243.74

     GAIN/LOSS THIS FISCAL YEAR         FEDERAL          STATE
               LONG TERM GAINS:        29,314.95       31,498.46
              LONG TERM LOSSES:            0.00            0.00
              SHORT TERM GAINS:       180,946.22      178,762.71
             SHORT TERM LOSSES:            0.00            0.00
      LONG TERM LOSS CARRYFORWARD:         0.00            0.00
      SHRT TERM LOSS CARRYFORWARD:         0.00            0.00


       F1-HELP  F2-HINT  F3-END  F5-RFIND  F6-PRINT  F7-UP  F8-DOWN  F10-LEFT
     4-☉          1    Sess-1    192.168.161.210              T0900BB1      3/15
```

Name: GW25N · Date: 03/14/2005   Time: 10:22:46

07/10/2008 14:17 FAX                                                                    ☑012/043
JUL-10-2008  11:26    FROM-Bureau of Indian Affairs          402-878-2943      T-399  P.007/023  F-747

Page: 1  Document Name: Untitled

2005 AUG 31  AM 10 44

```
                      ACCOUNT CHARACTERISTICS                      PAGE 1 OF 17
JA9021690  SIOUX NATION DKT 148-78 BH 9021-69-0
COMMAND ===>

****** ADMINISTRATIVE SECTION ******      (74B)
     ACCOUNT LONG TITLE: SIOUX NATION DOCKET 148-78 JULY 31,
                         1979 BLACKHILLS RECEIPT OF AWARD
                         ACCOUNT ORIGINAL AWARD
                         $105,994,430.52 DTD 7/23/80
            ADMINISTRATOR:  18: PETER FREDERICKS
     BACKUP ADMINISTRATOR:  22: RAE PADILLA
     SENIOR ADMINISTRATOR:   1: GREAT PLAINS REGION
          INVESTMENT MGR:   15: SONNY HOLLADAY - GREAT PLAINS
   BACKUP INVESTMENT MGR:    0: * NONE *
               ACCOUNTANT:   2: NONE ASSIGNED
                 ATTORNEY:   1: NONE ASSIGNED
              R/E OFFICER:   1: NONE ASSIGNED
               CONTROL ID:  437
            CONTROL GROUP:   1: GREAT PLAINS REGION
                   BRANCH: 998: MULTIPLE AWARDS
           INCEPTION DATE: 12/01/94


     F1-HELP  F2-HINT  F3-END  F5-RFIND  F6-PRINT  F7-UP  F8-DOWN  F10-LEFT
4-0             1    Sess-1   192.168.161.210           T0900BB1       3/15
```

Name: GW25N - Date: 03/14/2005  Time: 10:22:00

07/10/2008 14:17 FAX                                                              ☐013/043
JUL-10-2008 11:26    FROM-Bureau of Indian Affairs         402-878-2943      T-399  P.008/023  F-747

10. 10. 89    10:49 AM    *BIA DIV LAW ENF SERV  P02



# United States Department of the Interior

### OFFICE OF THE SECRETARY
### WASHINGTON, D.C. 20240

**OCT 10 1989**

RECEIVED
OC. 10 1989
*deen Area Office*
*GOVERNMENT*

**Memorandum**

**To:**        Aberdeen Area Director
              Billings Area Director

**From:**      Assistant Secretary – Indian Affairs    *Eddie F. Brown*

**Subject:**   Results of Research Report of Judgment Funds to the Sioux Tribe
              of Indians in Docket 74 before the United States Claims Court

This Results of Research Report is submitted in compliance with the Indian
Judgment Funds Act of October 19, 1973, 87 Stat. 466, as amended and
implemented by 25 CFR 87.

## BACKGROUND OF THE AWARD

On July 30, 1987, the U. S. Claims Court approved a stipulation of facts in
Docket 74 and entered a judgment on behalf of the Sioux Tribe of Indians in
the amount of $40,245,807.02.    The judgment was appealed to the U.S.
Supreme Court by the plaintiff. The appeal claimed attorneys who acted on
behalf of the tribe in negotiating the stipulation of facts did so in
conflict with the tribe's wishes (15 Ind. Law Rep. 4010; 14 Cl. Ct. 94).
The Supreme Court denied certiorari on the appeal, May 15, 1989. The award
was for compensation of aboriginal and recognized tribal land ceded to the
United States under the 1868 Treaty of Fort Laramie, 15 Stat. 635. Funds
to satisfy the award were appropriated June 5, 1989.

## SPECIFICS OF THE AWARD

Docket 74 was filed August 15, 1950, under the Indian Claims Commission Act
of August 13, 1946, 60 Stat. 1049, 25 U.S.C. 70, et seq. In 1954, the
Indian Claims Commission dismissed the petition (2 Ind. Cl. Comm. 646).
The dismissal was affirmed by the Court of Claims, 146 F. Supp. 299, in
1956.    In 1958, the Commission allowed the plaintiffs to amend their
petition, with the result that the claims based on the Act of February 28,
1877, 19 Stat. 254, which provided for the taking of the Black Hills, were
segregated into Docket 74-B. The claims based on the Treaty of April 29,
1868, 15 Stat. 635, remained in Docket 74 (33 Ind. Cl. Comm. 151, 153).
The recent history of this litigation is summarized in the Memorandum
Order, entered December 17, 1987, by the U.S. Claims Court (15 Ind. Law
Rep. 4010).

Despite numerous attempts by the Claims Court to expedite a settlement and
acceptance by the litigating parties, the Claims Court saw the case
evolving into a deadlock in 1985. As a result of the Court's
dissatisfaction with the course of the litigation, Docket 74 was terminated
on February 22, 1985 (12 Ind Law Rep. 4019, 4021, 4025-26).

The Claims Court terminated the litigation primarily because six of the eight reservation tribes indicated in tribal resolutions in 1983-1984, that they wished either: (1) to withdraw from the litigation to pursue a return of the land, (Oglala, Ft. Peck, Cheyenne River, and Lower Brule), or (2) to reject the offer of the United States to settle Docket 74 for $39,749,700 [Standing Rock and Rosebud]. The other two major litigants, the Crow Creek Sioux and the Santee Sioux Tribes indicated acceptance of a proposed $39,749,700 settlement, by passing tribal resolutions in 1984 (12 Ind. Law Rep. 4022-24).

The February 22, 1985, Claims Court award of $39,749,700 to the Sioux Tribe of Indians was in full and complete satisfaction of all of the plaintiff's claims raised in Docket 74. The award also was made "in full and complete satisfaction of all of the Federal Government's offset claims" (12 Ind. Law Rep. 4026). The alternatives, presented by the Court in the February 22, 1985, decision, were to allow the litigation to continue, dismiss the case based upon the majority of the tribes' desire for a return of the land, or terminate the litigation, with a money judgment in favor of the plaintiff (12 Ind Law Rep. 4024-25).

The February 22, 1985, decision was appealed to the U.S. Court of Appeals, Federal Circuit. On December 5, 1986, the Court of Appeals vacated the Claims Court decision and remanded the issues of offsets for further and expeditious consideration (806 F.2d 1046).

As stated by the Claims Court in Summary Judgment Opinion I, August 29, 1984 (11 ILR 4025), the 1868 Treaty of Fort Laramie, 15 Stat. 635, effected the cession of tribal lands in North Dakota, South Dakota, Montana, Wyoming and Nebraska. Article 2 of the treaty provided for the establishment of the Great Sioux Reservation in the western half of South Dakota. The Federal Government was obligated, under the treaty, to provide payments, goods, and services to the signatories. Those payments, goods, and services were a primary focus in Docket 74 during the 1980's (15 Ind. Law Rep. 4010, 4014; 11 Ind. Law Rep. 4025, 12 Ind. Law Rep. 4007, 12 Ind. Law Rep. 4014, and 12 Ind. Law Rep. 4019).

The discussion of offsets involved whether the defendant could claim certain expenditures made on behalf of the Sioux against the award of $43,949,700 made in 1978 by the Indian Claims Commission (42 Ind. Cl. Comm. 257). At the heart of this discussion was whether the 1868 Treaty was a treaty of peace or a treaty of cession. While the Indian Claims Commission ruled the 1868 Treaty, a treaty of peace, the Court of Claims reversed that opinion in a February 20, 1980, decision (42 Ind. Cl. Comm. 214, 225-232; 7 Ind. Law Rep. 5029, 5030; 616 F.2d 485, 489; and Order Terminating Docket 74, 12 Ind. Law Rep. 4020). Whether certain offsets could be claimed by the defendant, and how those offsets actually could be specified against the 1978 Indian Claims Commission award revolved on two different arguments.

The defendant argued that payments claimed as offsets, were undertaken in exchange for ceded tribal land. The plaintiff argued that the payments were made in exchange for peace which the Sioux pledged to maintain, therefore, the payments provided for in the treaty were not offsets to which the defendant was entitled, according to the Indian Claims Commission (42 Ind. Cl. Comm. 214, 230, 256,; 11 Ind. Law Rep. 4025).

2

# HISTORICAL BACKGROUND

The history of the Sioux Tribe, like other multi-band tribal groups has been extensively studied by anthropologists, historians, and others over the last 100 years. The exhibits compiled for this litigation alone are extensive and voluminous. Although the Sioux have long been identified with the Great Plains Indian culture, they were originally Woodland Indians occupying areas west of the Great Lakes. When white explorers first encountered them around 1660, the Sioux domain included the southern two-thirds of Minnesota and adjacent portions of Iowa, Wisconsin, and the Dakotas. The Woodland Indians economy was based upon hunting, fishing and gathering lake and forest products.

As a result of pressure from the Chippewa, their traditional adversaries, some Sioux bands began to move southwestward in the mid-eighteenth century. By 1750, they had crossed the Missouri River and ventured into the Black Hills. Until the western migration through the Sioux country in the mid-nineteenth century, contact with white traders and others had been generally peaceful. Two areas of conflict which developed were in Minnesota and along the Oregon Trail in the Dakota, Wyoming, Nebraska, and Montana area.

In 1862, the Sioux bands in Minnesota, subjected to threats and witnessing depletion of their game by white settlers, rebelled in attacks which became known as the Minnesota Uprising. The repercussions of these events were felt further west in the Dakota Territory. Contemporaneously, Red Cloud's War in the 1860's which closed the Bozeman Trail through the Powder River country in the Montana-Wyoming corridor resulted from white encroachment on Sioux hunting grounds. Against this background, famous Sioux leaders emerged to attack white settlers and miners, culminating in the famous battle at the Little Big Horn River in Montana in June 1876.

Two significant treaties were entered into between the United States, Sioux tribal bands, and other Indians both east and west of the Missouri River, north of the Platte River, and east of the Rocky Mountains. These treaties were the famous Fort Laramie treaties of 1851 and 1868. The history and subsequent understanding of these two treaties, especially that of 1868, is what concerns Docket 74.

The Sioux have generally been divided according to cultural and linguistic groups, which have corresponded in some degree to geographical locations. The Eastern-Santee division, the Middle-Wiciyela division, and the Western-Teton division are the generally agreed-upon groupings. The Eastern-Santee (Dakota), also known as the Mississippi Sioux were composed of the Sisseton, Wahpeton, Mdewakanton, and Wahpekute bands. The Middle-Wiciyela (Nakota), also known as the Missouri Sioux were composed of the Yankton and Yanktonai (Upper and Lower) bands. The Western-Teton (Lakota) were the most numerous, and most subdivided, composed of the Oglala, Upper Brule, Lower Brule, Hunkpapa, Blackfeet, Sans Arc, Two Kettle, and Miniconjou (See 247 Ind. Cl. Comm. 147; Swanton, 282).

Some Santee still occupy ancestral Sioux areas of Minnesota, and the eastern Dakotas. However, as a result of the Minnesota Uprising in 1862, some eventually found their way to Canada, Nebraska, and Montana. Some of

the Yankton band are in southeastern South Dakota, Iowa and Minnesota, while the Yanktonai bands ventured north to southern North Dakota and eastern South Dakota, and as far west as Montana. The Western-Teton Sioux primarily occupy reservations in North and South Dakota.

The Treaty of Fort Laramie of September 17, 1851, 11 Stat. 749, recognized and acknowledged certain tracts of lands occupied by the Sioux or Dahcotah Nation, the Gros Ventre, Mandan, and Arikara Nations, the Assinboine Nation, the Blackfoot Nation, the Crow Nation, and the Cheyennes and Arapahoes. Each group of lands recognized in the treaty were described by metes and bounds. While the United States recognized the respective territories of the tribes, the tribes mutually recognized each others territories.

In addition to providing for the Great Sioux Reservation in Western South Dakota, the 1868 Treaty provided that no persons, except those Indians authorized by the treaty would have use and occupancy of the reservation. However, the discovery of gold in the Black Hills, substantiated by an array exploration party, induced many non-Indians into the area. Pressure rose to open the Black Hills to white settlement (12 Ind. Law Rep. 4010). Despite the failure of a negotiating effort in 1875, the Federal Government sent another group of negotiators in 1876 to obtain rights to the Black Hills. An agreement was signed in the fall of 1876, with numerous Sioux bands, Northern Cheyenne, and Northern Arapaho. Congress ratified the agreement by the Act of February 28, 1877, 19 Stat. 254.

The Great Sioux Reservation was further reduced by the Act of March 2, 1889, 25 Stat. 888, which divided the Sioux lands in the Dakotas into the Pine Ridge, Rosebud, Standing Rock, Cheyenne River, Lower Brule, and Crow Creek Reservations (Koyce, 930-933).

As indicated above, the Petition in Docket 74 was filed before the Indian Claims Commission on August 15, 1950. The Sioux Tribe, consisting of eight major tribal entities filed the action under the Indian Claims Commission Act. The initial petition before the Indian Claims Commission was dismissed, and affirmed by the Court of Claims in 1956. In 1957, the attorney who represented the Sioux Tribe died. A new attorney filed a motion which the Court of Claims granted, remanding the claim to the Indian Claims Commission (23 Ind. Cl. Comm. 358, 359; 205 Cl. Ct. 148). Orders by the Commission in 1958 and 1960 allowed additional evidence to be submitted and two separate petitions, Dockets 74-A (later simply Docket 74) and 74-B, were subsequently considered by the Commission. The amended petition in Docket 74-A related specifically to the 1868 Treaty, recognized title, and certain Sioux hunting rights agreed to in Article XI of the 1868 Treaty. Docket 74-B related specifically to the Black Hills claim, comprising approximately 7 million acres taken under the Act of February 25, 1877, 19 Stat. 254, (205 Cl. Ct. 148 & 33 Ind. Cl. Comm. 151, 153-54).

In an August 27, 1965, Findings of Fact and Opinion, the Indian Claims Commission determined the boundaries of the "Territory of the Sioux or Dahcotah nation," as defined in the Treaty of Fort Laramie of September 17, 1851, 11 Stat. 749, (15 Ind. Cl. Comm. 577). The parties in Docket 74 agreed on the territory's boundaries, except for the western line of the Sioux boundary described in the treaty (15 Ind. Cl. Comm. 585). The Commission defined the western boundary based on the evidence submitted to

that point. However, a gap existed in the description of the lands between the Crow and Sioux Tribes (15 Ind. Cl. Comm. 577, 599, 610-615). In a further Opinion, issued September 10, 1969, the Commission clarified the western Sioux boundary under the 1851 Treaty, vis-a-vis the Crow, the Mandan, the Gros Ventre, and the Arikara, (21 Ind. Cl. Comm. 371, 375; 38 Ind. Cl. Comm. 469, 487).

Citing four U. S. Claims Court decisions dating to 1930 and the Indian Claims Commission case involving the Cheyenne and Arapaho (10 Ind. Cl. Comm. 1), the Commission indicated the "essential facts" regarding the history of the 1851 Treaty were "not in dispute" (21 Ind. Cl. Comm. 371-376; also 24 Ind. Cl. Comm. 147). Reiterating the purpose and intent of the treaty, the Commission issued an order amending its 1965 finding regarding the western boundary (21 Ind. Cl. Comm. 371, 376-382). The order delineated the western Sioux lands and boundary, subsequently referred to by the Commission as the "Sioux-Laramie" lands. These lands, depicted in Royce Area 597, encompass portions of Wyoming, Montana, and North and South Dakota (18th Annual Report of the Bureau of American Ethnology, pt. 2, 1896-97). The extent of the Sioux interest in these lands was the subject of further opinions (e.g., 23 Ind. Cl. Comm. 358 and 24 Ind. Cl. Comm. 147).

Article 16 of the 1868 Treaty provided hunting rights to those Sioux who were reluctant to become agriculturalists and live on the reservation provided for in Article 2 of the treaty. Article 2 established the extensive "Great Sioux Reservation" for the Sioux, and possibly other tribes. The reservation encompassed most of South Dakota west of the Missouri River (23 Ind. Cl. Comm. 358, 359). Article 16 provided for hunting rights to those Sioux who hunted "along the base of the Big Horn Mountains to the valley of the Yellowstone River." Hostilities in this area known as the Powder River Road were one of the main issues which promoted the negotiating of the 1868 Treaty (23 Ind. Cl. Comm. 358, 362).

Citing earlier decisions regarding the Treaty of 1851, and the respective interests of the Teton and Yanktonai Sioux bands in the "Sioux Fort Laramie land," the Commission proceeded to "valuing the land which the United States obtained from the plaintiffs by means of the Treaty of April 29, 1868, 15 Stat. 635" (38 Ind. Cl. Comm. 469, 470-71). In the Additional Findings of Fact issued July 15, 1976, the Commission found lands east of the Missouri River in North and South Dakota and lands west of the Missouri River in North Dakota, Montana, Wyoming, and Nebraska, to hold either aboriginal or recognized title (38 Ind. Cl. Comm. 469, 487-492). The area east of the Missouri, 14,273,000 acres were aboriginal lands of Teton and Yanktonai bands (23 Ind. Cl. Comm. 419, 424). In the area west of the Missouri, "plaintiffs possessed an undivided share of recognized title," in 33,869,000 acres under the 1851 Treaty (21 Ind. Cl. Comm. 371, 382).

For purposes of valuation, the proclamation date of the 1868 Treaty, February 24, 1869, was used by the Commission as the taking date (23 Ind. Cl. Comm. 419, 428). The Commission judged the total value of the subject lands east and west of the Missouri River to be $45,685,000 (38 Ind. Cl. Comm. 469, 485-86). In July 1978, the Commission reduced that amount by $1,735,300 which represented the .7 percent interest held by the Yankton Sioux to the Sioux Fort Laramie lands (41 Ind. Cl. Comm. 160, 172).

Appeals by the defendant for further offsets against the original $45.6
million award were denied by the Commission (42 Ind. Cl. Comm. 208, 214).
The motion and counter-motions on the offsets issue occupied the Commission,
the Court of Claims and the Claims Court for the better part of a decade,
1978-1987 (42 Ind. Cl. Comm. 210, 233, 245-51). The Commission, in its
review of the history and background of the 1868 Treaty, found it to be a
treaty of peace rather than a treaty of cession. In so finding, the
Commission denied the defendant's motions for offsets regarding payments on
the claim and gratuitous offsets.

The defendant appealed the Commission's July 1978 opinion, and in 1980, the
Court of Claims reversed the decision of the Commission on this central
point--the character and intent of the 1868 Fort Laramie Treaty--insofar as
this case was concerned, and said it was a treaty of cession (222 Ct. Cl.
421, 425-27; 616 F.2d 485; 7 Ind. Law Rep. 5029). This decision reopened
the issue of offsets, and whether they could be held against and deducted
from the $43,949,700 award made in 1980 (42 Ind. Cl. Comm. 257; 11 Ind. Law
Rep. 4025; 12 Ind. Law Rep. 4007).

## PREVIOUS AWARDS

One of the subplot issues in the long course of Docket 74 has been the
determination of not only what lands were meant to be included in the 1851
and 1868 treaties, but also the Indian tribal ownership of those lands. At
two different points, the Indian Claims Commission determined that the
Yankton Sioux held a 17 percent interest, and then a 7 percent interest, in
the land the Commission included in its determination of the 1851
Sioux-Laramie lands, i.e., that west of the Missouri River (24 Ind. Cl.
Comm. 147, 173; and 41 Ind. Cl. Comm. 160, 172). In 1980, the Court of
Claims affirmed the 1977 Commission decision which held that the Yankton
Sioux held a 7 percent interest in the Sioux-Fort Laramie lands (616 F.2d
485). The 7 percent interest of the Yankton Sioux in the these lands was
the subject of the $2,269,088.50 award by the Court of Claims in Docket
332-C-2, June 27, 1980.

When Docket 74 was reconsidered by the Indian Claims Commission, after
having been dismissed, the "Black Hills" case became Docket 74-B. An
October 29, 1968, Order by the Indian Claims Commission posed three
questions concerning the Act of February 28, 1877, 19 Stat. 254, (33 Ind.
Cl. Comm. 151, 153-54, 243). In February 1974, the Commission decided that
the 1877 Act which resulted in the taking of the Black Hills was a Fifth
Amendment taking. The Commission awarded the Sioux Tribe $17.5 million,
plus interest of approximately $85 million (33 Ind. Cl. Comm. 362). In
1975, the Court of Claims reversed the decision providing the interest on
the award (207 Ct. Cl. 234; 518 F.2d 1298). Ultimately, legislation (the
Act of March 13, 1978, 92 Stat. 153) passed to enable the interest claim of
the Sioux Tribe to proceed for reconsideration of the interest portion of
the award. In a June 1979 decision, the Court of Claims affirmed the
February 1974 award (220 Ct. Cl. 442; 33 Ind. Cl. Comm. 151, 362) of the
Commission. In 1980, the Supreme Court ruled that the Act of February 28,
1877, effected a taking of tribal property which had been set aside by the
1868 Fort Laramie Treaty, and that the Sioux were entitled to just compensa-
tion, including interest (448 U.S. 371).

## IDENTIFYING THE BENEFICIARIES

We find the following federally recognized tribes, as presently constituted and organized, to be the beneficiary entities of the $60,245,807.02 award in Docket 74. These tribes are the historical, cultural and political heirs of the representatives of the Sioux bands which used and occupied the subject lands, whose recognized title was ceded by the 1868 Fort Laramie Treaty:

The Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota. The Cheyenne River Sioux descend from the Miniconjou, Two Kettle, Blackfeet, and Sans Arc Sioux. The tribe is organized under the Indian Reorganization Act, under a constitution and bylaws approved December 27, 1935.

The Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota. The Crow Creek Sioux descend primarily from Lower Yanktonai Sioux, although some Lower Brule, Miniconjou, and Two Kettle Sioux have been listed among the descendants in the past. The Crow Creek Sioux Tribe is not organized under the Indian Reorganization Act, but under a constitution and bylaws approved April 26, 1949, and subsequently amended.

The Flandreau Santee Sioux Tribe of South Dakota. The Flandreau Santee Sioux is composed of descendants of those Santee Sioux who left the Santee Reservation in 1869, but continued to maintain contact with the Santee Sioux. The representatives of the Santee Sioux who signed the 1868 Fort Laramie Treaty were, therefore, a party which obtained certain rights to the subject lands as signatories. The connection of the Flandreau Santee Sioux to the Santee Sioux in Nebraska was further recognized by the 1889 Act. The tribe is organized under the Indian Reorganization Act, under a constitution and bylaws approved February 7, 1941, and subsequently revised and amended.

The Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota. The Lower Brule Tribe is composed of descendants from the Lower Brule Band, as well as the Lower Yanktonai band. Lower Brule is organized under the Indian Reorganization Act, with constitution and bylaws approved July 15, 1960.

The Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota. The Oglala Sioux are the largest and perhaps best known of the seven principal Teton bands of the Sioux tribe. The tribe is also composed of some Brule Sioux and Northern Cheyenne descendants. The Oglala Sioux Tribe is organized under the Indian Reorganization Act and is governed under a constitution and bylaws approved January 15, 1936.

The Rosebud Sioux Tribe of the Rosebud Reservation, South Dakota. The Rosebud Sioux Tribe is composed of Upper Brule descendants, but also includes Miniconjou, Sans Arc, Two Kettle, and Oglala descendants. The Rosebud Sioux Tribe is organized under the Indian Reorganization Act and is governed by a constitution and bylaws approved December 20, 1935.

The Santee Sioux Tribe of the Santee Reservation, Nebraska. The Santee Sioux Tribe is composed of the Santee Sioux band, members of which signed the 1868 Fort Laramie Treaty and the 1876 Agreement. The Santee

7

Sioux Tribe is organized under the Indian Reorganization Act and is governed by a constitution approved April 8, 1936.

The Standing Rock Sioux Tribe of the Standing Rock Reservation, North and South Dakota. The Standing Rock Sioux Tribe is composed of Hunkpapa, Blackfeet, and Upper and Lower Yanktonai Sioux descendants of signatories to the 1868 Treaty. The Standing Rock Sioux Tribe is organized under the Indian Reorganization Act and is governed by a constitution approved April 24, 1959, and amended May 11, 1984.

The Sioux Tribe of the Fort Peck Reservation, Montana. The Fort Peck Tribe is essentially composed of members of Upper Yanktonai Sioux descendants. In addition, there is Hunkpapa and Brule band blood among some members, according to the 1929 enumeration of the Fort Peck Reservation. There also is some Santee. The Assiniboine and Sioux Tribes of the Fort Peck Reservation require their membership to identify as either Sioux or Assiniboine, for claims award purposes. Those with equal Sioux and Assiniboine ancestry are required to choose to participate in either Sioux or Assiniboine awards. The Assiniboine and Sioux Tribes of the Fort Peck Reservation did not accept the Indian Reorganization Act, but are governed under a constitution and bylaws approved on November 30, 1960.

## ALLOCATION OF TRIBAL SHARES

To establish a formula for allocation of the tribal shares, it is necessary to determine the percentage to which each of the beneficiary tribes is entitled in the award. The loss for which the award was made is associated with the historic Sioux bands, now formed into various modern Sioux tribes. To use only the number of currently enrolled members as the basis for allocation would not comport with the historic nature of the loss, the claim itself, nor the length of time of the litigation. In addition, the present enrollment criteria of the beneficiary tribes differ.

To arrive at an appropriate division of the funds in Docket 74, different population and enrollment figures for each of the beneficiary tribes were researched and compiled. Five significant dates in the history of the Sioux Tribes' relationships with the United States were researched. The five dates are: 1) 1889, which marked the establishment by the Act of March 2, 1889, 25 Stat. 888, of the six reservations 2) 1920, which marked the beginning of the litigation process, when by the Act of June 3, 1920, 41 Stat. 738, Congress authorized the Sioux to file petitions with the U.S. Court of Claims; 3) 1950, which was the year the Sioux Tribes petitioned the Indian Claims Commission with Docket 74; 4) 1978, which marked the award in Docket 74 by the Indian Claims Commission, but was not paid since the litigation entered an appeals process which encompassed the next eleven years; and 5) 1989, the date of the entry of the award by the U.S. Claims Court.

The data available for each of the five dates was compiled from the Commissioner of Indian Affairs Annual Reports for 1889 and 1920; Census Rolls for 1920; statistics available in House Report 2503, 82d Congress, 1953, for 1950/1951; and data from the Aberdeen Area Office, and the Branch of Enrollment, Central Office, for the 1980/1981 and 1989 figures.

In cases of multiple beneficiaries to a judgment involving aboriginal or recognized lands, the Bureau of Indian Affairs has proposed that division of the funds be based upon historic tribal rolls, as close to the date of taking as possible. The Commissioner of Indian Affairs Report for 1889 indicates figures for each of the respective beneficiary entities, while the Indian Census Rolls exist for only four of the nine beneficiaries for 1889. However, the 1920 Indian Census Rolls exist for all nine beneficiary entities. The census enumerated each individual on the reservations, while the 1889 Commissioner's report only provided totals. We believe that use of the 1920 census material provides a more accurate reflection of the tribal populations than material available for 1889, and is more reflective of current enrollment figures recently available from the Aberdeen Area Office. The percentage of the total population for each of the nine beneficiary entities using the 1920 Indian Census Rolls are as follows:

| TRIBE | PERCENTAGE |
|-------|------------|
| Cheyenne River | 12.23% |
| Crow Creek | 4.22% |
| Flandreau | 1.27% |
| Fort Peck | 5.75% |
| Lower Brule | 2.27% |
| Oglala | 29.88% |
| Rosebud | 24.04% |
| Santee | 5.11% |
| Standing Rock | 15.23% |

We recommend that these percentages be considered as the basis for a division of the funds in Docket 74.

AGREEMENT ON THE DIVISION OF THE FUNDS

The Act of October 19, 1973, 87 Stat. 466, as amended, 25 U.S.C. 1401-1407, requires an agreement on the division of funds whenever two or more groups are determined to be beneficiaries. The Act requires that the agreement on the division of the funds occur within six months of the appropriation of the funds, in this case prior to December 5, 1989. We will need resolutions from each of the tribal governing bodies indicating agreement to the division of the funds. If no agreement can be reached regarding the division of the funds by this date, legislation will be required to authorize their use and distribution. Obtaining legislation can be very time-consuming.

The general membership of each beneficiary entity does not have to act now. They will be able to present their views when a Hearing of Record is held upon each of the tribal proposals for the use of the funds.

07/10/2008 14:19 FAX                                                          20240043
JUL-10-2008  11:28    FROM-Bureau of Indian Affairs        402-878-2943    T-399  P.018/023  F-747

We recommend the Aberdeen and Billings Area Directors offer to schedule a meeting or series of meetings with the beneficiary tribal councils after they have had an opportunity to review this Results of Research Report. An historian from the Washington, D.C., office will be available to travel to South Dakota, North Dakota and Montana to discuss the report and any of the background or statements contained in it. While this is not a normal procedure, we are most anxious to do all we can to assure an agreement on the division of the funds.

## DEVELOPMENT OF A SECRETARIAL PLAN

If the December 5, 1989, deadline is met, we can then proceed with obtaining tribal proposals for the use of the funds and begin making plans to schedule the Hearing of Record to obtain comments from the tribal members. Part 87.3(b) of 25 CFR, "Use or Distribution of Indian Judgment Funds," requires the development of tribal proposals. Given the current economic and budgetary conditions faced by the Government and Indian tribes across the country, we highly recommend that the total amount of each beneficiaries' share be programed.

In accordance with 25 CFR 87.3 and 87.4, the Branch of Acknowledgment and Research needs to receive tribal proposals for review as soon as possible. We recommend that they all be completed no later than February 1, 1990. Once we have received the proposals, along with the agencies' and area offices' comments and recommendations, and have determined the proposals to be adequate, we will authorize a Hearing of Record. Upon completion of the Hearing of Record, we will need the Area Directors' recommendations and reasons for support of each of the beneficiaries' proposals.

The Act of October 17, 1973, as amended, requires that we submit a Secretarial Plan to Congress within one year from the date of appropriation of the funds. We will develop a Secretarial Plan based upon the beneficiaries' proposals, comments made at the Hearing of Record, the agencies' and area offices' recommendations, and any other relevant documentation you submit. In this case, the Secretarial Plan must be submitted to Congress on or before June 4, 1990. Following a 60-day Congressional review period, the Secretarial Plan will become effective, if a joint resolution of disapproval is not passed by the Congress. The funds will then become available to the beneficiary entities. If we do not meet the December 5 deadline and if we do not submit a Secretarial Plan within the specified one year period, as has occurred in the case of Docket 74-B, legislation will be required to provide for the use of the funds.

The staff of the Branch of Acknowledgment and Research, (FTS) 343-3592, will be available to assist your office in completing this project.

Attachment

10

### Sources

This list is by no means exhaustive of the primary and secondary sources available on the Sioux Nation. However, a number of internal references in each of the listed sources were also consulted. For the sake of brevity they are not included below.

Government Documents:

Indian Claims Commission.
   Opinions & Findings of Fact:

   Northern Arapaho Tribe v. The United States.   Docket 329-D
   12 Ind. Cl. Comm. 229 (1963).

   Northern Cheyenne Indians v. The United States.  Docket 329-C
   13 Ind. Cl. Comm. 1 (1963).

   Sioux Tribe v. The United States.   Docket 74.
   Petition.  August 15, 1950.
   Findings/Opinions.
   15 Ind. Cl. Comm. 577/599 (1965).
   21 Ind. Cl. Comm. 371/381 (1969).
   23 Ind. Cl. Comm. 358/419 (1970).
   24 Ind. Cl. Comm. 98/147 (1970).
   38 Ind. Cl. Comm. 469/487 (1976).
   40 Ind. Cl. Comm. 454/476/518 (1977).
   42 Ind. Cl. Comm. 214/233/257 (1978).

   Sioux Tribe v. The United States.   Docket 74-B
   Opinions.
   24 Ind. Cl. Comm. 98 (1970).
   28 Ind. Cl. Comm. 425 (1972).
   33 Ind. Cl. Comm. 151/236/243 (1974).

   Yankton Sioux Tribe v. The United States.  Docket 332-C.
   Opinions.
   24 Ind. Cl. Comm. 147/208 (1970).
   24 Ind. Cl. Comm. 364 (1971).
   41 Ind. Cl. Comm. 160/170 (1977).

U. S. Congress.  House of Representatives.
   Committee on Interior and Insular Affairs.  Report.
   House Resolution Authorizing the Committee on Interior and
   Insular Affairs to Conduct an Investigation of the Bureau
   of Indian Affairs.  House Report No. 2503.  82d Cong.
   2d sess.  1953.  [Cited as H. Rept. 2503.]

U. S. Congress.  Senate.
   Treaty of September 17, 1851, 11 Stat. 749. (Fort Laramie)

Treaty of April 29, 1868, 15 Stat. 635.  (Fort Laramie -
(Sioux, et al.)

Treaty of May 10, 1868, 15 Stat. 655.  (Fort Laramie -
(Cheyenne & Arapaho)

U. S. Congress.  Statutes at Large.
Act of February 28, 1877, 19 Stat. 254.  (1876 Agreement &
Sen. Ex. Doc. No. 9, 44th Cong., 2d sess.).

Act of May 1, 1888, 25 Stat. 113, 133.  (1886 Agreement - Fort
Peck and Indians in Montana).

Act of March 2, 1889, 25 Stat. 888.  (Establish Six Sioux
Reservations in Dakotas).

Act of June 3, 1920.  41 Stat. 738. (Sioux - Court of
Claims)

U. S. Court of Claims.
Record Group 123.  Records of the U. S. Court of Claims.
General Jurisdiction.  Washington National Federal Records
Center.  Suitland, Maryland.  File No. 415-B, Flandreau
Band of Santee Sioux Indians, 1922.

Sioux Nation of Indians v. The United States.
182 Ct. Cl. 912 (1968) & 205 Ct. Cl. 148 (1974)
220 Ct. Cl.442 / 601 F.2d 1157 (1979)

U. S. v. Sioux Nation.
207 Ct. Cl. 234 / 518 F.2d 1298 (1975)
222 Ct. Cl. 421 / 616 F.2d 485 / 7 Ind. Law Rept. 5029 (1980).

U. S. Claims Court
Sioux Tribe of Indians v. United States.
Summary Judgment Opinion - I.  6 Cl. Ct. 91 (1984).
[See also @ 11 Ind. Law Rept. 4025].
Summary Judgment Opinion - II.  7 Cl. Ct. 468 (1985).
[See also @ 12 Ind. Law Rept. 4007].
Summary Judgment Opinion - III.  7 Cl. Ct. 481 (1985).
[See also @ 12 Ind. Law Rept. 4014].
Order Terminating Docket 74 and Awarding Final Judgment.
8 Cl Ct. 80 (1985).  [See also @ 12 Ind. Law Rept. 4019].
Memorandum Order.  16 Cl. Ct. 94 (1987)
[See also @ 15 Ind. Law 4010].

U. S. Court of Appeals. Federal Circuit.
Cheyenne River Sioux Tribe v. The United States.
Opinion on Appeal.  806 F.2d 1046 (1986).
[14 Ind. Law Rept. 2001].

Oglala Sioux Tribe & Rosebud Sioux Tribe v. The United
States.  Opinion on Appeal.  862 F.2d 275 (1988).
[16 Ind. Law Rept. 2034].

U. S. Supreme Court.
          United States v. Sioux Nation of Indians, et al.
               Opinion on Writ of Certiorari.  448 U. S. 371 (1980)

          Oglala Sioux Tribe v. United States.
               Petition on Writ of Certiorari.  Denied.  57 U.S. Law Week
               3753, May 15, 1989.

U. S. Department of the Interior.  Office of Indian Affairs.
          Annual Report of the Commissioner of Indian Affairs.
          Selected Years:  1851, 1868--1890, 1920.

               Indian Census Rolls, 1885-1940.  National Archives
               Microfilm, M 595.

Books & Articles:

Anderson, Gary.  "Early Dakota Migration and Intertribal War:  A
          Revision."  Western Historical Quarterly, vol. 11, no. 1,
          Jan. 1980, pp. 18-24.

Fowler, Loretta.  Arapahoe Politics, 1851-1978:  Symbols of Crises in
          Authority.  Lincoln:  University of Nebraska Press, 1982.

Hodge, Frederick W.  Handbook of American Indians North of Mexico.
          Part 1.  Washington, D.C.:  Government Printing Office, 1907.

Hurt, Wesley.  "Anthropological Report on Indian Occupancy of Certain
          Territory Claimed by Dakota Indians and by the Ka Dakota Sioux
          Indians and by Rival Tribal Claimants."  In Sioux Indians II.
          New York:  Garland Publishers, 1974.

Meyer, Roy W.  History of the Santee Sioux.  Lincoln:  University of
          Nebraska Press, 1967, 1980.

Olson, James C.  Red Cloud and the Sioux Problem.  Lincoln:  University of
          Nebraska Press, 1975.

Royce, Charles C.  Indian Land Cessions in the United States.  Eighteenth
          Annual Report of the Bureau of American Ethnology, 1896-97.
          Washington, D.C.:  Government Printing Office, 1899.

Stuart, Paul, ed.  History of the Flandreau Santee Sioux Tribe.
          Flandreau, South Dakota:  Flandreau Santee Sioux Tribe, 1971.

Swanton, John R.  The Indian Tribes of North America.  Washington, D.C.:
          Government Printing Office, 1926.

Utley, Robert.  The Indian Frontier of the American West, 1846-1890.
          Albuquerque:  University of New Mexico Press, 1984.

White, Richard.  "The Winning of the West:  The Expansion of the Western
          Sioux in the Eighteenth and Nineteenth Centuries."  Journal of
          American History, vol. 65, no. 2, Sept. 1978,  pp. 319-343.

*Summary of Trust Fund Report as of 7/31/89*

| 9018/2600 | $35,674,932.48 |
| 9018/2602 | $    367,674.73 |
| | $ 36,042,607.21 |

| 9518/2600 | $    159,115.20 |
| 9518/2601 | $      4,396.71 |
| 9518/2602 | $      2,474.21 |
| | $    165,986.12 |

$ 36,208,593.33

| CR | 12.23 | — | $  4,428,310.96 |
| CC | 4.22 | — | $  1,528,002.64 |
| Flandreau | 1.27 | — | $    459,849.14 |
| Ft. Peck | 5.75 | — | $  2,081,994.12 |
| LB | 2.27 | — | $    821,935.07 |
| PR | 29.88 | — | $ 10,819,127.68 |
| RB | 24.04 | — | $  8,704,545.84 |
| Santee of Neb. | 5.11 | — | $  1,850,259.12 |
| SR | 15.23 | — | $  5,514,568.76 |

$ 36,208,593.33

07/10/2008 14:20 FAX                                                 20231/043
JUL-10-2008  11:29    FROM-Bureau of Indian Affairs    402-878-2943    T-399  P.023/023  F-747

Black Hills Award - Dkt. 148-78  (Formerly Dkt. 74-B)

Summary of Trust Fund Report as of 7/31/89

9021/2600  -  $95,939,542.71

9521/2600  -  $127,261,685.85
             _____

              $223,201,228.56

### Docket 148-78 and Docket 74 Awards

The information in the following six paragraphs is taken from a response by the Acting Chief, Division of Tribal Government Services, Washington, D.C., to an inquiry about the Black Hills Award.

In 1980 the U.S. Supreme Court upheld a Federal Appeals Court decision regarding an award, with interest, to the Sioux Nation of Indians involving the Black Hills of South Dakota. The decision awarded the plaintiffs, under Docket 74-B (148-78), about $106 million in principal and accumulated interest for a Fifth Amendment taking of lands within the Black Hills, as was provided by an 1877 Act of Congress.

Prior to and subsequent to the award, certain members and groups within several of the major Sioux tribes, who were litigants in the suit, rejected the monetary award. They have called for a return of the Black Hills (though exactly what amount of the total area has been unclear at times). One of the main components of the memberships, at Oglala, Rosebud, Standing Rock, and Cheyenne River, rejecting the award has been the Grey Eagle Society.

The Black Hills issue has engendered considerable national and Congressional attention in the intervening years since the Supreme Court decision. In the mid-1980's several bills were introduced by Senator Bradley (New Jersey), which provided for return of lands in the Black Hills to the Sioux Nation. None of the bills were reported out of committee.

In August 1988 Senator Pressler (South Dakota) introduced S. 2686 to provide for the use and distribution of the funds in Docket 74-B (148-78). No action was taken on the bill. Representative Matthew Martinez (California) introduced H.R. 5680 in September 1990, "to settle the Black Hills claims with the Sioux Nation...." Since H.R. 5680 was introduced late in the session, no action was taken on the bill, and it was not reintroduced in the next Congress.

The Indian Judgment Funds Act of 1973 provides that when more than one beneficiary entity is determined to share in an award, an agreement on the division of the funds is required. When no agreement on a division of funds is forthcoming, the Act provides that Congress must enact legislation for the use of the funds to be available to the beneficiary entities.

As you are aware, discussion and correspondence regarding the Black Hills Case has occupied considerable interest within the Sioux Nation community. Various tribal resolutions have been adopted. Congressional inquiries to us and replies to those requests have exchanged information. Until legislation is passed by the Congress and signed by the President, the funds will continue to be invested by a Special Trustee in interest-bearing accounts.

Since there has been no agreement among the beneficiaries on the division of funds awarded in Docket 74 (74A), legislation is required to authorize their use and distribution also.

Status of funds as of May 30, 2001:
Docket 148-78 (74B) - $544,188,539.13
Docket 74 (74A) - $81,020,370.25

# DECLARATION OF

# Ernest F. Pourier

# July 14, 2008

# EXHIBIT C

# Santee Sioux Nation



425 Frazier Ave N. Ste 2
Niobrara, NE 68760-7219

Phone #: 402-857-2302
Fax #: 402-857-2307

# CONSTITUTION AND BYLAWS

# OF THE SANTEE SIOUX NATION

## PREAMBLE

We, the Santee Sioux Nation, in order to organize for the common welfare for the Nation and its posterity and to insure domestic tranquility, to enjoy certain rights of self-government and self-determination, to conserve and develop our land and natural resources, to protect the nation's sovereignty, traditional values of respect, generosity, bravery, wisdom, that guide our nation, do ordain and establish this constitution for the general health, safety, welfare and integrity of the nation according to the Act of Congress, dated June 18, 1934 (48 Stat. 984).

## ARTICLE 1 – TERRITORY

This constitution shall apply to the lands embraced in the Santee Reservation, the same as is described under the Executive order of August 31, 1869, and to any and all future additions of land acquired within or without said boundary lines by the Secretary of the Interior for the nation or by the nation, and, that such jurisdiction shall extend to lands held in trust by the United States for the Santee Sioux Nation or the members thereof.

1

# ARTICLE 11 – MEMBERSHIP

The membership of the Santee Sioux Nation shall consist as follows:

(a) All persons of Indian blood whose names appear or are entitled to appear on the official census roll of the Santee Sioux Tribe of Nebraska as of April 1, 1934, with the supplement thereto of January 1, 1935, provided that within one year from the adoption and approval of this constitution and bylaws, additions and eliminations may be made in said roll and supplement by the tribal council, subject to the approval of the Secretary of the Interior. Persons enumerated in the "McLaughlin roll" made under the Act of March 4, 1917 (39 Stat 1.195), or their descendants, shall not be considered, by virtue of such enrollment, to have established membership in the Santee Sioux Nation under this section.

(b) All children born prior to the effective date of this amendment to any member of the Santee Sioux Tribe of Nebraska who is a resident of the Santee Sioux Reservation at the time of the birth of said children. After the effective date of this amendment all children who are ¼ Sioux Blood of the entire Sioux Nation, provided that said children are at least 1/8 Santee Sioux Nation Blood shall be included as members.

(c) Prior to the effective date of this amendment, all children of any member who is not a resident of the reservation at the time of the birth of said children may be admitted to membership by the tribal council under ordinances made by the tribal council. After the effective date of this amendment, all children who are ¼ Sioux Blood of the entire Sioux Nation and provided said children are at least 1/8 Santee Sioux Nation Blood may be admitted under ordinances of the Council.

## SECTION 2.

The administration of the foregoing powers, and of all bylaws and ordinances affecting membership, shall be vested in an enrollment committee. The act of such committee shall be subject to review by the Council.

## SECTION 3.

Adoption – Request for adoption of an Indian who is a nonmember of the nation shall be made by written application to the enrollment committee who shall make recommendation to the Council. The decision of the Council shall be subject to popular vote at the next annual election.

## SECTION 4.

Those individuals who received per cap payment, pursuant to the Mississippi Sioux Judgment funds, and from the Santee Sioux Tribe of Nebraska, as lineal descendants, are not eligible for enrollment under this Constitution.

2

## SECTION 5.

Nothing contained in this article shall be construed to deprive any Santee Sioux Indian of any vested right.

## SECTION 6.

Any member can relinquish membership by submitting a written, signed and notarized statement in accordance with ordinances adopted by the Council so long as such relinquishment is not effective until acceptance from another tribe or nation. Procedures for disenrollments shall be adopted by the Council in accordance with applicable law.

## ARTICLE III – GOVERNING BODY

SECTION 1. The governing body under this Constitution and bylaws shall be a tribal council hereinafter known as the Council, composed of eight members elected by the people as follows: (1) One Chairperson, (1) one Vice-Chairperson, (1) one Treasurer, (1) one Secretary and (4) four Councilpersons.

SECTION 2. The Chairperson, the Vice-Chairperson, Treasurer and the Secretary shall be elected at large by popular vote of the members. One councilperson shall be elected from each district of the reservation at large by popular vote of the members as follows:
1. Santee District, one (1) delegate.
2. Hobu Creek District, one (1) delegate.
3. Howe Creek District, one (1) delegate.
4. Bazile Creek District, one (1) delegate.
   (a) The first election of officers and councilpersons under this amended Constitution and by-laws shall be called, held and conducted within thirty days after the adoption and approval of the amended Constitution by a provisional election committee appointed by the present tribal council in power under such rules and regulations as they may prescribe.

## SECTION 3.
(a) Primary elections shall be held on the last Tuesday of September.
(b) General elections shall be held on the first Tuesday after the first Monday in November.

## SECTION 4. The officers and councilpersons provided for in Section 2 of
Article III shall be elected for the following terms of office:
(a) the Chairperson first elected shall serve a four (4) year term.
(b) the Vice-Chairperson first elected shall serve a three (3) year term.
(c) the Treasurer first elected shall serve a two (2) year term.

3

(d) the Secretary first elected shall serve a one (1) year term.

(e) The Councilpersons first elected shall serve one, two, three and four year terms according to the lowest vote getter to highest; and thereafter the term of office for all elected officials shall be four years.

SECTION 5. The Council shall adopt resolutions and ordinances regulating the procedures of the Council itself and of other agencies and officials provided that salaries shall not be changed by the Council effective for their present terms.

SECTION 6. The Council shall establish the manner of control of elections by ordinances.

SECTION 7. The council shall have authority to appoint subordinate officers, boards and committees.

## ARTICLE IV – POWERS OF SELF GOVERNMENT

SECTION 1. Enumerated powers – The Council shall exercise the following powers, subject to any limitations imposed by the Constitution and bylaws of the Santee Sioux Nation, hereinafter referred to as "nation" in this article, and subject to any limitations imposed by the Constitution or statutes of the United States.

(a) To negotiate with the federal, state and local government on behalf of the nation and to advise and consult with the representatives of the Interior Department on all activities of the Department that may affect the Santee Sioux Nation as long as such consultation is required by federal law.

(b) To employ counsel for the protection and advancement of the rights of the nation and its members.

(c) To approve or veto any sale, disposition, lease, or encumbrance of tribal land, interest in tribal land, or other tribal assets which may be authorized or executed by the Secretary of the Interior, the Commissioner of Indian Affairs, or any other qualified official or agency of government, provided that any land shall never be leased for a period exceeding ten years, sold, or encumbered, except for governmental purposes, which leases may be for 25 years.

(d) To make assignments of land to members of the nation and to regulate the leasing of assignments in conformity with ARTICLE VIII of this constitution.

(e) To manage all economic affairs and enterprises of the nation in accordance with the terms of the Corporate Charter.

4

(f) To appropriate for public purposes of the nation available funds within the exclusive control of the Council and any other available funds.

(g) To levy taxes and regulatory fees upon persons under the jurisdiction of the nation.

(h) To purchase lands of members of the nation for public purposes, under condemnation proceedings in courts created by the Council at fair market value.

(i) To safeguard, regulate and promote the peace, safety, morals and general welfare of the nation by regulating the conduct of trade and the use and disposition of property upon the reservation.

(j) To regulate the inheritance of property, real and personal, within the territory of the Santee Sioux Reservation under ordinances adopted by the Council.

(k) To charter subordinate organizations for economic purposes and to regulate the activities of cooperative associations of members of the nation under ordinances adopted by the Council.

(l) To protect and preserve the property, wildlife, natural resources, and mineral rights of the nation and its members.

(m) To select and remove delegates to sit on the national council of the entire Sioux Nation.

(n) To delegate to district governments, subordinate boards, or nation officials, or to cooperative associations which are open to all members of the nation any of the foregoing powers, reserving the right to review any actions taken by virtue of such delegated powers prior to and after such actions are taken.

(o) To exclude from the restricted lands of the reservation, persons not legally entitled to enter or reside therein.

(p) To govern the conduct of persons under the territorial jurisdiction of the nation as defined in Article I of the Constitution in the exercise of treaty rights and immunities.

(q) To regulate commerce within the jurisdictional boundaries of the nation or on any after acquired lands.

(r) To provide for the appointment of guardians and foster homes for orphan, minor, and/or mentally incompetent members of the nation and to administer funds or property which may be transferred or entrusted to the council or a court established by the Council for these purposes.

(s) To establish a police force and court system through ordinances for the administration of justice and the resolution of disputes within the jurisdiction of the nation. Such court shall be independent of the Council.

(t) To establish a financial institution to promote the thrift and self-reliance of members and to support the maintenance of essential government services and economic and community development.

SECTION 2. Future Powers – The Council may exercise such further powers as may in the future be delegated to the nation by individual members of the nation, the Secretary of the Interior, or by any duly authorized official or agency of the state or federal government.

SECTION 3. Reserved Powers – Any rights and powers heretofore vested in the Santee Sioux Nation, but not expressly referred to in this constitution, shall not be abridged by this article, but may be exercised by the people of the Santee Sioux Nation, through the adoption of appropriate bylaws and constitutional amendments.

## ARTICLE V. REMOVAL

SECTION 1. The removal from office of a member of the tribal council shall be as follows: In the event of a complaint in writing specifying improper conduct or neglect of duty from twenty-five members of the tribe against a member of the tribal council, it shall be the duty of the tribal council, if such complaint is considered of sufficient merit, to appoint a committee of five members of the tribe, independent of its own membership and those making such complaints, to hold a public hearing and make written report to the tribal council of its findings, a copy of such report to be furnished to accused. Upon receipt of such reports, the tribal council shall meet in executive session to consider such report and hear testimony of the accused. The tribal council shall exercise the right of removing such accused officer. If the tribal council shall expel a member, that member may seek reelection at the next annual election.

SEC. 2. Temporary vacancies, by reason of death, removal from office, forced absence, or resignation, in the tribal council shall be filled by said council until the next annual election where his successor shall be elected for the duration of the unexpired term.

## ARTICLE VI – REFERENDUM

SECTION 1. Any exercise of any enumerated powers lodged in the tribal council shall be subject to a referendum vote of the people upon a written petition signed by not less than 25% of the total number of voters in the last annual election, provided that not less than 30 per cent of the eligible voters voting shall vote in any such referendum.

6

# ARTICLE VII – LAND

SECTION 1. Allotted lands, including heirship lands, within the Santee Sioux Reservation shall continue to be held as heretofore by their present owners. This constitution does not compel any owner of an allotment or inherited land to convey his land to the tribe and it is understood that the tribal council has no power to compel any owner of such land to convey his land to the tribe. But it is recognized that under existing law, such lands may be condemned for public purposes, such as roads, public buildings, or other public improvements, upon payment of adequate compensation by any agency of the State of Nebraska or of the Federal Government or by the tribe itself. It is further recognized that under existing law such lands may be inherited by the heirs of the present owners, whether or not they are members of the Santee Sioux Nation. Likewise, it is recognized that under existing law, the Secretary of the Interior may, in his discretion, remove restrictions upon such land, upon application by the Indian owner, whereupon the land will become subject to State taxes and may then be mortgaged or sold. The right of the individual Indian to hold or to lose his land, as under existing law, shall not be abrogated by anything contained in this constitution, but the owner of restricted land may, with the approval of the Secretary of the Interior, voluntarily convey his land to the Santee Sioux Nation, either in exchange for money payment or in exchange for an assignment covering the same land or other land, as hereinafter provided.

SEC 2. Tribal lands of the Santee Sioux Nation and all lands which may hereafter be acquired by the Santee Sioux Nation or by the United States in trust for the Santee Sioux Nation shall be held as tribal lands, and no part of such lands shall be mortgaged or sold.

SEC. 3. Tribal lands shall not be allotted to individual Indians, but such tribal lands as are not required for school, agency, or other administrative use, may be assigned by the tribal council to members of the Santee Sioux Nation, or may be leased or otherwise used by the tribe as hereinafter provided.

SEC. 4. Tribal lands may be leased by the tribal council with the approval of the Secretary of the Interior in accordance with law. Preference shall be given, first, to Indian cooperative associations and secondly, to individual Indians who are members of the Santee Sioux Nation. No lease of tribal lands to a nonmember shall be made by the tribal council unless it shall appear that no Indian cooperative association or individual member of the nation is able and willing to use the land and to pay a reasonable fee for such use.

7

SEC. 5. In any assignment of tribal lands which are now owned by the nation, or which may hereafter be acquired for the nation by the United States or purchased by the nation out of tribal funds, or which may be designated for the use of the nation, preference shall be given first, to heads of families which are entirely landless, and secondly, to heads of families which have no allotted lands or interests in allotted lands, but shall have already received assignments consisting of less than an economic unit of agricultural land or other land or interests in land of equal value, such economic unit to be determined by the tribal council in ordinances which shall be subject to review by the Secretary of the Interior or his designated representative. Assignments under this section shall be known as "standard assignments."

No allotted member of the nation who may hereafter have the restrictions upon his land removed and whose land may thereafter be alienated shall be entitled to receive an assignment of land as a landless Indian.

The tribal council may, if it sees fit, charge a fee of $5.00 on approval of an assignment made under this section.

SEC. 6. Any person holding a standard assignment of land who shall for a period of two years fail to use the lands so assigned or shall use the land for any unlawful purpose, may have his assignment cancelled by the tribal council after due notice and opportunity to be heard. Such land may then be available for reassignment. Powers of ejectment, in case of refusal to vacate, shall be lodged with the superintendent of the jurisdiction and with the tribal council.

Upon the death of any Indian holding a standard assignment, his heirs or other individuals designated by him by written request shall have preference in the reassignment of land, provided such persons are eligible to receive a standard assignment.

SEC. 7. Any member of the Santee Sioux Nation who owns an allotment of land or any share in heirship land or any deeded land, may with the approval of the Secretary of the Interior, voluntarily transfer his interest in such land to the nation and receive therefor an assignment in the same land or other land of equal value, or he may receive a proportionate share in a unit of agricultural or other land.
Assignments made under this section shall be known as "Exchange assignments."

SEC. 8. Exchange assignments may be used or leased by the assignee to Indian cooperative associations, to individual members of the tribe, or, if no individual Indian or Indian cooperative association is able and willing to lease the land at a reasonable fee, such assignments may be leased to non-Indians in the same manner as allotted lands.

SEC. 9. Upon the death of a holder of an exchange assignment, such lands shall be reassigned by the tribal council to his heirs or devisees, subject to the following conditions:

(a) Such lands may not be reassigned to any heir or devisee who is not a member of the Santee Sioux Nation, except that a life assignment may be made to the surviving spouse or child of the holder of such assignment.

(b) Such lands may not be reassigned to any heir or devisee who already owns or holds more than an economic unit of land. Such economic unit of land shall be determined by the tribal council.

(c) Such land may not be subdivided into units too small for practical use. The tribal council shall determine the practical subdivision of the land in each case. If the land cannot be properly subdivided, the tribal council may issue to such heir or devisee a proportionate share in other lands or other interests in land of equal value.

(d) If there are no eligible heirs or devisees of the decedent, the land shall be eligible for reassignment the same as other tribal lands.

SEC. 10. Improvements of any character made upon assigned land may be willed to inherited by members of the Santee Sioux Nation. When improvements are not possible of fair divisions, the tribal council shall dispose of them under such regulations as it may provide for the benefit of such heirs. No permanent improvements may be removed from any tribal or assigned land without the consent of the tribal council.

SEC. 11. No member of the Santee Sioux Nation may use or occupy tribal lands except under an assignment or lease.

SEC. 12. Unassigned land shall be managed by the tribal council for the benefit of the members of the entire nation in conformity with such rules and regulations as the Secretary of the Interior may prescribe under section 6 of the act of June 18, 1934 (48 Stat. 984).

SEC. 13. Available tribal funds may be used, with the consent of the Secretary of the Interior, to acquire land for the Santee Sioux Nation.

SEC. 14. Applications for assignment of land shall be made in writing. Such applications shall be submitted to the tribal council at regular or special sessions. The application will be placed in the hands of a proper committee who will call the matter up for action at the next regular meeting of the tribal council. Any member of the tribe may object in writing to a proposed assignment. In the event of objection, the chairman of the tribal council shall set a date for hearing, advising both the applicant and the objector.

After the tribal council has taken action on any assignment, any member of the nation who is concerned in such action and who is dissatisfied therewith, may appeal to a board of review composed of the superintendent of the jurisdiction, the farmer, the social worker, and a committee appointed by the tribal council. The action of the board of review, after consultation with the tribal council and all interested parties, shall be final.

The secretary of the council shall furnish the superintendent or other officer in charge of the agency a complete record of all action taken by the tribal council on applications for assignment of land, and a complete record of assignments shall be kept in the agency office and shall be open for inspection by members of the nation.

The tribal council shall draw up one or more forms for standard and exchange assignments, which shall be subject to the approval of the Secretary of the Interior.

## ARTICLE VIII. AMENDMENTS

This constitution and bylaws may be amended by a majority vote of the qualified voters of the Santee Sioux Nation voting at an election called for that purpose by the Secretary of the Interior, provided that at least thirty (30) per cent of those entitled to vote shall vote in such election; but no amendment shall become effective until it shall have been approved by the Secretary of the Interior. It shall be the duty of the Secretary of the Interior to call an election on any proposed amendment, upon receipt of a written resolution of the tribal council signed by at least seven of the membership of the tribal council.

# BYLAWS
## OF THE
## SANTEE SIOUX NATION

### ARTICLE I – OATH

SECTION I. All officers when elected shall be duly installed and subscribe to an oath of office to support the constitution of the United States and this constitution. Such officers may be sworn in by any officer qualified to administer an oath.

### ARTICLE II – ADOPTION OF CONSTITUTION AND BYLAWS

This constitution and bylaws, when ratified by a majority of the qualified voters of the Santee Sioux Nation, voting at a special election called for the purpose by the Secretary of the Interior, provided that at least thirty (30) per cent of those entitled to vote shall vote in such election, shall be submitted to the Secretary of the Interior, and if approved, shall be effective from the date of approval.

11

# CERTIFICATION OF ADOPTION

Pursuant to an order, approved January 15, 1936, by the Secretary of the Interior, the attached constitution and bylaws was submitted for ratification to the members of the Santee Sioux Tribe of the Sioux Nation of the State of Nebraska and was on August 30, 2002, duly ratified by a vote of 323 for, and 38 against, in an election in which over 30 percent of those entitled to vote cast their ballots, in accordance with section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), as amended by the act of June 15, 1935 (Pub., No. 147, 74th Cong.).

**TEALA C. WALKER**
*Chairman of Election Board*
**ROGER TRUDELL**
*Member, Election Board*
**THELMA THOMAS**
*Member, Election Board*

**TEALA C. WALKER**
*Acting Superintendent in Charge of the Reservation.*

## APPROVAL

I, Gerry E. Foell, Acting Regional Director, of the Great Plains Regional Office, Bureau of Indian Affairs, by virtue of the authority granted to me by 3 IAM 4.4, hereby approve the attached Amendment I (proposed Amendment A on the August 21, 2002, ballot). Amendment II (proposed Amendment B on the August 21, 2002, ballot)., Amendment III (proposed Amendment C on the August 21, 2002, ballot) and Amendment IV (proposed Amendment D on the August 21, 2002, ballot) to the Constitution and Bylaws of the Santee Sioux Nation.

**GERRY E. FOELL**
*Acting Regional Director*

Date: 8/30/2002
Great Plains Regional Office
Aberdeen, South Dakota

12