UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Nez Perce Tribe, et al. | ) | Civil Action No. 06cv02239-JR |
| | ) | |
| Plaintiffs, | ) | DECLARATION OF |
| v. | ) | |
| | ) | RICHARD P. FIELITZ, JR. |
| KEMPTHORNE, et al. | ) | |
| | ) | |
| Defendants | ) | |

I, Richard P. Fielitz, Jr., pursuant to 28 U.S.C. § 1746 and based on my personal knowledge or upon information provided to me in my official capacity, do hereby declare and state:

1. I am the Chief of Staff of the Office of the Special Trustee for American Indians ("OST") in the Department of the Interior ("DOI" or "Interior"). I have held this position since October 28, 2007, and I have been employed by OST since May 2004. In total, I have almost 25 years of employment with Interior. My duties include oversight responsibilities for various OST functions including litigation support.

2. The Special Trustee is responsible for carrying out statutory mandates enumerated in Public Law 103-412, the American Indian Trust Fund Management Reform Act of 1994, to provide for more effective management of, and accountability for, the proper discharge of the Secretary's trust responsibilities to Indian tribes, individual Indians, and Alaska Natives that relate to Indian trust asset management. The various offices within the Office of the Special Trustee include that of the Deputy Special Trustee - Trust Services (DST - TS), who manages and supervises the Office of Trust Funds Management, the Office of Trust Funds Investments, and the Office of Trust Reporting and

Reconciliation. As explained in 25 C.F.R. section 115.702, Interior may only accept certain specific sources of funds for deposit into an Indian trust account. In addition, as explained in 25 C.F.R. section 115.804, Interior will account to a tribe only for those trust funds that are received into, and maintained by, Interior's trust funds management system, and not for any funds the tribe receives directly ("direct pay").

3. Interior presently maintains approximately 1,800 tribal trust fund accounts, for over 250 different tribal entities. As of September 30, 2007, the total trust fund balances held for tribes were almost $2.9 billion. However, tribes may request their funds be taken out of trust, and, under specified conditions, also may request any remaining withdrawn funds to later be taken back into trust status (see 25 C.F.R. Part 1200). Other differences between tribal trust fund accounts result from the fact that some tribes have considerable assets that generate trust income, while others may have very few. Some tribes have only a single trust account, consisting perhaps of a judgment fund; others have multiple types of accounts, dating from different times and containing funds from different sources (such as timber or other natural resource revenues). Tribes also play significant roles in leasing and other asset management decisions, many through their own corporations, and they reside in close proximity to their assets (unlike individuals, who can live thousands of miles away from their often-fractionated assets).

4. Tribal trust holdings are vastly different not only in how they are invested, but also in the nature of cash flows, balances held, and requirements that must be met per the governing trust document (e.g., public law, statutory restriction, judgment ruling, settlement agreement). For instances, Proceeds of Labor accounts are generally unrestricted flow-through accounts that are used for various tribal projects and/or individual member per capita distribution purposes, whereas Judgment Accounts must follow the distribution requirements of the applicable court ruling, statute,

agreement or other governing document. Water Rights accounts generally are for funding certain water-related projects as stipulated by the settlement agreement. Escrow and Economic Recovery accounts may also be governed (along with Judgment and Water Rights accounts) by certain statutory requirements regulating the amount of disbursements, e.g., whether those disbursements come from the principal portfolio and/or income portfolio, and precisely in what manner the disbursements may be used. In many of these accounts, the principal is restricted and only the income is used. Many tribes have Proceeds of Labor accounts, but some do not. Most tribes have Judgment accounts, but some do not. Some tribes have Escrow or Forestry accounts, but many do not. Some tribes have Infrastructure Development and Economic Recovery funds, but most do not. Each tribe has a unique combination of tribal trust accounts that require specific management decisions in order to properly receipt, invest and disburse funds. Not only does the accounting work for each type of trust account vary widely, but the investment strategy is vastly different based on the type of account as well as the associated needs of the tribe (at least, as those needs are made known to Interior from time to time by a tribe).

5. Over the years, Interior has developed and implemented specialized policies, regulations, business systems and forms for handling trust funds and maintaining and reporting its records of account. Prior to 1951, each Bureau of Indian Affairs ("BIA") Agency Office (typically located on Indian reservations) accounted for financial activity using handwritten ledgers and journals. In the early 1950s, Interior first installed a more centralized accounting system in the BIA Area (Regional) Offices that integrated all fund types, such as IIM and Tribal. Beginning in 1965, BIA began further centralizing its accounting functions on a mainframe computer, with that conversion completed in the late 1960s. The Trust Funds Management System (TFMS or Finance) was developed and implemented in 1968 and modified in 1974. The earliest date for which Interior now has electronic

account and transaction data available is July 1, 1972 (the "Tribal Electronic Ledger Era"). These electronic data came from the TFMS system starting in 1982 and were keyed from hard-copy TFMS system reports for July 1, 1972-1982. Before July 1, 1972, that is, for the time period known as the Tribal Paper Ledger Era, account and transaction information currently is available only in hard copy reports and ledgers. The Office of Trust Funds Management ("OTFM") used TFMS until it converted to the Omnitrust system, a commercial off-the-shelf ("COTS") trust management system used by private-sector trust entities, for activity in tribal trust fund accounts in April 1995. OTFM converted tribal trust fund accounts from Omnitrust to Trust 3000, another COTS trust management system, on March 1, 1999. Interior has the electronic transaction data from the Omnitrust and Trust 3000 time periods.

6. As passed in 1938, 25 U.S.C. section 162 authorized the Secretary of the Interior to invest tribal trust assets in bank CDs and Government obligations. The BIA started a formal investment program in 1966. Prior to that time, tribal trust assets were paid the 4% or 5% Treasury statutory rate, as applicable. Under the BIA program, Area and Agency officials were responsible for consulting with the tribes and communicating tribal needs and objectives to the BIA Branch of Investments. As the list of eligible tribal investments was expanded in the 1970s and interest rates reached historical highs, the BIA invested where appropriate in more short-term (less than one year) bank CDs. Those CDs were carried at cost and incurred no principal risk resulting from changes in interest rates. When short-term rates declined, tribal trust account investments shifted where appropriate to government agency securities, which offered higher rates of interest but also held the potential for market price risk with changes in interest rates over the life of those holdings.

7. The investment objectives of each tribal account are individually determined. OST attempts to determine tribal investment needs and objectives in consultation with each tribe. Account

investment objectives are based upon applicable requirements and restrictions; information provided by the tribe on the use, timing and possible future distribution of the funds; tribal budget data, if available; the integration of tribal trust assets into the overall asset allocation of the tribe; and historical account activity.

8. Prior to the creation of OST as a result of the 1994 Trust Reform Act, the investment and accounting functions that now are carried out by OST were performed within the BIA. In early 1996 the BIA and OST held meetings with tribes to explain the results of the Arthur Andersen Tribal Reconciliation Project (TRP), which provided tribes with their tribal trust account balances stated as of September 30, 1995 The then-Special Trustee, Paul Homan, also addressed a letter to the tribal recipients of the TRP that asked that each tribe that received a TRP return the accompanying attestation as to the accuracy of those September 30, 1995 account balances. The records presently available to me indicate that, of the twelve named plaintiffs in this action, six tribes (Tule River, Klamath, Yurok, Cheyenne-Arapaho, Sac and Fox, and Tlingit-Haida) responded that they disputed the accuracy of those balances; three tribes (Hualapai, Pawnee Nation of Oklahoma and Santee Sioux of Nebraska) asked for additional time to consider the matter; and three tribes (Nez Perce, Mescalero Apache and Yakima) never responded. None of the twelve named plaintiffs in this action were among the tribes who returned attestations accepting their account balances although the Gila River Indian Community, Oneida Nation and a few other Tribes did provide attestations accepting their account balances.

9. One of the multi-tribe judgment accounts that OST manages is for the Sioux Nation ICC docket commonly known as the Black Hills judgment fund. The tribes with an interest in that judgment account are the Crow Creek Sioux; the Cheyenne River Sioux; the Flandreau Tribe; the Lower Brule Sioux; the Oglala Sioux; the Santee Sioux of Nebraska; the Standing Rock Sioux; the

Rosebud Sioux; and the Assiniboine & Sioux. At least one of these tribes has expressed an interest in having these judgment funds distributed; however, others have declined to accept their funds.

10. Attached as Exhibit A is a true and correct copy of a March 1, 2007, letter from the Special Trustee to the Chairman of the Hoopa Valley Tribe and the Chairperson of the Yurok Tribe. As explained in that letter, after over 40 years of dispute between those two Tribes (and others), Interior decided to distribute the remaining funds it held pursuant to the Hoopa-Yurok Settlement Act to the Yurok Tribe, contingent upon receipt of an unconditional waiver from that Tribe pursuant to the Act. Attached as Exhibit B is a true and correct copy of the March 21, 2007 letter from the Yurok Tribe Chairperson to the Special Trustee, together with Tribal Resolution No. 07-037, accepting the funds under the conditions stipulated by Interior. Also in March 2007, the Hoopa Valley Tribe filed an appeal with the Interior Board of Indian Appeals ("IBIA") from the Special Trustee's action. The IBIA dismissed the appeal, and then denied the Hoopa Valley Tribe's request for reconsideration (see *Hoopa Valley Tribe v. Special Trustee for American Indians*, 2007 I.D. LEXIS 30, 44 IBIA 210 and 2007 ID LEXIS 29, 44 IBIA 247).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of July, 2008.

Richard P. Fielitz, Jr.

# DECLARATION OF

# Richard P. Fielitz, Jr.

# July 14, 2008

# EXHIBIT A



**United States Department of the Interior**
OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS
Washington, D.C. 20240

March 1, 2007

Honorable Clifford Lyle MarshallHonorable Maria Tripp
Chairman, Hoopa Valley TribeChairperson, Yurok Tribe
P.O. Box 1348190 Klamath Boulevard
Hoopa, California 95546Klamath, California 95548

Dear Chairman Marshall and Chairperson Tripp:

As you both know too well, issues related to the 1988 Hoopa-Yurok Settlement Act (Act), including the establishment and distribution of the Hoopa-Yurok Settlement Fund (Fund), have a long history. Notwithstanding resolution of decades of disputed issues between the two Tribes and their members, one final issue remains to be resolved nearly twenty years after the Act's passage: distribution of funds still held by the Department pursuant to the Act.

At the request of both the Hoopa Valley Tribe and the Yurok Tribe, as well as the Tribes' Congressional delegation, the Department has evaluated whether authority still exists to distribute these funds administratively or whether the parties must resolve this matter through the courts or Congress. As explained below, the Department has concluded it can distribute these funds to the Yurok Tribe administratively, consistent with the provisions of the Act, if the Yurok Tribe were to submit a new waiver of claims as required by the Act.

Discussion and Analysis

Pursuant to the Act, the Department placed into escrow monies from seven Indian trust fund accounts, representing the proceeds still held in trust by the Department from the resources of the former Joint Reservation, to establish the Fund. The Act envisioned three specific distributions of the Fund: certain individual payments based on tribal membership elections; distribution to the Hoopa Valley Tribe of roughly one-third of the Fund; and distribution to the Yurok Tribe of roughly one-third of the Fund plus the Fund's remainder once the individual payments were made. The Hoopa Valley Tribe received over $34 million between 1988 and 1991, its designated share under the Act. The Department continues to hold the remaining balance, representing the share set aside in 1991 for the benefit of the Yurok Tribe (roughly $37 million), with interest accrued over the past fifteen years (now totaling roughly $90 million), as well as funds authorized by the Act specifically for the Yurok Tribe (roughly $3.1 million).

The Department has not previously distributed these remaining funds because the Yurok Tribe did not provide the waiver required by the Act in order to receive benefits.

Although purporting to waive claims, the Department interpreted the 1993 Yurok Resolution to preserve the Tribe's claims and thus failed to satisfy the Act's waiver requirement. The Yurok Tribe brought a takings claim, which led to the decision rendered in *Karuk Tribe v. United States*, 41 Fed. Cl. 468 (1998), *aff'd*, 209 F.3d 1366 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001).

Conclusion of this litigation triggered the Secretary's obligation under the Act to issue a Report to Congress. The Secretary, through the Bureau of Indian Affairs, submitted the Report in March 2002, and the Senate Indian Affairs Committee held a hearing in August 2002, in which the Department and both Tribes participated.

The Department stated then that, because the Yurok Tribe litigated its takings claims rather than waiving them, the Yurok did not meet the Act's condition precedent for the Yurok to receive its share of the Fund or other benefits. The Department stated also the Hoopa Valley Tribe had already received its benefits under the Act and was not entitled to further distributions. Based on those factors, the Department recommended, *inter alia*, that it would be inappropriate to make any general distribution without further instruction from Congress and that Congress should consider the need for additional legislation to address any issue regarding entitlement and to fulfill the Act's intent. Congress has not acted on the Department's recommendations to date.

The Yurok Tribe proposes now to provide the Department with a new, unconditional waiver of claims, a concept not proposed at the time of the 2002 hearing. The Hoopa Valley Tribe argues, in essence, that the Act's authority no longer remains viable and that the fully-litigated takings claim precludes the Yurok Tribe from providing a new waiver. After careful review of all the issues, the Department concludes that the Yurok Tribe can tender a new, unconditional waiver and that the Act provides authority to the Department to act administratively to distribute the remaining funds to the Yurok Tribe upon receipt of such a waiver if it otherwise comports with the waiver requirements under the Act.

Neither the Act nor its legislative history specifies whether proceeding under one provision would preclude the Yurok Tribe from proceeding under the other, *i.e.*, whether bringing a takings claim and providing a waiver, actions both authorized under the Act, were mutually exclusive. For a number of reasons, we conclude that the takings litigation in *Karuk Tribe* did not result in the Yurok Tribe's forfeiting the benefits established in the Act. For example, the Act does not specify a time limitation, like the limited period to bring a constitutional challenge, on the ability to provide a waiver. Moreover, the Act's Yurok waiver provision is not limited solely to the constitutionally-based property claims authorized by the Act and litigated by the Yurok Tribe. The Act did not provide any contingent distribution arrangements if the Yurok Tribe chose to assert a takings claim. Fundamentally, nothing in the Act states that the Yurok Tribe's choosing to litigate its takings claim would cause the Tribe to forfeit the benefits under the Act.

Because Congress acted as a trustee in passing the Act and because the Hoopa Valley Tribe received already all of its benefits established by the Act, including its designated

share of the Fund, we believe that any ambiguity in the Act should be read in favor of providing the other beneficiary, the Yurok Tribe, with its benefits established by the Act. Because the Act specifically authorized either Tribe to bring certain claims against the United States yet did not provide for an alternative distribution of benefits if a Tribe took such an action, we further believe that an interpretation of the Act that avoids penalizing a beneficiary for taking an authorized action and that avoids potentially troublesome constitutional issues to be necessary here. Thus, we believe that it would be unreasonable to read the Act to work a forfeiture of the Yurok's right to receive the monies from the Fund, and we decline to do so.

The Act authorized the Yurok Interim Council, an entity that ceased to exist in 1993, to provide the requisite waiver under the Act. The Act did not preclude or otherwise divest power from the permanent Yurok Council also to waive claims. Both the Department and the Hoopa Valley Tribe subsequently acknowledged that the Yurok Tribe, after the expiration of the Interim Council, could "cure" its conditional waiver. Therefore, we also conclude that the current governing body of the Yurok Tribe can submit the waiver required by the Act.

Conclusion

After careful consideration and for the reasons set out briefly above, the Department has concluded that, through administrative action, the remaining funds set aside pursuant to the Act can still be distributed to the Yurok Tribe. The better reading of the Act and the underlying circumstances is to allow the Yurok Tribe to submit an unconditional waiver and to authorize the Department to distribute these funds to the Yurok Tribe upon that proper submission.

The Department appreciates that the underlying issues of this dispute have been argued between the two Tribes (and others) for over 40 years. Both Tribes have argued vigorously and persuasively for their respective positions. In recognition of these divergent views, the Department will not take action on this final decision and distribute the remaining funds until thirty days after the Department has received an unconditional waiver from the Yurok Tribe consistent with the Act.

Sincerely,

Ross O. Swimmer
Special Trustee for American Indians

# DECLARATION OF

# Richard P. Fielitz, Jr.

# July 14, 2008

# EXHIBIT B



# YUROK TRIBE

190 Klamath Boulevard • Post Office Box 1027 • Klamath, CA 95548

March 21, 2007

Hon. Ross O. Swimmer
Special Trustee for American Indians
U.S. Department of the Interior
Washington, D.C. 20240

Dear Mr. Swimmer,

Thank you for your letter of March 1, 2007, advising us of the Department's decision to make payment to the Yurok Tribe of monies which have been held in the Hoopa-Yurok Settlement Fund for benefit of the Yurok Tribe since enactment of the Hoopa-Yurok Settlement Act in 1988.

Pursuant to your request of March 1, we attach hereto a duly adopted unconditional waiver of claims arising out of the provisions of the Act.

We understand that Settlement funds will be distributed 30 days from the Department's acceptance of this waiver. The Yurok Tribe expresses to you and your colleagues its heartfelt gratitude for your efforts in finally bringing this matter to a just and equitable conclusion.

Sincerely,

*Maria Tripp*

Maria Tripp
Chair

Phone: (707) 482-1350 • Fax: (707) 482-1377



# YUROK TRIBE

190 Klamath Boulevard • Post Office Box 1027 • Klamath, CA 95548

### RESOLUTION
### of the
### YUROK TRIBAL COUNCIL

**RESOLUTION NO.:**   07-037

**DATE APPROVED:**   March 21, 2007

**SUBJECT:**   Waiver of Certain Claims and Consent to Uses of Tribal Funds Pursuant to the Hoopa-Yurok Settlement Act

**WHEREAS:** The Yurok Tribe is a Federally recognized Indian Tribe pursuant to a determination by the Bureau of Indian Affairs that was published in the *Federal Register* (60 Fed. Reg. 9,249 (February 16, 1995)), eligible for all rights and privileges afforded to Federally recognized tribes, including, but not limited to, the rights and privileges afforded under the Hoopa-Yurok Settlement Act, and the Yurok Tribal Council is the governing body of the Yurok Tribe under the authority of the Yurok Constitution of 1993; and,

**WHEREAS:** On April 26, 1988, Representative Doug Bosco introduced H.R. 4469, a version of which was enacted as the Hoopa-Yurok Settlement Act (the "Act") on October 31, 1988; and,

**WHEREAS:** Section 2(c) of the Act provides for certain benefits to the Yurok Tribe, including apportionment of funds, certain land transfers, and certain land acquisition authorities, provided that the Yurok Tribe adopt a resolution waiving certain claims, as required by the Act; and,

**WHEREAS:** The Senate Report accompanying the Act states that the waiver required by the Act does not prevent the Yurok Tribe "from enforcing rights or obligations created by this Act," S. Rep. 100-564 at 17; and,

**WHEREAS:** The Yurok Tribal Council has fully considered the claims to be waived under the Act and the consent to be granted and has balanced them against the benefits identified and mandates to the Yurok Tribe under the Act and has concluded that the Tribe would best be served by complying with the mandates identified in the Act; and,

**WHEREAS:** The Act provided for the establishment of the Yurok Interim Tribal Council, which on March 9, 1992 was authorized to submit the Waiver of Claims described in the Act; the permanent Yurok Tribal Council now has the authority originally granted by the Act to the Yurok Interim Tribal Council; and,

**WHEREAS:** The Yurok Tribal Council has carefully considered the Tribe's Constitution and other Tribal law and custom concerning the method by which the resolution called for by the Act should be enacted; and,

**NOW THEREFORE BE IT RESOLVED:** That the Yurok Tribal Council has the authority and responsibility under the Constitution and Bylaws of the Yurok Tribe to approve, certify, and enact the resolution required by the Hoopa-Yurok Settlement Act; and,

**BE IT FURTHER RESOLVED:** That this Resolution is not intended, and shall not be construed, so as to prevent the Yurok Tribe from enforcing its rights and the obligations of the United States created by the Hoopa-Yurok Settlement Act, see S. Rep. 100-564 at 17; and,

**BE IT FURTHER RESOLVED:** That the Yurok Tribe hereby waives any claim the Yurok Tribe may have against the United States arising out of the provisions of the Hoopa-Yurok Settlement Act; and,

**BE IT FURTHER RESOLVED:** That the Yurok Tribe affirms tribal consent to the contribution of Yurok Escrow monies to the Settlement Fund, such contribution having already been made as provided in Section 4(a) of the Act, and for their use as payments to the Hoopa Tribe, such payments having already been made as provided in Section 4(c) of the Act, and to individual Yuroks, such payments having already been made as provided in Section 6(c)(3) of the Hoopa-Yurok Settlement Act; and,

**BE IT FURTHER RESOLVED:** That the Chairperson and Secretary of the Yurok Tribal Council are hereby authorized, directed and empowered to sign the resolution for and on behalf of the Yurok Tribe as its act and deed.

## CERTIFICATION

This is to certify that this **Resolution No. 07-037** was approved at a duly called meeting of the Yurok Tribe on **March 21, 2007**, at which a quorum was present and that this **Resolution No. 07-037** was adopted by a vote of __6__ for and __0__ opposed and __0__ abstentions. This **Resolution No. 07-037** has not been rescinded or amended in any way.

DATED THIS 21ST DAY OF MARCH, 2007

_Maria Tripp_
Maria Tripp, Chair

ATTEST:

_signature_
Cynthia McKernan