UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Nez Perce Tribe, et al. ) | |
| ) | Civil Action No. 06cv02239-JR |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| KEMPTHORNE, et al. ) | |
| ) | |
| Defendants ) | |

## DECLARATION OF STANLEY SPEAKS

I, Stanley Speaks, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1.) I am the Regional Director for the Bureau of Indian Affairs ("BIA") Northwest Regional Office. I have held the position of the Regional Director of Trust Services since 1982, and I have been at the Northwest Region since August, 1982. My responsibilities as a Regional Director include serving as the line officer responsible for the planning, implementing, directing, monitoring and evaluating the BIA's trust responsibilities and program services within the Northwest Region and, in particular, the Klamath Tribes of Oregon (Klamath Tribes), as the Klamath Tribes is not serviced by any local BIA Agency. The services provided by the Northwest Regional Office include Welfare Assistance; Aid to Tribal Government; Social Services; Indian Child Welfare Act; Natural Resources; Wildlife and Parks; Scholarships; Adult Education; Education (other); Tribal Courts; Job Placement and Training; and, Economic Development.

2.) Although the services to the forty four (44) Tribes in the Northwest Region are similar in principle, in practice the scope and range can be very different for different Tribes including, but not limited to **allocation of funds to support 638 contracts for management of Tribal programs, cash flow needs, disbursements and tribal TPA budget input. Litigation funds are allocated to the Klamath Tribes to resolve Klamath Basin Off Project Water and Restoration Adjudication Issues. Contract Funds are made available to complete Klamath Tribes water rights claims in the Klamath Basin.** This means that the income generated from various activities will vary from Tribe to Tribe.

3.) Another significant characteristic of the Klamath Tribes is its history, unique perhaps in all of Indian Country. The indigenous Klamath people have had a presence in south central Oregon and northern California for over 14,000 years. They had control over 23 million acres and were known to travel extensively through the Willamette Valley and up to the Columbia River, establishing widespread trade networks. In 1846 when non-Indian settlement began in their traditional lands, clashes between cultures occurred that led to the Modoc War of 1872. Three traditionally adversarial tribes, the Klamaths, Modocs and Yahooskin Indians were ultimately assigned to live on the same reservation under the treaty of 1864. With that treaty, the Klamath Tribes ceded more than 20 million acres of land. People of the Klamath Tribes retained their right to hunt, fish and gather on the lands reserved to them "in perpetuity". Additionally, treaty guarantees promised an exchange of federal services which included health benefits, education, housing, and the protection of their sovereignty and natural resources.

Before termination, the reservation held extraordinary natural resources such as timber, wild game, water resources and agricultural land. In 1873, Tribal members sold lumber, facilitated by an agency sponsored saw-mill, to Fort Klamath and many private parties. By 1896 timber sales outside of the reservation amounted to about 250,000 board feet. The economy of Klamath County was sustained by valuable Klamath timber lands for decades. By the 1950, the Klamath Tribes was one of the wealthiest tribes in the United States. They owned and managed for long term yield, the largest stand of Ponderosa pine in the western United States. The Klamath Tribes was the only tribe in the United States that paid for all the federal, state and private services used by their members.

In 1954, Congress adopted the Klamath Termination Act (P.L. 587) which ended federal recognition of the Klamaths, Modocs and Yahooskins as a tribe, despite consistent official opposition from the Tribes and the Bureau of Indian affairs. The reservation land base of approximately 1.8 million acres was taken by condemnation and the Klamath people were no longer considered Indians. The Tribes were cut off from the treaty guaranteed services. Economic self-sufficiency of the Klamath people was undermined due to the loss of their right to use tribally held lands for grazing and timber. Furthermore, it was unlikely that tribal members could acquire any lands of the former reservation since the lands could only be acquired in blocks of no less than 5,000 acres.

In 1986, the Klamath Tribes gained restoration of federal recognition. Although the land base was not returned, the Tribe was directed to compose an Economic Development Self-sufficiency Plan (ESSP). After a lengthy analysis process, the Tribal Council and the General Council determined that the construction of a casino would help serve the goal of long term self-sufficiency. The Kla-Mo-Ya Casino began its operation in 1997, 45 years after termination. The Bureau of Indian Affairs has since taken 52 small tracts of land, amounting to 605.055 acres in trust for the Klamath Tribes. Other tracts are in the process of are in the process of being converted into trust status. To the best of my knowledge there have been no timber harvests monies collected or distributed since restoration. The largest income producing enterprise is the casino and those funds are not considered trust income and not tracked in our system.

4.) Since Termination, the Klamath Tribes have brought lawsuits and taken other actions on their own behalf. There is no indication that the Klamath Tribes expect or allow other tribes to sue or to act for them. There are no instances of which I am aware that in which the Klamath Tribes have joined with other tribes as co-plaintiffs in any administrative appeal or litigation.

Since 1961, the Klamath Tribes have presented the following claims to the Indian Claim Commission: **Docket 100**, claim for lands ceded in 1864, awarded $2.5 million; **Docket 100-A**, claim for additional compensation for the 621,824.28 acres excluded from reservation surveys, awarded $4,162,992.82; **Docket 100 B-1**, claim for mismanagement of their funds and properties, after appeal to the Court of Claims, **Docket 389-72**, awarded $18,000,000.00; **Docket 100 B-2**, claim for mismanagement of tribal forest and sawmill operations, settled for $16,500,000.00; **Docket 100-C**, claims for mismanagement of Klamath grazing and agricultural lands and irrigation projects and rights –of-way conveyed through tribal lands at less than fair market value, disposed of by award of $785,000.00 to pay off tribal loans used for litigation funds; Court of Claims, **Docket 387-72** additional compensation for tribal lands disposed of during termination, awarded $21,235,496.80 and $2,220,793.20.

In 1974 the federal court ruled in Kimbol v. Callahan that Klamath individuals retained their rights to hunt, fish and gather, and were to be consulted in land management decisions when those decisions affected their treaty rights. Later, in the case of United States v. Adair, the federal court determined that the Tribes have continuing water rights to support the existence of the fish and wildlife necessary to sustain their right to fish and hunt. Necessary wildlife habitat and fisheries under management of the federal government, however, were nearly decimated. Presently, the Klamath Tribes seek to restore their former lands and natural resources and provide for the social, economic, and spiritual well-being of its citizens.

Presently, the State of Oregon is adjudicating the water rights of the Klamath Tribes in the Klamath River Basin (*In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River, a Tributary of the Pacific Ocean* before the Office of Administrative Hearings, State of Oregon, for the Water Resources Department; Cases 277, 279-282, and 284-286). The legal proceedings for these eight cases began in February 2007, and under the current schedule, the proceedings will continue through November 2010.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of July, 2008.

_Stanley Speaks, Northwest Regional Director_