# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NEZ PERCE TRIBE, et al.,               )
for and on behalf of themselves            )
and all others similarly situated,         )
                                           )
                    Plaintiffs,            )
                                           )   No. 06cv02239-JR
           v.                              )
                                           )
DIRK KEMPTHORNE,                           )
SECRETARY OF THE INTERIOR, et al.,         )
                                           )
                    Defendants.            )
                                           )

## DECLARATION
## OF
## Gregory J. Chavarria

## July 14, 2008

## INTRODUCTION

1.      My name is Gregory J. Chavarria.  I am a certified public accountant licensed in the State of New Mexico.  I have been engaged by the United States to submit this declaration to explain the Tribal Reconciliation Project, as it relates to Plaintiffs' Motion for Class Certification, and to respond to the declaration of Mr. Kevin Nunes dated June 5, 2008.

2.      I have served clients in the areas of audit, management consulting and litigation consulting for approximately 22 years.  I am currently the Managing Partner of the Albuquerque Client Service Center of Clifton Gunderson, LLP.  Prior to that I was a founding member (partner) in the public accounting firm of Chavarria, Dunne & Lamey, LLC (CD&L), a limited liability company established in 1996.  Prior to founding CD&L, I worked for Arthur Andersen & Co. (Andersen) beginning in 1985 when I received my Bachelor of Accountancy degree from New Mexico State University.

3.      Through the course of my 22 year career I have served clients in a variety of industries and services.  I am experienced in planning and performing large complex audit and consulting engagements and have served several industries including financial institutions, investment companies, federal, state and tribal governments.  I have extensive experience and personal knowledge regarding accounting issues related to Native American Trust Funds, having served on a large number of audit and consulting engagements for various offices within the U.S. Department of the Interior responsible for managing Native American Trust Funds.  As a senior auditor at Andersen, I was responsible for the performance of the first annual financial audit of Tribal and Individual Indian Monies Trust Funds managed by the U.S. Department of the Interior Bureau of Indian Affairs. Subsequently, I was the overall engagement manager responsible for the planning and

1

performance of the Tribal Trust Funds Reconciliation Project for the period of July 1972

through September 1992 (See Curriculum Vitae Attachment A). This directly related

experience has allowed me to gain a solid understanding of accounting issues relating to

these tribal trust funds.

## OVERALL CONCLUSIONS

4.      Although there are some similarities in accounting and management of trust funds

for certain tribes and standardization of documentation and reporting, similar to many large

organization and industries, there are also significant differences in management and

accounting needs and unique accounting requirements among tribes not represented by the

twelve named Plaintiffs. My analysis of these data also demonstrates that the transactions for

these twelve named Plaintiffs are not representative of the proposed class of 222 tribes. The

list included in Attachment B represents my understanding of tribes considered for the

proposed class which I have included in my analysis. The list includes tribes that do not have

a pending case in the United States District Court other than the twelve named plaintiffs.

The list also excludes the Jicarilla Apache Tribe, Pueblo of Laguna, The Navajo Tribe and

Delaware-Cherokee Tribe of Oklahoma, which I understand have specifically requested to be

excluded from the class.

5.      My conclusions, further described below are based on my review of the

individually issued U.S. Department of the Interior Bureau of Indian Affairs (BIA) Agreed

Upon Procedures and Findings Reports for each of the 222 tribes dated December 31, 1995,

along with analysis of the electronic data used for the production of such reports by Andersen

for the time period of July 1, 1972 through September 30, 1992. My conclusions are also

based on my personal experience and knowledge of the organizational structure, accounting procedures and documentation of the BIA related to trust funds.

### The Tribal Reconciliation Project

6.    The Tribal Reconciliation Project (TRP) performed by Andersen was an engagement to perform certain agreed-upon procedures with respect to each individual tribe's trust account transactions for the period of July 1972 through September 1992. The primary objective of the TRP was to "reconstruct historical transactions, to the extent practicable, for all years for which records are available for all tribal trust accounts managed by the Bureau."[1] The agreed upon procedures performed can be summarized as follows for significant tasks under the project:

7.    **Basic Reconciliation –** This process was a verification of all tribal trust transactions to supporting financial documents. For example, receipt transactions were verified against deposit tickets and/or related collection vouchers and/or other relevant documentation. Disbursement transactions were verified against U.S. Treasury processed SF 1166 documents (Voucher and Schedule of Payments), Treasury reports (GOALS) of processed SF1166's, journal vouchers and/or other relevant disbursement documentation. Exceptions and proposed adjustments were reported to each tribe based on each individual tribe's transactions and accounts only.

8.    **Investment Yield Analysis –** This process was a calculation of investment yields on each tribe's individual trust accounts for comparison to benchmark rates for the purpose of identifying any potential accounting errors in interest earnings. Based on established parameters, unusual fluctuations from the benchmark rates as determined for each

---

[1] Agreed Upon Procedures and Findings Report of Independent Public Accountants issued by Andersen dated December 31, 1995.

individual account were investigated in order to determine if there were accounting errors. Results of the calculation and any proposed adjustments were reported to each tribe based on each individual tribe's results.

9.    **Treasury Interest Recalculation** – This was a detailed recalculation for each individual tribe's accounts of Treasury interest on cash balances based on the Treasury overnight investment or statutory interest as applicable based on the time period.  Prior to January of 1985, interest was earned on cash balances held in trust at statutory rates (4% or 5%) and subsequent to December 1984 interest was earned based on each day's short term Treasury investment rate ("Overnighter rates").   All variances as a result of each tribe's calculations were quantified and reported separately.

10.    **Systems Reconciliation** – This was a comparison and reconciliation of transactions and balances reported in multiple systems to each other.  The primary accounting system used by the Department of the Interior (DOI) for management and accounting for trust funds was the Finance System during the period covered by the TRP. The government also used a subsidiary system (MoneyMax) for tracking the detail investment purchase and maturities, individual investment rates, maturity dates, etc.  The two systems were maintained separately and were reconciled to each other as part of the TRP. Additionally, the U.S. Treasury maintains its own accounting system tracking receipts and disbursements independent of the Finance System used by DOI.  As part of the TRP, each transaction posting was compared and reconciled between the Finance System and the Treasury System for fiscal year 1992.  Subsequently Andersen completed and reported similar reconciliation results for fiscal years 1991 and 1990 as well as a balance comparison as of June 30, 1972 between the Finance System balances and the U. S. Treasury reported

4

balances in the Combined Statement of Receipts, Expenditures and Balances of the United

States Government. The results of the system reconciliation procedures were summarized in

total in the TRP reports, however proposed adjustments were only reported to those specific

tribes affected.

11.    **Fill the Gap Procedures** – This procedure was a verification of selected receipts

to lease agreements, sales agreements, contracts, permits or other documentation creating an

obligation to pay. This work was performed on a sample basis with an emphasis on contracts

with collections greater than $5,000. A total of 692 leases were tested, not including more

extensive scopes for five (5) selected tribes. Not all tribes were affected by this test, and the

sample was not intended to be representative of all tribes. Results were reported individually

for each tribe for which collections were selected for testing.

12.    **Five Tribe Pilot Project** – Five tribes including Confederated Tribes and Bands

of the Yakama Indian Nation were subject to much more extensive testing than any of the

other tribes, particularly with regard to Fill the Gap Procedures. The other tribes, which were

part of this project, were: The Confederated Salish and Kootenai Tribes of the Flathead

Reservation, Hopi Tribe of Arizona, Three Affiliated Tribes of the Fort Berthold Reservation

and Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation. These five tribes

received customized procedures considering the specific revenue sources, dollar value of

activity and/or any specific concerns raised by the tribes through consultation and a

memorandum of understanding between each of the five tribes and DOI. As an example,

these tribes received extensive Fill the Gap work designed to provide significant individual

tribal dollar coverage; these tribes also received compliance testing procedures, specific

judgment award testing, tests of accounts maintained in the IIM system, process flow

5

diagrams of accounting related functions and recommendations for improving such processes and other specific procedures specified in individual tribe's memorandum of understanding.

13.    **Analytical Review** – Andersen prepared graphs of receipt and disbursement activity for fiscal years 1978 through 1992 for the purpose of considering for investigation any unusual fluctuations in receipts and disbursements during the time period. The graphs were provided to each tribe as information for consideration, but only 15 tribes were selected for follow-up investigation of any unusual fluctuations. The results of any follow-up investigation were reported to those individual tribes selected.

14.    **Pro Forma Procedures** – This was a calculation performed for informational purposes of the tribes. What is meant by informational purposes is that the calculation was not a quantification of an accounting error, but purely a hypothetical calculation not requiring a correction/adjustment to the accounts. The hypothetical calculation considered the assumption that no liquidity or cash balances were required in an account and that instead all such balances could have been invested immediately upon receipt. The calculation quantifies what would have been earned had all cash balances been invested and earned a yield equivalent to a stated benchmark rate in comparison to actual interest earnings on cash balances for fiscal years 1978 through 1992. The results were reported individually to each tribe for accounts held during the period.

15.    **Deposit Lag Time** – This procedure was also performed for informational purposes only. It was the summarization of the amount of time between the apparent receipt date of collections to the deposit date posted in the tribes' trust accounts. The lag time specific to each tribe was summarized and reported individually.

6

16.    In early 1996, Interior provided the results of the TRP reports to tribes.   The information provided to tribes as part of the TRP generally included: (1) transaction by transaction account statements (receipts, interest earnings, disbursements, balances, etc.) for tribal trust fund accounts for the period from July 1, 1972 (Fiscal Year 1973), to September 30, 1995 (Fiscal Year 1995); (2) a report describing the procedures performed for the fiscal years 1973 through 1992 period and the results thereof; and (3) electronic images of source documents[2/] that supported certain transactions for fiscal years 1973 through 1992.

### Rebuttal of Kevin Nunes' Declaration

17.    In the Declaration of Kevin W. Nunes, dated June 5, 2008 Mr. Nunes concludes:

"1)    from a fiduciary accounting perspective, and based upon what I know about the Agreed-Upon Procedures Project and other U.S. Government tribal trust fund account transaction materials that I have reviewed, Defendants' and AA' treatment of the trust fund account transactions of the twelve named Plaintiffs is typical of their treatment of the trust fund account transactions of other tribes involved in the Agreed-Upon Procedures Project; and

2)    from a fiduciary accounting perspective, and based upon what I know about the Agreed-Upon Procedures Project and other tribal trust fund account transaction materials that I have reviewed, the trust fund account transactions of the twelve named Plaintiffs are representative generally of the trust fund account transactions processed by Defendants for other tribes covered by the Project."[3]

18.    Mr. Nunes does not define his meaning of the "treatment of the trust fund account transactions". Assuming he is referring to the method by which transactions are accounted for, there are certainly similarities in accounting treatment of transactions as much as there

---

[2/]    Source documents are the various trust-fund related financial documents, including those related to non-investment receipt transactions (e.g., deposit ticket, schedule of collections, and journal voucher), investment transactions (e.g., accounts distribution sheet and Treasury market securities purchase form), and non-investment disbursement transactions (e.g., request for withdrawal and voucher and schedule of payment).

[3] Declaration of Kevin W. Nunes Paragraph 9, page 7.

are governing standards for accounting treatment of transactions. These trust account

transactions are accounted for within the same accounting system and documentation for

certain transactions is standardized. For example, there is a standard form required to be

prepared and submitted to the U. S. Treasury in order to disburse funds.

19.    These similarities however are not enough to suggest that the transactions of any

one tribe are representative of another. Each tribal account is managed individually by DOI

and accounting considerations are unique to each tribe based on the resources and operational

needs of the individual tribes. Timber collections have different accounting considerations

than farm and pasture collections. For example, timber collections are based on a scaling

process over a specified period of time identifying species and volume of timber and

applying the proper contract price. The documentation would typically include a significant

number of scaling tickets from each logging unit tabulated and summarized in order to

determine the value of timber logged for collection purposes. Farm and pasture collections

are typically based on acreage and a stated price without the extensive volume and value

considerations. These accounting documentation variations are addressed in the Andersen

Agreed-Upon Procedures Project primarily in the lease testing (Fill the Gap) procedures.

Depending on the source of income, the accounting documentation used to verify the

expected amount of receipt could vary significantly.

20.    From an accounting perspective, the resource management, collection processing,

budgeting and disbursement processing for these accounts occur at the Agency and Regional

Offices of the BIA. These Agencies and Regional Offices are separate accounting and

management locations designed to address the needs of the tribes and individual

accountholders for which they are responsible. Agency and Regional Offices are spread

geographically and are in relatively close proximity to the tribes they serve. While one Agency Office may exclusively serve a tribe whose primary resource is timber, another Agency Office may serve a tribe whose primary source of revenue is coal, making the operations of each substantially different.

21.    There were approximately 87 Agency Offices and 12 Regional Offices responsible for managing and accounting for tribes' trust funds during the time period of July 1972 through September 1992; the period covered by the TRP. Only 12 Agency Offices and 7 Regional Offices are represented by the twelve named plaintiff tribes in this case.

22.    In the specific opinions and conclusions section of Mr. Nunes's declaration he concludes that "there are many facts relating to Defendants' and AA's treatment of the trust fund account transactions of the twelve named Plaintiffs that are similar, if not identical, to the facts relating to the trust fund account transactions of other tribes covered by the Agreed-Upon Procedures Project. As examples, Mr. Nunes cites the following facts:

   a.    "the tribal trust fund account manuals and handbooks developed by Defendants set forth uniform instructions for processing tribal trust fund account transactions for all tribes; for example, the source documents that Defendants require to process non-investment transactions in tribal trust fund accounts are the same from tribe to tribe;

   b.    the basic reporting by Defendants on tribal trust fund account transactions appears to be consistent for all tribes;

   c.    under their contract in the 1990s, the BIA and AA jointly developed "Agreed-Upon Procedures" that were intended to be applied consistently to the tribal trust fund account transactions of all tribes;

   d.    AA applied the Agreed-Upon Procedures to the trust fund account transactions of all tribes consistently; for example, where AA found source documents or other records to be missing, AA's treatment, notations, and reporting of these instances to the BIA were the same for all tribes, and, where AA identified accounting errors, AA provided proposed adjustments to BIA in a manner similar for all tribes;

9

e.  other than the unique statistics for each tribes' account(s), the BIA – AA Agreed-Upon Procedures Project reports to tribes provided the same general information to all tribes about the Project and its results in uniform format."[4]

23.    While these facts may be similar for all tribes, they are also similar to a broad range of both private industry and government practices as well as the accounting industry as a whole.  The facts can be summarized as standardized documentation policies, standardized reporting and standardized testing and reporting procedures.  Standardization is common practice in the accounting industry.  As an example, the Securities Exchange Commission establishes reporting standards for all public companies.  All are required to submit a standard K-1 annual report among other standard reports despite the dissimilar and unique nature of the reporting entities.  While the form is standardized, the content and substance is still unique to the reporting entity.  While both a manufacturing company and a pharmaceutical company both report revenue and operating expenses, the operations of each are significantly different.

24.    This is an important distinction excluded from the facts listed by Mr. Nunes.  The accounting documentation and form of reporting is standardized, but the substance and content is unique to each tribe and is reflective of the resources and operational needs of each specific tribe.  Reported receipts for one tribe may represent oil and gas revenue while another tribe's receipts represent timber revenue.  The accounting and reporting issues for these two resources are very different and one is not representative of the other.  The form of the reports issued by Andersen was standardized but the content of each report was unique to each tribe.  Each tribe received its individual accounting results and documentation of

---

[4] Declaration of Kevin W. Nunes Paragraph 10, page 7, page 8

accounting errors, if any were found. Each transaction was treated as a separate unit for evaluation and the results of any one tribe were not extrapolated to another.

25.    Mr. Nunes also states:

"I am of the opinion that there are many facts underlying the trust fund account transactions of the twelve named Plaintiffs that are extremely similar, if not identical, to the facts related to the trust fund account transactions of other tribes involved in the Agreed-Upon Procedures Project. Some examples of the representativeness of these account transaction facts include:

a.    According to the information on the CD-ROMs, all twelve named Plaintiffs appear to have Proceeds of Labor Accounts;

b.    According to the information on the CD-ROMs, at least ten of the twelve named Plaintiffs have Judgment Fund Accounts;"[5]

While the twelve named Plaintiffs may have these two broad categories of accounts, the only common element is that the very broad categories of restricted and unrestricted accounts are represented. As explained below, Proceeds of Labor Accounts and Judgment Fund accounts are unique and have unique accounting requirements.

26.    Proceeds of Labor accounts are unrestricted accounts used to collect and distribute funds as a result of an individual tribe's trust resources such as oil and gas, timber, farm and pasture, business leases, coal or other mineral resources, etc. Withdrawals from these accounts are based on each tribe's unique operational needs and revenue expectations reflected in tribal budgets adopted by each individual tribal council. Judgment accounts are the result of federal judgments awarded to the tribe and are restricted as to use. The use of monies as a result of an adjudicated or legislated award is dictated by the judgment award docket and a Use and Distribution Plan prepared by a tribe and approved by Congress. While the categories of accounts are represented by the twelve named plaintiffs, the unique

---

[5] Declaration of Kevin W. Nunes Paragraph 11, page 9

accounting requirements of other tribes in the proposed class based on resources specific to those tribes or specific judgment awards are not.

27.    Mr. Nunes goes on to provide the following facts as justification of his opinion that the transactions represented by the twelve named Plaintiffs are representative of the proposed class:

      c.   "According to the information on the CD-ROMs, of the Plaintiffs that have Proceeds of Labor Accounts, there is a wide variety of resources underlying these accounts, including oil and gas, timber, mining, gravel, and various surface leases;

      d.   The number of transactions in the account databases on the CD-ROMs for the twelve named Plaintiffs ranged from 722 (Pawnee) to 24,199 (Yakama).

      e.   The amounts of the transactions in the account databases on the CD-ROMs for the twelve named Plaintiffs ranged from pennies to millions of dollars"[6]

Mr. Nunes suggests by presenting these facts that the volume of transactions and type of revenue resources for the twelve named Plaintiffs is representative of the proposed class.

28.    My analysis of the revenue data[7] summarized below illustrates that the transaction type of revenue and volume for the twelve named Plaintiffs are not reflective of the proposed class.

| | Twelve Named Plaintiffs | | | Proposed Class | | |
|---|---|---|---|---|---|---|
| | Trans. count | Amount | % | Trans. count | Amount | % |
| Timber | 2,030 | $266,812,154 | 50% | 6,915 | $410,989,411 | 15% |
| Interest | 13,767 | 97,768,966 | 18% | 47,074 | 566,888,682 | 21% |
| Judgment | 25 | 40,577,732 | 8% | 417 | 407,894,573 | 15% |
| Surface | 4,949 | 21,201,814 | 4% | 29,616 | 82,682,939 | 3% |
| Oil and Mineral | 3,600 | 13,711,444 | 3% | 32,474 | 649,258,632 | 24% |
| Other | 6,448 | 89,075,654 | 17% | 24,268 | 605,288,713 | 22% |
| | 30,819 | $529,147,764 | 100% | 140,764 | $2,723,002,950 | 100% |

---

[6] Declaration of Kevin W. Nunes Paragraph 11, page 9

[7] These data represent receipt transactions excluding Treasury interest transactions for the twelve named plaintiffs and proposed class of tribes included in Attachment B.

29.    Based on the above summary, the twelve named Plaintiff transactions are heavily concentrated in timber revenue with a relatively small concentration in oil and mineral revenue.  Timber represents 50% of all revenue and oil and mineral only represents 3% for the twelve named Plaintiffs; while the proposed class transactions include only 15% in timber revenue and 24% in oil and mineral.

30.    Other disparities I noted is the concentration of revenue in a singular tribal entity included among the twelve named Plaintiffs.  The Confederated Tribes and Bands of the Yakama Indian Nation (Yakama) accounts for $325,732,168 or 61 % of the total receipts for the twelve named Plaintiffs and for 94% of total timber revenue.

31.    The Yakama Tribe was also one of only two (2) tribes subject to "Fill the Gap" testing which is the term used to describe the accounting procedures to test lease and natural resource production revenue, such as revenue from timber sales, oil and gas production, coal and other mineral production, etc.  Although the work performed for this tribe was significant, as it is one of five (5) pilot tribes selected for extensive work, this is the only tribe under the responsibility of the BIA Yakama Agency Office.  So all of the accounting procedures, functions and documentation subject to the reconciliation procedures for Yakama are under the control of one BIA Agency Office responsible only for Yakama.  As one of the five (5) pilot tribes, the work performed for Yakama was designed to address the specific concerns of this tribe as documented in a memorandum of understanding between Yakama and the BIA.  To further illustrate the differences in approach/procedures performed, I have attached a copy of the Yakama Tribe's TRP report (Attachment C) and the Yurok Tribe's TRP report (Attachment D).

13

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of July, 2008.

Gregory J. Chavarria

# DECLARATION OF

# Gregory J. Chavarria

# July 14, 2008

# ATTACHMENT A

# Curriculum Vitae

## Gregory J. Chavarria, CPA

Partner
Clifton Gunderson LLP
100 Sun Avenue NW, Suite 210
Albuquerque, NM 87109

### Education and Affiliations

Bachelor of Accountancy, December 1985
New Mexico State University
Licensed CPA in the State of New Mexico
Member of the American Institute of Certified Public Accountants
Member of New Mexico Society of Public Accountants

### Range of Experience

I entered public accounting in 1985 and worked for Arthur Andersen & Co. until 1996 when I left to form my own accounting and consulting firm, Chavarria, Dunne & Lamey LLC (CD&L) with my two partners. Together we grew the firm to over 100 staff before being acquired by Clifton Gunderson. I continue as Managing Partner of the Albuquerque Client Service Center of Clifton Gunderson where I have both business management as well as client engagement partner responsibilities.

In my 22 years of public accounting experience, I have served clients in a variety of industries and services. I am experienced in conducting audit and consulting engagements for federal government agencies, state and local agencies and Tribal governments. I am knowledgeable in the areas of reporting and audit requirements specific to government agencies and have instructed several training courses covering Generally Accepted Government Auditing Standards, Government Auditing Standards (Yellow Book) issued by the Comptroller of the United States, Single Audit Act and OMB Circulars A-128 and A-133.

Aside from government experience I have served as a auditor and consultant on a substantial number of engagements in private industry, including:

- Financial Institutions
- High Technology
- Research and Development
- Aviation
- Manufacturing
- Construction
- Oil and Gas

I have extensive experience in planning and managing large management consulting and litigation consulting engagements involving coordination of simultaneous efforts, significant staffing levels and large volumes of data. I have been involved in the planning and performance of several large consulting and audit contracts of Arthur Andersen, CD&L and Clifton Gunderson.

## *ProfessionalandBusinessHistory*

CliftonGundersonLLP
ManagingPartnerofAlbuquerqueClientServiceCent        er

Businessmanagementandadministrativeresponsibili        tiesfortheAlbuquerque
ClientServiceCenter;Engagementpartnerresponsib        ilitiesforanumberoflarge
accountingandconsultingengagementsincludingthe        followingcurrentfederal
governmentengagements:

- OfficeofHistoricalTrustAccounting–Tribaland        IndividualIndianMonies
  (IIM)TrustFundsHistoricalAccountingProjects
- U.S.DepartmentofJusticeTribalLitigationExpert        Witnessengagements

Chavarria,Dunne&LameyLLC,CertifiedPublicAcco        untants
Partner(member/owner),1996–2007

Businessmanagementandadministrativeresponsibili        tiesforafirmofover100
professionals;Engagementpartnerresponsibilities        foranumberoflargeaudit,
managementaccountingandlitigationconsultingeng        agementsincludingthe
followingfederalgovernmentengagements:

- OfficeofHistoricalTrustAccounting–Individual        IndianMonies(IIM)
  TrustFundsHistoricalAccountingProjects
- OfficeoftheSpecialTrustee,OfficeofTrustRisk        Management-IIM
  AccountingPilotProject
- OfficeoftheSpecialTrustee,OfficeofTrustFund        sManagement-Special
  DepositAccountClean-UpPilotProject
- OfficeoftheSpecialTrustee-Cobellv.NortonLi        tigation
- OfficeoftheSpecialTrustee,OfficeofTrustFund        sManagement–Annual
  TribalandIIMTrustFundsAudits
- U.S.DepartmentofJusticeTribalLitigationSuppor        t

ArthurAndersen&Company(Andersen)
AuditStaff,Senior,Manager1985–1996

Auditandconsultingengagementperformanceandman        agementresponsibilities
foravarietyofclientsandindustries;Overallma        nagementresponsibilityfor
OfficeoftheSpecialTrustee–TribalReconciliati        onProject

## *Testimony*

ExpertandFactwitnessTestimony--UnitedStates        CourtofFederalClaims-TheOsage
TribeofIndiansofOklahomav.TheUnitedStateso        fAmerica.;No.99-550L(into
whichhasbeenconsolidatedNo.00-169L)

# DECLARATION OF

# Gregory J. Chavarria

# July 14, 2008

# ATTACHMENT B

Tribes Included in Proposed Class

| # | Tribe Name |
|---|---|
| 1 | NOT DEFINED |
| 2 | AGUA CALIENTE BAND OF CAHUILLA INDIANS |
| 3 | EASTERN BAND OF CHEROKEE INDIANS OF NORTH CAROLINA |
| 4 | SEMINOLE TRIBE OF FLORIDA |
| 5 | TONAWANDA BAND OF SENECA INDIANS OF NEW YORK |
| 6 | PENOBSCOT TRIBE OF MAINE |
| 7 | HOULTON BAND OF MALISEET INDIANS OF MAINE |
| 8 | MASHANTUCKET PEQUOT TRIBE OF CONNECTICUT |
| 9 | COW CREEK BAND OF UMPQUA INDIANS OF OREGON |
| 10 | MICCOSUKEE TRIBE |
| 11 | POARCH BAND OF CREEK INDIANS |
| 12 | WAMPANOAG TRIBE OF GAY HEAD OF MASSACHUSETTS |
| 13 | SPOKANE TRIBE OF INDIANS |
| 14 | KALISPEL INDIAN COMMUNITY |
| 15 | CHEHALIS TRIBE |
| 16 | HOH INDIAN TRIBE |
| 17 | LUMMI TRIBE |
| 18 | MAKAH INDIAN TRIBE |
| 19 | MUCKLESHOOT INDIAN TRIBE |
| 20 | NISQUALLY INDIAN TRIBE |
| 21 | NOOKSACK INDIAN TRIBE |
| 22 | PORT GAMBLE INDIAN COMMUNITY |
| 23 | PUYALLUP TRIBE |
| 24 | QUILEUTE TRIBE |
| 25 | QUINAULT TRIBE |
| 26 | SHOALWATER BAY TRIBE |
| 27 | SKAGIT TRIBE OF INDIANS |
| 28 | SKOKOMISH INDIAN TRIBE |
| 29 | SQUAXIN ISLAND TRIBE |
| 30 | SWINOMISH INDIANS |
| 31 | TULALIP TRIBE |
| 32 | LOWER ELWHA TRIBAL COMMUNITY |
| 33 | JAMESTOWN KLALLAM TRIBE OF WASHINGTON |
| 34 | CHINOOK TRIBE AND BANDS OF INDIAN |
| 35 | UPPER SKAGIT INDIAN TRIBE |
| 36 | COWLITZ TRIBE OF INDIANS |
| 37 | SAMISH TRIBE OF INDIANS |
| 38 | SUQUAMISH INDIAN TRIBE OF THE PORT MADISON RESERVATION |
| 39 | KIKIALLUS TRIBE OF INDIANS |
| 40 | NATIVE VILLAGE OF TETLIN, ALASKA |
| 41 | DAWAMISH TRIBE OF INDIANS |
| 42 | SNOHOMISH TRIBE OF INDIANS |
| 43 | CONFEDERATED TRIBES OF GRANDE RONDE COMMUNITY |
| 44 | CONFEDERATED TRIBES OF SILETZ RESERVATION |
| 45 | CONFEDERATED TRIBES OF UMATILLA RESERVATION |

Tribes Included in Proposed Class

| # | Tribe Name |
|---|---|
| 46 | NORTHERN PAIUTE NATION |
| 47 | CONFEDERATED TRIBES OF WARM SPRINGS RESERVATION |
| 48 | KOOTENAI TRIBE OF IDAHO |
| 49 | DELAWARES OF IDAHO, INC. |
| 50 | BLACKFEET TRIBE |
| 51 | CROW TRIBE OF MONTANA |
| 52 | CONFEDERATED SALISH AND KOOTENAI TRIBES OF THE FLATHEAD RESERVATION |
| 53 | FORT BELKNAP INDIAN COMMUNITY |
| 54 | GROS VENTRE TRIBE OF FORT BELKNAP |
| 55 | ARAPAHOE TRIBE OF THE WIND RIVER RESERVATION |
| 56 | SHOSHONE TRIBE OF THE WIND RIVER RESERVATION |
| 57 | DEVILS LAKE SIOUX TRIBE |
| 58 | TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS |
| 59 | FLANDREAU SANTEE SIOUX TRIBE |
| 60 | SISSETON-WAHPETON SIOUX TRIBE |
| 61 | PONCA TRIBE OF NEBRASKA |
| 62 | LOWER SIOUX INDIAN COMMUNITY, MINNESOTA |
| 63 | PRAIRIE ISLAND INDIAN COMMUNITY OF MINNESOTA |
| 64 | BOIS FORTE BAND OF CHIPPEWA |
| 65 | FOND DU LAC BAND OF CHIPPEWA |
| 66 | GRAND PORTAGE BAND OF CHIPPEWA |
| 67 | LEECH LAKE BAND OF CHIPPEWA |
| 68 | WHITE EARTH BAND OF CHIPPEWA |
| 69 | RED LAKE BAND OF CHIPPEWA INDIANS |
| 70 | MILLE LACS BAND OF CHIPPEWA INDIANS |
| 71 | SHAKOPEE MEDAWAKANTON SIOUX COMMUNITY OF MINNESOTA (PRIOR LAKES) |
| 72 | MEDAWAKANTON & WAHPAKOOTA BANDS OF SIOUX INDIANS, MINNESOTA |
| 73 | SHAKOPEE SIOUX |
| 74 | BROTHERTON INDIANS-WISCONSIN |
| 75 | BAD RIVER BAND OF CHIPPEWA INDIANS |
| 76 | LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS |
| 77 | LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS |
| 78 | ONEIDA TRIBE OF INDIANS OF WISCONSIN |
| 79 | FOREST COUNTY POTAWATOMI COMMUNITY |
| 80 | ST CROIX CHIPPEWA INDIANS OF WISCONSIN |
| 81 | STOCKBRIDGE MUNSEE COMMUNITY OF MOHICANS |
| 82 | WISCONSIN WINNEBAGO INDIANS |
| 83 | MENOMINEE INDIAN TRIBE OF WISCONSIN |
| 84 | MINNESOTA CHIPPEWA BAND OF LAKE SUPERIOR |
| 85 | MINNESOTA CHIPPEWA OF THE MISSISSIPPI |
| 86 | PAIUTE-SHOSHONE TRIBE OF THE FALLON RESERVATION |
| 87 | BAY MILLS INDIAN COMMUNITY |
| 88 | HANNAHVILLE INDIAN COMMUNITY, MICHIGAN |
| 89 | SAGINAW CHIPPEWA INDIAN TRIBE, MICHIGAN |
| 90 | KEWEENAW BAY INDIAN COMMUNITY |

Tribes Included in Proposed Class

| # | Tribe Name |
| --- | --- |
| 91 | GRAND TRAVERSE BAND OTTAWA & CHIPPEWA INDIANS OF MICHIGAN |
| 92 | L'ANSE & VIEW DE SERT CHIPPEWA FUND |
| 93 | POTAWATOMI INDIANS OF MICHIGAN & INDIANA |
| 94 | SAC AND FOX TRIBE OF THE MISSISSIPPI IN IOWA |
| 95 | OTTAWA & CHIPPEWA OF MICHIGAN |
| 96 | INDIANS OF THE BIG BEND (HENDERSON) RANCHERIA |
| 97 | COLD SPRINGS RANCHERIA |
| 98 | COLUSA RANCHERIA |
| 99 | COLFAX RANCHERIA INDIANS |
| 100 | FT BIDWELL INDIAN COMMUNITY OF PAIUTE INDIANS |
| 101 | GRINDSTONE INDIAN RANCHERIA OF WINTUN-WAILAKI INDIANS |
| 102 | LAYTONVILLE RANCHERIA |
| 103 | FT INDEPENDENCE INDIAN COMMUNITY OF PAIUTE INDIANS |
| 104 | MANCHESTER BAND OF POMO INDIANS |
| 105 | MIDDLETOWN RANCHERIA OF POMO INDIANS |
| 106 | BIG PINE BAND OF OWENS VALLEY PAIUTE SHOSHONE INDIANS |
| 107 | PIT RIVER TRIBE |
| 108 | ROUND VALLEY INDIAN TRIBES |
| 109 | RUMSEY INDIAN RANCHERIA OF WINTUN INDIANS |
| 110 | SANTA ROSA RANCHERIA INDIANS |
| 111 | SHINGLE SPRINGS RANCHERIA INDIANS |
| 112 | OWENS VALLEY INDIANS OF BISHOP COMMUNITY |
| 113 | SUSANVILLE RANCHERIA INDIANS |
| 114 | RESIGHINI RANCHERIA INDIANS |
| 115 | HOOPA VALLEY TRIBE |
| 116 | AUGUSTINE INDIANS |
| 117 | CABAZON INDIANS |
| 118 | CAHUILLA INDIANS |
| 119 | CAMPO INDIANS |
| 120 | CAPITAN GRANDE INDIANS |
| 121 | BARONA INDIANS |
| 122 | INAJA INDIANS |
| 123 | LA JOLLA INDIANS |
| 124 | LA POSTA INDIANS |
| 125 | MESA GRANDE BAND |
| 126 | MORONGO BAND |
| 127 | PALA BAND |
| 128 | PAUMA BAND |
| 129 | RINCON BAND |
| 130 | SAN MANUEL BAND OF MISSION INDIANS, CALIFORNIA |
| 131 | SAN PASQUAL BAND |
| 132 | SANTA ROSA INDIANS |
| 133 | SANTA YNEZ BAND |
| 134 | SANTA YSABEL BAND |
| 135 | SOBOBA INDIANS |

Tribes Included in Proposed Class

| # | Tribe Name |
|---|---|
| 136 | TORRES AND MARTINEZ INDIANS |
| 137 | TWENTY NINE PALMS BAND |
| 138 | BARON LONG INDIANS |
| 139 | YAVAPAI APACHE NATION OF THE CAMP VERDE RESERVATION |
| 140 | COCOPAH TRIBE |
| 141 | FORT MOJAVE INDIAN TRIBE OF ARIZONA |
| 142 | HAVASUPAI TRIBE |
| 143 | WHITE MOUNTAIN APACHE TRIBE |
| 144 | PAYSON INDIAN BAND |
| 145 | HOPI TRIBE OF ARIZONA |
| 146 | SAN XAVIER INDIANS |
| 147 | FORT MCDOWELL MOHAVE-APACHE INDIAN COMMUNITY |
| 148 | SAN CARLOS APACHE TRIBE |
| 149 | KAIBAB BAND OF PAIUTE INDIANS |
| 150 | PRESCOTT YAVAPAI INDIANS |
| 151 | OWENS VALLEY INDIANS OF LONE PINE COMMUNITY |
| 152 | SHERWOOD VALLEY RANCHERIA INDIANS |
| 153 | STRATHMORE RANCHERIA INDIANS |
| 154 | ELEM INDIAN COLONY OF POMO INDIANS |
| 155 | TAYLORVILLE BAND OF MAIDU INDIANS |
| 156 | TUOLUMNE RANCHERIA INDIANS |
| 157 | WESTERN SHOSHONE INDIANS |
| 158 | FORT MCDERMITT PAIUTE AND SHOSHONE TRIBES |
| 159 | MOAPA BAND OF PAIUTE INDIANS |
| 160 | PYRAMID LAKE PAIUTE TRIBE |
| 161 | PAIUTE-SHOSHONE TRIBE OF THE FALLON RESERVATION |
| 162 | SUMMIT LAKE PAIUTE TRIBE |
| 163 | WALKER RIVER PAIUTE TRIBE |
| 164 | WASHOE TRIBE OF NEVADA AND CALIFORNIA |
| 165 | TONTO APACHE TRIBE OF ARIZONA |
| 166 | SKULL VALLEY BAND OF GOSHUTE INDIANS OF UTAH |
| 167 | SOUTHERN PAIUTE NATION |
| 168 | UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, UTAH |
| 169 | BENTON PAIUTE INDIANS |
| 170 | PAIUTE INDIAN TRIBE OF UTAH |
| 171 | CHEMEHUEVI INDIAN TRIBE |
| 172 | QUECHAN INDIAN TRIBE |
| 173 | PUEBLO OF ACOMA |
| 174 | PUEBLO OF COCHITI |
| 175 | PUEBLO OF ISLETA |
| 176 | PUEBLO OF JEMEZ |
| 177 | PUEBLO OF NAMBE |
| 178 | PUEBLO OF PICURIS |
| 179 | PUEBLO OF POJOAQUE |
| 180 | PUEBLO OF SANDIA |

Tribes Included in Proposed Class

| # | Tribe Name |
|---|---|
| 181 | PUEBLO OF SAN FELIPE |
| 182 | PUEBLO OF SAN ILDEFONSO |
| 183 | PUEBLO OF SAN JUAN |
| 184 | PUEBLO OF SANTA ANA |
| 185 | PUEBLO OF SANTA CLARA |
| 186 | PUEBLO OF SANTO DOMINGO |
| 187 | PUEBLO OF TAOS |
| 188 | PUEBLO OF TESUQUE |
| 189 | PUEBLO OF ZIA |
| 190 | PUEBLO OF ZUNI |
| 191 | CANONCITO NAVAJO INDIANS |
| 192 | SOUTHERN UTE TRIBE |
| 193 | UTE MOUNTAIN UTE TRIBE |
| 194 | KIOWA, COMANCHE & APACHE TRIBES OF INDIANS |
| 195 | FORT SILL APACHE TRIBE OF OKLAHOMA |
| 196 | WICHITA & AFFILIATED TRIBES OF OKLAHOMA |
| 197 | WICHITA/CADDO/DELAWARE INDIANS |
| 198 | CADDO INDIAN TRIBE OF OKLAHOMA |
| 199 | DELAWARE TRIBE OF WESTERN OKLAHOMA |
| 200 | COMANCHE TRIBE OF OKLAHOMA |
| 201 | APACHE TRIBE OF OKLAHOMA |
| 202 | KIOWA TRIBE OF OKLAHOMA |
| 203 | ABSENTEE DELAWARE TRIBE OF OKLAHOMA |
| 204 | ABSENTEE SHAWNEE TRIBE OF OKLAHOMA |
| 205 | CHEROKEE BAND OF SHAWNEE INDIANS OF OKLAHOMA |
| 206 | CITIZEN BAND POTAWATOMI INDIAN TRIBE OF OKLAHOMA |
| 207 | IOWA TRIBE OF OKLAHOMA |
| 208 | KICKAPOO TRIBE OF OKLAHOMA |
| 209 | ALABAMA AND COUSHATTA TRIBES OF TEXAS |
| 210 | KICKAPOO TRIBE OF KANSAS |
| 211 | SAC AND FOX TRIBE OF MISSOURI IN KANSAS |
| 212 | THLOPTHLOCCO TRIBAL TOWN |
| 213 | CHEROKEE NATION OKLAHOMA |
| 214 | EASTERN CREEK |
| 215 | DELAWARE TRIBE OF KANSAS |
| 216 | QUAPAW TRIBE OF OKLAHOMA |
| 217 | OTTAWA TRIBE OF OKLAHOMA |
| 218 | SENECA & SHAWNEE FUND |
| 219 | PEORIA TRIBE OF OKLAHOMA |
| 220 | CHITIMACHA TRIBE OF LOUISIANA |
| 221 | COUSHATTA TRIBE OF LOUISIANA |
| 222 | MISSISSIPPI BAND OF CHOCTAW INDIANS |

# DECLARATION OF

# Gregory J. Chavarria

# July 14, 2008

# ATTACHMENT C

ARTHUR ANDERSEN LLP

ATTACHMENT C

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### Table of Contents

|  |  | Page |
|---|---|---|
| | Agreed-Upon Procedures and Findings Report of Independent Public Accountants | |
| | Executive Summary of Findings | 6 |
| | **Attachments** | |
| A | Summary of Basic Reconciliation Procedures and Results | 26 |
| B-1 | Summary of Investment Yield Analysis Procedures and Results | 36 |
| B-2 | Summary of Treasury Interest Recalculation Procedures and Results | 55 |
| B-3 | Summary of Pro Forma Procedures and Results | 60 |
| C | Summary of Analytical Review Procedures and Reportable Conditions | 62 |
| D-1 | Summary of MoneyMax System to Finance System Reconciliation Procedures | 83 |
| D-1a | Summary of MoneyMax System to Finance System Reconciliation Results for All Tribes | 85 |
| D-1b | Summary of MoneyMax System to Finance System Reconciliation Results for Yakama Nation | 86 |
| D-2 | Summary of U.S. Treasury System to Finance System Reconciliation Procedures | 87 |
| D-2a | Summary of U.S. Treasury System to Finance System Reconciliation Results for All Tribes | 89 |
| D-2b | Summary of U.S. Treasury System to Finance System Reconciliation Results for Yakama Nation | 91 |
| E | Summary of Deposit Lag Time Procedures | 92 |
| E-1 | Summary of Deposit Lag Time Results for Yakama Nation | 93 |
| E-2 | Summary of Deposit Lag Time Results for All Tribes | 94 |
| F | Summary of Tribal Individual Indian Money (IIM) Procedures and Results | 95 |
| G | Summary of Fill the Gap Procedures | 98 |
| G-1 | Summary of Fill the Gap Results for Yakama Nation | 100 |
| G-2 | Summary of Timber Sales Results for Yakama Nation | 101 |
| G-3 | Summary of Timber Sales Proposed Adjustments and Reclassifications for Yakama Nation | 110 |
| G-4 | Summary of Surface Lease Proposed Adjustments and Reclassifications for Yakama Nation | 119 |
| G-5 | Summary of Unlocated Fill the Gap Documentation for Yakama Nation | 129 |
| G-6 | Summary of Fill the Gap Results for All Tribes | 135 |
| H | Summary of Disbursement Activity for Judgment Awards | 136 |
| I | Bureau/Tribal Memorandum of Understanding: | |
| | I-1   Summary of Timber Payments/Timber Deposits | 143 |
| | I-2   Forest Management Deduction (FMD) | 146 |
| J | Summary of Laws and Regulations Compliance Testing | 147 |
| K | Review of Operations | 154 |
| L | Other Findings/Recommendations | 177 |



ARTHUR ANDERSEN LLP

## Agreed-Upon Procedures and Findings Report of
## Independent Public Accountants

To the U.S. Department of the Interior, Bureau of Indian Affairs:

At your request, and in accordance with the U.S. Department of the Interior, Bureau of Indian Affairs (the Bureau) contract number CMK00129395, as modified at various dates (the Contract), we have performed the following agreed-upon procedures (see items numbered one (1) through twelve (12) below) with respect to the Tribal Trust account transactions of the Confederated Tribes and Bands of the Yakama Indian Nation (Yakama Nation) for the period from July 1, 1972 (Fiscal Year 1973) through September 30, 1992 (Fiscal Year 1992) (i.e., reconciliation period), except as otherwise noted. Yakama Nation is one (1) of five (5) Indian Tribes included in the Five Tribes Pilot Project of the Bureau Tribal Trust Funds Reconciliation Project (Reconciliation Project).

The Congressional mandate for the Reconciliation Project requires an accounting to each Tribe for each of their Trust accounts. The primary objective of the Reconciliation Project, as stated in the Contract, is to reconstruct historical transactions, to the extent practicable, for all years for which records are available for all Tribal Trust accounts managed by the Bureau. Phase I of the Reconciliation Project substantiated that not all records would be available for a full accounting of such funds. Due to the unavailability of some records, the scope of the Reconciliation Project is designed to provide reasonable assurance as to the accuracy of each Tribal Trust account balance. The agreed-upon procedures performed, as required by the Contract, represent the Bureau's standard of reasonableness. We understand the Five Tribes Pilot Project was designed by the Bureau to obtain information regarding specific potential problem areas that may be encountered in the overall reconciliation process and to gain insight on the specific procedures required to successfully bring to closure the reconciliation effort for a select group of Tribal accounts.

Below are summaries of the agreed-upon procedures applied. Attachments A through K further detail certain procedures, findings and reportable conditions and are incorporated by reference into this report. Attachments A through K include information marked "Supplemental Information" which has been included at the Bureau's request to further clarify the report. This supplemental information has not been subjected to the agreed-upon procedures described below.

Source documents used in performing all of the following agreed-upon procedures were obtained by the Bureau and provided to us for reconciliation purposes. The Bureau has advised us that not all of the source documents for the reconciliation period could be located. The number and percentage of transactions that were reconciled to source documents are shown in Attachment A, "Summary of Basic Reconciliation Procedures and Results."

1.  **Account Statements**

    We prepared account statements including detail of transactions, balances, results of reconciliations and proposed adjustments using Bureau provided financial records. The accompanying Tribal Account Statements should be read in conjunction with this report.



The accompanying statements do not include award accounts with multiple tribal beneficiaries for the period the award was undistributed. Such statements have been delivered to the Bureau for appropriate dissemination.

2. **Basic Reconciliation**

We performed the following procedures to reconcile individual account transactions:

   a. **Receipts** - We verified (i.e., traced and agreed) non-investment receipts posted to each of Yakama Nation's accounts, to the extent source documentation was provided, as to amount, date and account number to deposit tickets and/or related collection vouchers, journal vouchers and/or other relevant collection documentation (see Attachment A for "Summary of Basic Reconciliation Procedures and Results").

   b. **Disbursements** - We verified (i.e., traced and agreed) non-investment disbursements posted to each of Yakama Nation's accounts, to the extent source documentation was provided, as to amount, date and account number to U.S. Treasury ("Treasury") processed SF1166 documents (Voucher and Schedule of Payment), Treasury reports (GOALS) of processed SF1166's, journal vouchers and/or other relevant disbursement documentation. We also verified (i.e., traced and agreed), to the extent source documentation was provided, the posted disbursement transactions as to amount, date and account number to the requests for withdrawal from Yakama Nation and/or the Bureau (see Attachment A for "Summary of Basic Reconciliation Procedures and Results").

   c. **Investment Transactions** - We also performed procedures similar to 2a and 2b above for certain investment transactions (i.e., purchases and maturities) in Fiscal Years 1986 through 1991. However, these procedures were discontinued and these transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation (see Attachments B-1 and B-2 for "Summary of Investment Yield Analysis Procedures and Results" and "Summary of Treasury Interest Recalculation Procedures and Results," respectively).

3. **Investment Analysis**

The following procedures were applied to Fiscal Years 1978 through 1992. General ledger income/cost codes needed to determine whether a transaction is interest related were not available for years prior to Fiscal Year 1978 and, therefore, interest receipts could not be identified for comparison.

   a. **Investment Yield Analysis** - We calculated annual investment interest yields on each of Yakama Nation's accounts and compared to the Annual Tribal Fund Benchmark rates (Benchmark) (see Attachment B-1) to identify potential errors in interest earnings. We investigated unusual fluctuations from the Benchmark parameters (see Attachment B-1 for discussion of parameters) to determine whether amounts were properly posted. This analysis also provides information to Yakama Nation as to the performance of their specific accounts compared to the Tribal Trust Fund as a whole, as reported by the Bureau (see Attachment B-1 for "Summary of Investment Yield Analysis Procedures and Results").

   b. **Treasury Interest Recalculation** - We recalculated Treasury Overnighter interest earnings and statutory Treasury interest earnings received by Yakama Nation on the



daily cash balance in each of Yakama Nation's Trust accounts using the applicable Treasury interest rates and daily balances provided by the Bureau (see Attachment B-2 for "Summary of Treasury Interest Recalculation Procedures and Results").

c. **Pro Forma Calculations** - We performed, for informational purposes only, pro forma calculations of interest income on uninvested funds for Fiscal Years 1978 through 1992 for all of Yakama Nation's Trust accounts. This calculation is an estimate of what might have been earned had uninvested funds yielded returns comparable to the Benchmark rates. The calculation is an automated calculation of interest based on Bureau provided general ledger reported balances and the Benchmark rates (see Attachment B-3 for "Summary of Pro Forma Procedures and Results").

4. **Analytical Review**

We reviewed Yakama Nation's account statement detail of transactions (for Fiscal Years 1978 through 1992, as income/cost codes were not available for years prior to Fiscal Year 1978) discussed in the Basic Reconciliation and investigated judgmentally identified unusual fluctuations in receipts and disbursements (see Attachment C for "Summary of Analytical Review Procedures and Reportable Conditions").

5. **Systems Reconciliation**

a. We reconciled the MoneyMax System (Bureau investment subsidiary detail) investment balances to the Finance System (general ledger) investment balances for all Tribes as of September 30, 1992, with the exception of certain investment transactions affecting several tribes, including Yakama Nation, which were reconciled internally by the Bureau. Any adjustments resulting from such internal reconciliations are not reflected in this report or in the accompanying Tribal Account Statements (see Attachments D-1, D-1a and D-1b for "Summary of MoneyMax System to Finance System Reconciliation Procedures," "Summary of MoneyMax System to Finance System Reconciliation Results for All Tribes" and "Summary of MoneyMax System to Finance System Reconciliation Results for Yakama Nation," respectively).

b. We reconciled Fiscal Year 1992 Bureau cash transactions reported by the U.S. Treasury (Treasury) to the Bureau's Finance System (General Ledger System Reconciliation) and reports submitted to the Treasury (Treasury Reporting Reconciliation). The resulting variances were investigated for Tribal Trust funds (Account 8365) and resolved, to the extent supporting documentation was located by the Bureau (see Attachments D-2, D-2a and D-2b for "Summary of U.S. Treasury System to Finance System Reconciliation Procedures," "Summary of U.S. Treasury System to Finance System Reconciliation Results for All Tribes" and "Summary of U.S. Treasury System to Finance System Reconciliation Results for Yakama Nation," respectively).

6. **Deposit Lag Time**

We compared, for informational purposes only, the lag time from the apparent date of receipt of funds (as defined in Attachment E) to the deposit date posted to the general ledger accounts and summarized the results (see Attachments E, E-1 and E-2 for "Summary of Deposit Lag Time Procedures," "Summary of Deposit Lag Time Results for Yakama Nation" and "Summary of Deposit Lag Time Results for All Tribes," respectively).



7. **Tribal Individual Indian Money (IIM)**

We reviewed, on a sample basis, receipts and disbursements posted to Yakama Nation's Individual Indian Money (IIM) accounts and verified (i.e., traced and agreed) such receipts and disbursements to supporting documentation (see Attachment F for "Summary of Tribal Individual Indian Money (IIM) Procedures and Results").

8. **Fill the Gap**

We verified (i.e., traced and agreed), on a sample basis, receipt amounts posted to the general ledger to original lease agreements, sales agreements, contracts, permits or other documentation as appropriate, to the extent provided, to determine that the amounts received and the allocation of such amounts to general ledger accounts were properly recorded based on such documentation (see Attachments G, G-1, G-2, G-3, G-4, G-5 and G-6 for "Summary of Fill the Gap Procedures," "Summary of Fill the Gap Results for Yakama Nation," "Summary of Timber Sales Results for Yakama Nation," "Summary of Timber Sales Proposed Adjustments and Reclassifications for Yakama Nation," "Summary of Surface Lease Proposed Adjustments and Reclassifications for Yakama Nation," "Summary of Unlocated Fill the Gap Documentation for Yakama Nation" and "Summary of Fill the Gap Results for All Tribes," respectively).

9. **Disbursement Activity for Judgment Awards**

We reviewed disbursement transactions for judgment award accounts to verify (i.e., trace and agree) they were authorized by the Award Fund Distribution Plan (the Plan) and were posted to the proper account based on the purpose identified on the Tribal request and/or resolution (see Attachment H for "Summary of Disbursement Activity for Judgment Awards").

10. **Bureau/Tribal Memorandum of Understanding**

We performed the procedures described below at the request of the Bureau as a result of the Memorandum of Understanding between the Bureau and Yakama Nation.

   a. We reviewed, on a sample basis, the timeliness of timber payments received from the loggers in accordance with the provisions of the contracts (see Attachment I-1 for "Summary of Timber Payments/Timber Deposits").

   b. We reviewed, on a sample basis, the timeliness of timber deposits into interest-bearing accounts (see Attachment I-1 for "Summary of Timber Payments/Timber Deposits").

   c. We reviewed documentation of the history, policies and procedures relating to the implementation of the Forest Management Deduction (FMD). In addition, we determined the amount of the FMD that was returned to the Treasury (see Attachment I-2 for "Forest Management Deduction").

   d. We reviewed unadjusted account balance discrepancies in year-end and beginning-year balances for Fiscal Years 1973 through 1992 (see accompanying Tribal Account Statements).

   e. We reviewed Summary of Trust Funds statements provided to Yakama Nation and made recommendations for changing the reporting of interfund transfers and related activity (see Attachment L for "Other Findings/Recommendations").



11. **Laws and Regulations Compliance Testing**

We performed tests of compliance with laws and regulations with the 1992 Code of Federal Regulations (CFR), Volume 25, for a sample of income producing surface leases and timber sales active during Fiscal Year 1992. The laws and regulations tested may or may not be applicable to the leases and sales tested because they may have changed since the inception of the various leases and sales (see Attachment J for "Summary of Laws and Regulations Compliance Testing").

12. **Internal Control Review**

We interviewed key Bureau personnel involved in relevant accounting functions and prepared process flowcharts with our understanding of the information obtained for the purpose of identifying internal control weaknesses (see Attachment K for "Review of Operations").

13. **Other Findings/Recommendations**

Based upon our procedures performed above, we presented general findings and recommendations (see Attachment L for "Other Findings/Recommendations").

14. **Findings**

As a result of applying the agreed-upon procedures for all items, findings were noted (see Attachments A through L for detail of findings).

Because the above procedures do not constitute an audit made in accordance with generally accepted auditing standards, we do not express an opinion on any of the elements referred to above. Had we performed additional procedures or had we made an audit of the financial statements of the Trust Funds managed by the Bureau in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you. In addition, this work was more limited than would be necessary to express an opinion on the Bureau's internal control structure taken as a whole and furthermore, would not necessarily disclose all material weaknesses in the structure. Accordingly, we are unable to, and do not, express an opinion on the internal control structure of the Bureau taken as a whole. Further, it is beyond our professional competence to provide advice regarding legal matters. Accordingly, we cannot and do not make any representations regarding any legal issues raised in conjunction with performing our procedures. This report relates only to the elements specified above and does not extend to any financial statements of the Trust Funds managed by the Bureau taken as a whole.

This report is solely for the information of the Bureau to assist the Bureau in determining whether the objective described in the second paragraph of this report has been met and is not to be used, referred to or distributed for any other purpose.

Arthur Andersen LLP

Albuquerque, New Mexico
December 31, 1995



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

### SUPPLEMENTAL INFORMATION

#### Introduction/Overview

CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION (Yakama Nation) is one (1) of five (5) Indian Tribes included in the Five Tribes Pilot Project of the U.S. Department of the Interior, Bureau of Indian Affairs (the Bureau) Tribal Trust Funds Reconciliation Project (Reconciliation Project). The primary objective of the Reconciliation Project, as stated in contract number CMK00129395, as modified at various dates (the Contract), is to reconstruct historical transactions to the extent practicable for all years where records are available for all Tribal Trust accounts managed by the Bureau. The approach and scope of work was designed based on a standard of reasonable assurances. The agreed-upon procedures performed, as specified in the Contract, are the Bureau's standard of reasonableness. The Five Tribes Pilot Project was designed by the Bureau to obtain information regarding specific potential problem areas that may be encountered in the overall reconciliation process and to gain insight on the specific procedures required to successfully bring to closure the reconciliation effort for a select group of Tribal accounts.

The following pages represent brief summaries of findings by task.



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

I.    **Account Statements**

Below is a list of proposed adjustments and reclassifications by account and respective unadjusted fund balances as of September 30, 1992 for accounts utilized by Yakama Nation for the period July 1, 1972 through September 30, 1992. The respective proposed adjustments and reclassifications are reported in the accompanying Tribal Account Statements for Yakama Nation.

| Account Number | Description | Unadjusted Fund Balance as of September 30, 1992 | Proposed Adjustments/ Reclassifications Due To Account | Proposed Adjustments/ Reclassifications Due From Account |
|---|---|---|---|---|
| 7033 | Award of Indian Claims Commission - Yakama Tribe of Indians | - | $         - | $         - |
| 7040 | Proceeds of Labor Land Enterprises - Yakama Indian Nation | 3,648,959 | 531,433 | (44,189) |
| 7051 | Yakama Nation Credit | 55,518 | 46 | - |
| 7068 | Yakama Indian Nation Perpetual Reserve Fund | 4,076,804 | 2,133 | |
| 7127 | Award of Indian Claims Commission - Yakama Nation Treaty of June 9, 1855 | - | - | - |
| 7399 | Award of Indian Claims Commission - Yakama Tribe of Indians | - | - | - |
| 7473 | Yakama Indians Washington | 18,978,767 | 277,889 | (421,708) |
| 7533 | Award of Indian Claims Commission - Yakama Tribe of Indians | - | - | - |
| 7627 | Award of Indian Claims Commission - Yakama Nation Treaty of June 9, 1855 | - | - | - |
| 7899 | Award of Indian Claims Commission - Yakama Tribe of Indians | - | - | - |
| 7973 | Yakama Indians Washington | - | - | - |
| 93622600 | Yakama Nation - Receipt of Award | - | - | - |
| 93622610 | Yakama Nation - Per Capita | - | - | - |
| 94012605 | Yakama Tribe of Indians Award of Indian Claims Commission Doc. 47A and 162 - Other Funds | - | - | - |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

**I.    Account Statements (Continued)**

| Account Number | Description | Unadjusted Fund Balance as of September 30, 1992 | Proposed Adjustments/ Reclassifications | |
| --- | --- | --- | --- | --- |
| | | | Due To Account | Due From Account |
| 94012610 | Yakama Tribe of Indians Award of Indian Claims Commission Doc. 47A and 162 - Per Capita | $       500 | $       - | $       - |
| 94182600 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Receipt of Award | - | - | - |
| 94182601 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Payment of Attorney's Fee & Expenses | - | - | (1,538) |
| 94182610 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Per Capita | 164 | - | - |
| 94182615 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Land Purchase Program | 18,146 | | |
| 98622600 | Yakama Nation - Receipt of Award | - | - | - |
| 98622610 | Yakama Nation - Per Capita | - | - | - |
| 99012605 | Yakama Tribe of Indians Award of Indian Claims Commission Doc. 47A and 162 - Other Funds | - | - | - |
| 99012610 | Yakama Tribe of Indians Award of Indian Claims Commission Doc. 47A and 162 - Per Capita | 287 | 25 | - |
| 99182600 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Receipt of Award | 3,278 | 32,801 | - |
| 99182601 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Payment of Attorney's Fee & Expenses | 1,069 | - | (35,936) |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### EXECUTIVE SUMMARY OF FINDINGS

**I.  Account Statements (Continued)**

| Account Number | Description | Unadjusted Fund Balance as of September 30, 1992 | Proposed Adjustments/ Reclassifications | |
|---|---|---|---|---|
| | | | Due To Account | Due From Account |
| 99182610 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Per Capita | $    300 | $    2,999 | $    - |
| 99182615 | Court of Claims Yakama Tribe D310-74 Confederated Tribes and Bands of Yakama D342-70343-74 - Land Purchase Program | 20,657 | 914 | - |
| | Totals | $  26,804,449 | $  848,240 | $  (503,371) |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

**EXECUTIVE SUMMARY OF FINDINGS**

I.    Account Statements (Continued)

Summary of Proposed Adjustments/Reclassifications by Task

|  | Due To Account(s) | Due From Account(s) | Net |
|---|---|---|---|
| Basic Reconciliation (see Attachment A) | $ 22,769 | $ (7,041) | $ 15,728 |
| Investment Analysis (see Attachments B-1 and B-2) | 247,987 | (40,754) | 207,233 |
| MoneyMax to Finance (see Attachment D-1b) | - | - | - |
| U.S. Treasury to Finance (see Attachment D-2b) | - | (147) | (147) |
| Fill the Gap Timber (see Attachment G-3) | 363,931 | (401,292) | (37,361) |
| Surface (see Attachment G-4) | 213,553 | (54,137) | 159,416 |
| Totals | $ 848,240 | $ (503,371) | $ 344,869 |
| Passed Adjustments (see Attachment A) | $ 2,422 | $ (9,466) | $ (7,044) |

Note:  The proposed/passed adjustments above include interest impact from the effective date of the proposed adjustment or reclassification through September 30, 1994.  The interest computed was based on Bureau provided Benchmark rates (see Attachment B-1) based upon the overall yield for all Tribes' investments and assumed annual compounding.  Benchmarks may not be representative of any single Tribe's actual investment yields.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

### II. Basic Reconciliation (see Attachment A)

The following summarizes the results of the reconciliation of the posting of source documents performed as part of the Basic Reconciliation procedures. Reconciled investment transactions represent those reconciled early in the reconciliation process. Investment transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation. The following schedule represents absolute dollar coverage (the sum of the gross value of all transactions without consideration of mathematical plus (+) and minus (-) sign) for the entire reconciliation period.

#### Summary of Basic Reconciliation Results for Yakama Nation

|                                        | Transactions | Percent | Absolute Dollars    | Percent |
|----------------------------------------|-------------:|--------:|--------------------:|--------:|
| **Non-Investment Transactions:**       |              |         |                     |         |
| Reconciled                             | 11,193       | 81%     | $      614,684,494  | 89%     |
| Unreconciled                           | 2,616        | 19      |         76,854,510  | 11      |
|                                        | 13,809       | 100%    | $      691,539,004  | 100%    |
| **Investment Transactions:**           |              |         |                     |         |
| Reconciled                             | 949          | 14%     | $      726,417,953  | 32%     |
| Tested Through Alternative Procedures  | 5,879        | 86      |       1,565,222,674 | 68      |
|                                        | 6,828        | 100%    | $    2,291,640,627  | 100%    |
| Totals                                 | 20,637       | 100%    | $    2,983,179,631  | 100%    |

Note: Treasury interest transactions are excluded from this schedule (see Attachment B-2 for "Summary of Treasury Interest Recalculation Procedures and Results").

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

**II.    Basic Reconciliation (see Attachment A) (Continued)**

The following summarizes the results of the reconciliation of the posting of source documents performed as part of the Basic Reconciliation procedures. Reconciled investment transactions represent those reconciled early in the reconciliation process. Investment transactions were tested through alternative procedures such as Investment Yield Analysis and Treasury Interest Recalculation. The following schedule represents absolute dollar coverage (the sum of the gross value of all transactions without consideration of mathematical plus (+) and minus (-) sign) for the entire reconciliation period.

### Summary of Basic Reconciliation Results for All Tribes

|  | Transactions | Percent | Absolute Dollars | Percent |
|---|---|---|---|---|
| **Non-Investment Transactions:** |  |  |  |  |
| Reconciled | 218,531 | 87% | $ 15,333,094,983 | 86% |
| Unreconciled | 32,901 | 13 | 2,411,574,165 | 14 |
|  | 251,432 | 100% | $ 17,744,669,148 | 100% |
| **Investment Transactions:** |  |  |  |  |
| Reconciled | 65,267 | 16% | $ 21,306,350,015 | 24% |
| Tested Through Alternative Procedures | 335,146 | 84 | 67,210,929,523 | 76 |
|  | 400,413 | 100% | $ 88,517,279,538 | 100% |
| Totals | 651,845 | 100% | $ 106,261,948,686 | 100% |

Note:   Treasury interest transactions are excluded from this schedule (see Attachment B-2 for "Summary of Treasury Interest Recalculation Procedures and Results").



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

**II.    Basic Reconciliation (see Attachment A) (Continued)**

As a result of performing the Basic Reconciliation procedures, we identified certain proposed adjustments.  Below is a summary of proposed adjustments identified:

### Summary of Basic Reconciliation Proposed Adjustments

|  | Due To Account(s) | Due From Account(s) | Net |
|---|---|---|---|
| Scoped (1) (see Attachment A) | $        4,475 | $        (6,947) | $        (2,472) |
| Proposed (2) (see Attachment A) | 18,237 | - | 18,237 |
| Proposed Date Changes (3) (see Attachment A) | 57 | (94) | (37) |
| Totals | $      22,769 | $      (7,041) | $      15,728 |

(1)  Exceptions identified in the reconciliation process that were determined to be insignificant by the Bureau (less than or equal to $1,000 each).  At the Bureau's direction, no additional follow-up procedures were performed.

(2)  Exceptions identified in the reconciliation process that through additional follow-up and discussions with the Bureau, it was determined that an error occurred resulting in a misstatement of the account.  With Bureau concurrence, adjustments were proposed for these items.

(3)  As a result of the Basic Reconciliation procedures, date exceptions (i.e., proposed date changes) were noted.  Proposed date changes represent a difference in the effective date (i.e., posted date) per the general ledger and the source document.  Although the transaction amount was not an error, the resulting discrepancy would have an interest impact.

Note: The proposed adjustments above include interest impact from the effective date of the proposed adjustment through September 30, 1994.  The interest computed was based on Bureau provided Benchmark rates (see Attachment B-1) based upon the overall yield for all Tribes' investments and assumed annual compounding.  Benchmarks may not be representative of any single Tribe's actual investment yields.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

II.    **Basic Reconciliation (see Attachment A) (Continued)**

As a result of performing the Basic Reconciliation procedures, we identified certain errors and proposed adjustments which were not approved by the Bureau (i.e., passed adjustments). Although no requested additional supporting documentation could be provided, the Bureau concluded that a subsequent correction was made to the account, or the exception is no longer valid based on the Bureau's review of the account statement, other general ledger reports, or knowledge of the accounting system. Following is a summary of the passed adjustments:

### Summary of Basic Reconciliation Passed Adjustments

|  | Due To Account(s) | Due From Account(s) | Net |
|---|---|---|---|
| Passed Adjustments (see Attachment A) | $    2,422 | $    (9,466) | $    (7,044) |

Note: The interest impact was from the effective date of the passed adjustment through September 30, 1994. The interest computed was based on Bureau provided Benchmark rates (see Attachment B-1) based upon the overall yield for all Tribes' investments and assumed annual compounding. Benchmarks may not be representative of any single Tribe's actual investment yields.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

**III.    Investment Analysis (see Attachments B-1 and B-2)**

As a result of performing the Investment Analysis procedures for Yakama Nation, the following proposed adjustments were identified:

### Summary of Investment Analysis Proposed Adjustments

|  | Due To Account(s) | Due From Account(s) | Net |
|---|---|---|---|
| Yield Analysis (see Attachment B-1) | $           - | $        (1,538) | $        (1,538) |
| Overnighter (see Attachment B-2) | 247,987 | (39,216) | 208,771 |
| Totals | $    247,987 | $      (40,754) | $     207,233 |

(1)  The proposed adjustments above include interest impact from the effective date of the proposed adjustments through September 30, 1994.  The interest computed was based on Bureau provided Benchmark rates (see Attachment B-1) based upon the overall yield for all Tribes' investments and assumed annual compounding.  Benchmarks may not be representative of any single Tribe's actual investment yields.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

IV.    **Analytical Review (see Attachment C)**

We reviewed Yakama Nation's account statement detail of transactions (for Fiscal Years 1978 through 1992, as income/cost codes were not available for years prior to Fiscal Year 1978) discussed in the Basic Reconciliation and investigated judgmentally identified unusual fluctuations in receipts and disbursements.

An analytical review of Yakama Nation's non-judgment award accounts was conducted for anomalies such as unusual fluctuations in receipts, large disbursements, etc., that may indicate potential problem areas with the collection and posting of receipts and disbursements.

Analytical review is a high-level process to identify whether data and identified relationships are reasonable in relation to trends and other expectations. Analytical review procedures are intended to enhance an overall understanding of the data and to reveal apparent inconsistencies that may not be identified through the use of detailed testing.

As a result of performing analytical review procedures, we have noted the following:

- Although timber receipts fluctuate, they account for the majority of Yakama Nation's income.

- Surface receipts have been a stable source of income since Fiscal Year 1989.

- Although disbursements of one (1) year, according to Yakama Nation's Budget Strategy (based on discussions with Agency and Yakama Nation's representatives) should correspond to receipts of the previous year, they often did not. Yakama Nation's disbursements; however, for the fifteen (15) year span reviewed did approximate the same amount of receipts collected. Disbursements appear to increase with increased available funds as part of Yakama Nation's budgeting process.

- The graphical data indicates minimal "oil and mineral" receipts over the period reviewed. However, based on discussions with Agency personnel and our review of one (1) of the transactions posted as "oil and mineral" (i.e., the remaining five (5) transactions were unreconciled), it appears that these six (6) transactions were misclassified.

For a detail of specific procedures and reportable conditions, see Attachment C.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

V.    **Systems Reconciliation (see Attachments D-1, D-1a, D-1b, D-2, D-2a and D-2b)**

- **MoneyMax System to Finance System Reconciliation**

We reconciled the MoneyMax System (Bureau investment subsidiary detail) investment balances to the Finance System (general ledger) investment balances for all Tribes as of September 30, 1992, with the exception of certain investment transactions affecting several tribes, including Yakama Nation, which were reconciled internally by the Bureau. Any adjustments resulting from such internal reconciliations are not reflected in this report or in the accompanying Tribal Account Statements.

o    The following reclassifications were identified as a result of the reconciliation of MoneyMax System to Finance System for the year ended September 30, 1992.

MoneyMax System to Finance System Reclassifications

| Description of Reclassifications | Amount |
|---|---|
| 1. Reclassification in account 7473 2655 from general ledger account 108.10 (treasury securities) to general ledger account 108.30 (government securities) | $    2,809,313 |
| 2. Reclassification in account 7473 2650 to reclassify the income code in the system from U.S. Treasury interest (9705) to government securities interest (9707) | 55,657 |
| Total | $    2,864,970 |

Note: The proposed reclassifications above are reflected in the accompanying Tribal Account Statements as reclassifications between cash and investment balances. They do not affect total fund balances reported to Yakama Nation.

- **U.S. Treasury System to Finance System Reconciliation**

We reconciled Fiscal Year 1992 Bureau cash transactions reported by the U.S. Treasury (Treasury) to the Bureau's Finance System (General Ledger System Reconciliation) and reports submitted to the Treasury (Treasury Reporting Reconciliation). The resulting variances were investigated for Tribal Trust funds (Account 8365) and resolved, to the extent supporting documentation was located by the Bureau.

o    Any resulting adjustments affecting Yakama Nation are reported in the accompanying Tribal Account Statements.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

VI.    **Deposit Lag Time (see Attachments E, E-1 and E-2)**

We compared, for informational purposes only, the lag time from the apparent date of receipt of funds to the deposit date posted to the general ledger accounts and summarized the results.

### Summary of Deposit Lag Time Results for Yakama Nation

|  | 0 Days | 1-10 Days | Over 10 Days | Totals |
|---|---|---|---|---|
| Number of Transactions | 57 | 7,442 | 47 | 7,546 |
| Amount in Lag | $ 212,259 | $ 102,201,181 | $ 162,996 | $ 102,576,436 |

### Summary of Deposit Lag Time Results for All Tribes

|  | 0 Days (1) | 1-10 Days | Over 10 Days | Totals |
|---|---|---|---|---|
| Number of Transactions | 20,820 | 104,146 | 8,405 | 133,371 |
| Amount in Lag | $1,687,060,669 | $1,352,040,267 | $ 123,116,429 | $3,162,217,365 |

(1) Zero (0) days lag time numbers also include 1,533 Electronic Funds Transfers (EFTs) - type receipts totaling $1,098,453,127 and receipts for which no actual receipt date could be determined.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

VII.    **Tribal Individual Indian Money (IIM) (see Attachment F)**

We reviewed, on a sample basis, the receipts and disbursements posted to Yakama Nation's Individual Indian Money (IIM) accounts and verified (i.e., traced and agreed) such receipts and disbursements to supporting documentation.

### Summary of Receipts Testing

| Tribal IIM Account Number | Receipts | Receipts Verified | Percent Verified | Percent Verified of Total Yakama Tribal IIM Receipts (1) |
|---|---|---|---|---|
| 124T000835 | $  12,561,553 | $  9,399,330 | 75% | 25% |
| 124T000030 | 11,841,490 | 7,904,814 | 67 | 21 |
| Totals | $  24,403,043 | $  17,304,144 | 71% | 46% |

(1)  This column represents receipts verified (i.e., traced and agreed) as a percentage of receipts from six (6) Tribal IIM accounts totaling $37,725,017.

### Summary of Disbursements Testing

| Tribal IIM Account Number | Disbursements | Disbursements Verified | Percent Verified | Percent Verified of Total Yakama Tribal IIM Disbursements (2) |
|---|---|---|---|---|
| 124T000835 | $  14,640,818 | $  6,058,293 | 41% | 15% |
| 124T000030 | 11,841,490 | 8,026,879 | 68 | 20 |
| Totals | $  26,482,308 | $  14,085,172 | 53% | 35% |

(2)  This column represents disbursements verified (i.e., traced and agreed) as a percentage of disbursements from six (6) Tribal IIM accounts totaling $40,227,274.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## EXECUTIVE SUMMARY OF FINDINGS

VIII.    **Fill the Gap (see Attachments G, G-1, G-2, G-3, G-4, G-5 and G-6)**

We verified (i.e., traced and agreed), on a sample basis, receipt amounts posted to the general ledger to original lease agreements, sales agreements, contracts, permits or other documentation as appropriate, to the extent provided, to determine that the amounts received and the allocation of such amounts to general ledger accounts were properly recorded based on such documentation.

### Summary of Fill the Gap Results for Yakama Nation

| Tribal Trust Receipts | | Amount | Percent |
|---|---|---|---|
| Surface Leases | $ | 6,303,238 | 2% |
| Timber Sales | | 262,522,079 | 88 |
| Subtotal Tested | | 268,825,317 | 90 |
| Not Tested | | 31,267,307 | 10 |
| Total (1) | | 300,092,624 | 100% |
| Tribal IIM Receipts | | | |
| Surface Leases | $ | 6,592,617 | |
| Timber Sales | | 27,328,068 | |
| Subtotal Tested | | 33,920,685 | |
| Total Tribal Trust and Tribal IIM | $ | 302,746,002 | |

(1)  This excludes investment and judgment award transactions.

Note: See Attachments G-2, G-3 and G-4 for "Summary of Timber Sales Results for Yakama Nation," "Summary of Timber Sales Proposed Adjustments and Reclassifications for Yakama Nation" and "Summary of Surface Lease Proposed Adjustments and Reclassifications for Yakama Nation," respectively.