U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE PROPOSED ADJUSTMENTS AND RECLASSIFICATIONS FOR YAKAMA NATION

Detail of Proposed Adjustments and Reclassification by Type (Continued)

Incorrect Interest Amount Charged

| Lease # | Rental | Due To Account(s) | Due From Account(s) |
|---|---|---|---|
| 6170 | $ 2,000.00 | $ 238.68 | $ - |
| 6172 | 2,700.00 | 322.23 | - |
| 6182 | 5,000.00 | 15.61 | - |
| 6202-0 | 1,670.00 | 439.69 | - |
| 6236 | 5,775.00 | 11.39 | - |
| 6295 | 6,350.00 | 100.20 | - |
| 6298 | 5,000.00 | 180.00 | - |
| 6299 | 14,500.00 | 552.95 | - |
| 6363 | 5,700.00 | 208.01 | - |
| 6366 | 6,880.00 | 21.49 | - |
| 6371 | 8,900.00 | 70.22 | - |
| 6442 | 5,500.00 | - | (195.29) |
| 6443 | 5,500.00 | - | (195.29) |
| 6453 | 11,780.00 | 87.16 | - |
| 6471 | 1,000.00 | 190.85 | - |
| 6487 | 6,000.00 | 11.63 | - |
| 6495 | 4,050.00 | 98.69 | - |
| 6687-0 | 1,320.00 | 184.85 | - |
| 6687-1 | 437.50 | 2.33 | - |
| 6707 | 2,700.00 | 207.26 | - |
| 6732 | 5,650.00 | 91.95 | - |
| 6746-0 | 19,800.00 | - | (1,779.42) |
| 6888 | 5,460.00 | 6.01 | - |
| 6990 | 5,610.00 | - | (0.13) |
| 7024 | 11,000.00 | 179.01 | - |
| 7232 | 2,160.00 | 173.07 | - |
| 7234 | 5,000.00 | 441.36 | - |
| 7252 | 5,000.00 | 86.30 | - |
| 7334 | 7,850.00 | - | (23.23) |
| 7487 | 9,155.00 | 2,229.34 | - |
| 7999-0 | 10,710.00 | 838.21 | - |
| 8961-0 | 5,350.00 | 224.95 | - |

U.S. DEPARTMENT OF THE INTERIOR

BUREAU OF INDIAN AFFAIRS

TRIBAL TRUST FUNDS RECONCILIATION PROJECT

FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT

FOR

CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION

JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE PROPOSED ADJUSTMENTS AND RECLASSIFICATIONS FOR YAKAMA NATION

Detail of Proposed Adjustments and Reclassification by Type (Continued)

Incorrect Interest Amount Charged

| Lease # | Rental | Due To Account(s) | Due From Account(s) |
|---|---|---|---|
| 9048-0 | 5,400.00 | 572.66 | (3.81) |
| 9689-0 | 9,610.00 | 715.65 | (9.92) |
| 9722-0 | 12,450.00 | 425.77 | |
| 9847-0 | $ 14,400.00 | $ - | $ (25.33) |
| Subtotals (Incorrect Interest Amount Charged) | | $ 48,022.02 | $ (8,363.69) |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE PROPOSED ADJUSTMENTS AND RECLASSIFICATIONS FOR YAKAMA NATION

Detail of Proposed Adjustments and Reclassification by Type (Continued)

Incorrect Rental Payments

| Lease # | Rental | Due To Account(s) | Due From Account(s) |
|---|---|---|---|
| 237 | $ 4,692.00 | $ 4,656.00 | $ - |
| 404 | 13,455.17 | 100.00 | - |
| 510 | 6,000.00 | 100.00 | (100.00) |
| 1206 | 9,900.00 | - | (100.00) |
| 1383 | 14,678.00 | 14,678.00 | - |
| 2079 | 8,250.00 | - | (3,470.00) |
| 2360 | 5,100.00 | 1,900.00 | - |
| 2615 | 7,000.00 | 100.00 | - |
| 2615 | 5,000.00 | 818.36 | - |
| 2715 | 2,000.00 | - | (973.49) |
| 2771 | 4,800.00 | 100.00 | - |
| 2812 | 6,450.00 | 322.50 | - |
| 3065 | 5,800.00 | - | (476.70) |
| 3209 | 5,963.00 | 612.62 | - |
| 3549 | 7,920.00 | 2,510.00 | - |
| 3665 | 17,435.00 | 435.00 | - |
| 3862 | 5,500.00 | 39.10 | - |
| 4237 | 5,500.00 | 6,467.63 | - |
| 4510 | 1,875.00 | 1,597.61 | - |
| 4980 | 10,470.00 | 3,143.82 | - |
| 6091 | 5,621.00 | 5,621.00 | (5,621.00) |
| 6141 | 8,375.00 | 3,906.88 | - |
| 6687-0 | 1,320.00 | - | (780.89) |
| 6741 | 5,500.00 | 5,500.00 | (5,500.00) |
| 6885 | 13,200.00 | 12.77 | - |
| 7024 | 11,000.00 | 5,458.91 | (5,458.91) |
| 7487-0 | 9,155.00 | 11,543.74 | - |
| 8961-0 | 5,350.00 | 100.00 | (100.00) |
| 9295-0 | 16,821.95 | 6,666.53 | - |
| 9689-0 | 13,600.00 | 100.00 | - |
| Subtotals (Incorrect Rental Payments) | | $ 76,490.47 | $ (22,580.99) |



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE PROPOSED ADJUSTMENTS AND RECLASSIFICATIONS FOR YAKAMA NATION

Detail of Proposed Adjustments and Reclassification by Type (Continued)

Incorrect Execution Fees

| Lease # | Rental | Due To Account(s) | Due From Account(s) |
|---|---|---|---|
| 4510 | $ 1,875.00 | $ 93.75 | $ (93.75) |
| 6081 | 6,450.00 | 322.50 | (322.50) |
| 6126 | 7,000.00 | 350.00 | (350.00) |
| 6208 | 5,180.00 | 259.00 | (259.00) |
| 6236 | 5,775.00 | 288.75 | (288.75) |
| 6251 | 7,500.00 | 375.00 | (375.00) |
| 6254 | 6,650.00 | 332.50 | (332.50) |
| 6259 | 6,000.00 | 300.00 | (300.00) |
| 6295 | 6,350.00 | 317.50 | (317.50) |
| 6298 | 5,000.00 | 250.00 | (250.00) |
| 6299 | 14,000.00 | 500.00 | (500.00) |
| 6327 | 6,090.00 | 304.50 | (304.50) |
| 6357 | 6,400.00 | 320.00 | (320.00) |
| 6363 | 5,700.00 | 285.00 | (285.00) |
| 6366 | 6,880.00 | 344.00 | (344.00) |
| 6371 | 8,900.00 | 445.00 | (445.00) |
| 6390 | 6,000.00 | 300.00 | (300.00) |
| 6393 | 7,000.00 | 350.00 | (350.00) |
| 6428 | 3,500.00 | 279.00 | (279.00) |
| 6453 | 11,780.00 | 500.00 | (500.00) |
| 6481 | 4,800.00 | 240.00 | (240.00) |
| Subtotals (Incorrect Execution Fees) | | $ 6,756.50 | $ (6,756.50) |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF SURFACE LEASE PROPOSED ADJUSTMENTS AND RECLASSIFICATIONS FOR YAKAMA NATION

Detail of Proposed Adjustments and Reclassification by Type (Continued)

Incorrectly Labeled Miscellaneous Receipts

| Lease # | Rental | Due To Account(s) | Due From Account(s) |
|---------|--------|-------------------|---------------------|
| 3558 | $ 6,900.00 | $ 345.00 | $ - |
| 6112 | 7,190.00 | 359.50 | - |
| 6141 | 8,375.00 | 418.75 | - |
| 6152 | 5,900.00 | 295.00 | - |
| 6204 | 7,000.00 | 350.00 | - |
| 6206 | 5,850.00 | 292.50 | - |
| 6229 | 8,000.00 | 400.00 | - |
| 6322 | 5,500.00 | 275.00 | - |
| Subtotals (Incorrectly Labeled Miscellaneous Receipts) | | 2,735.75 | - |
| Totals | | 134,004.74 | (37,701.18) |
| Net Amount Due To Accounts | | $ 96,303.56 | |



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF UNLOCATED FILL THE GAP DOCUMENTATION FOR YAKAMA NATION

### FINDINGS

We selected active logging units between July 1972 and September 1992 for volume testing on a sample basis of one (1) month's production per year per logging unit. In connection with our work, we requested documents from the FRC in Seattle and the Agency office. We systematically searched and accumulated the required source documents for volume testing. The following documents could not be located for our testing:

### *TIMBER*

**Log Scale Certificates:**

| Logging Unit Number | Scaling Unit Number | Date | Documents |
|---|---|---|---|
| Kinney Creek (7) | 125 | September 1991 | Bureau # B08008 |
| Mt. Adams Resale (47) | 14725 | August 1986 | Bureau # 34560 |
| Potato Hill Salvage (62) | 16225 | October 1987 | Bureau # 151, 18202, 18515 and 18519 |
| Shamrock Springs II (1) | 125 | July 1989 | Bureau # 67118 |

**Scale Sheets:**

| Logging Unit Number | Scaling Unit Number | Date | Documents |
|---|---|---|---|
| Beauty Camp (51) | 112 | November 1975 | Three sheets, 1st cycle |
| Big Muddy (59) | 120 | June 1976 | All sheets, 3rd cycle |
|  | 124 | June 1976 | All sheets, 1st cycle |
|  | 125 | June 1976 | All sheets, all cycles |
|  | 128 | June 1976 | All sheets, all cycles |
|  | 225 | June 1976 | All sheets, all cycles |
|  | 228 | June 1976 | All sheets, all cycles |
|  | 1213 | June 1976 | All sheets, all cycles |
|  | 3214 | June 1976 | All sheets, all cycles |
| Borde Flat (48) | 481 | November 1972 | All sheets, 1st cycle |
|  | 482 | November 1972 | All sheets, 1st cycle |
|  | 483 | November 1972 | All sheets, 1st cycle |
|  | 994477 | November 1972 | All sheets, 1st cycle |
| Brush Creek (45) | 6 | July 1987 | All sheets, 3rd cycle |



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF UNLOCATED FILL THE GAP DOCUMENTATION FOR YAKAMA NATION

**Scale Sheets (Continued):**

| Logging Unit Number | Scaling Unit Number | Date | Documents |
|---|---|---|---|
| Cedar Valley (65) | 100 | February 1991 | All sheets, 2nd cycle |
| Clearwater (36) | 106 | November 1974 | All sheets, 1st cycle |
| | 306 | November 1974 | One sheet, 3rd cycle |
| Cougar Creek (54) | 25425 | September 1987 | All sheets, 2nd cycle |
| | 125 | November 1988 | Several sheets, 2nd cycle |
| Diamond Fork (69) | 21416 | August 1979 | Two sheets, 1st cycle |
| Dry Creek Falls (53) | 35300 | July 1987 | All sheets, 2nd cycle |
| Dry Logy Blowdown II (11) | 1019 | June 1978 | One sheet, 2nd cycle |
| Grayback Mountain (27) | 12700 | November 1986 | All sheets, 2nd cycle |
| High Ridge (6) | 10604 | September 1980 | One sheet, 3rd cycle |
| Holdaway Meadow II (29) | 6 | September 1982 | All sheets, all cycles |
| | 7 | September 1982 | All sheets, all cycles |
| | 6 | August 1983 | All sheets, 1st cycle |
| | 7 | August 1983 | All sheets, all cycles |
| Hunt Canyon (62) | 1142 | July 1976 | One sheet, 2nd cycle |
| | 1141 | July 1976 | All sheets, 2nd cycle |
| Kaiser Butte II (61) | 16125 | December 1987 | Seven sheets, 1st cycle |
| Kinney Creek (7) | 125 | September 1990 | Several sheets, 2nd cycle |
| | 100 | September 1990 | All sheets, 3rd cycle |
| | 994297 | September 1990 | One sheet, 2nd cycle |
| | 994298 | September 1990 | Four sheets, 2nd cycle |
| Klose Butte (13) | 1160 | November 1978 | All sheets, 2nd cycle |
| | 3160 | November 1978 | All sheets, 2nd cycle |
| | 11313 | October 1980 | One sheet, 3rd cycle |
| | 21313 | October 1980 | One sheet, 2nd and 3rd cycles |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF UNLOCATED FILL THE GAP DOCUMENTATION FOR YAKAMA NATION

**Scale Sheets (Continued):**

| Logging Unit Number | Scaling Unit Number | Date | Documents |
|---|---|---|---|
| Kusshi Creek (15) | 1229 | October 1979 | One sheet, 1st cycle |
| Lakebeds (49) | 149 | June 1974 | Two sheets, 3rd cycle |
| Lincoln Plateau (24) | 248 | August 1972 | All sheets, 1st and 3rd cycles |
| Lodgepole I (64) | 125 | July 1988 | One sheet, 3rd cycle |
| Lost Horse Plateau (69) | 6 | August 1989 | One sheet, 2nd cycle |
| Mill Creek IV (19) | 11900 | September 1980 | All sheets, 1st and 2nd cycles |
| Mosquito Creek (4) | 11416 | July 1979 | Three sheets, 2nd cycle |
| Panther Creek (50) | 110 | January 1975 | All sheets, 2nd cycle |
|  | 111 | January 1975 | All sheets, all cycles |
|  | 112 | January 1975 | One sheet, 2nd cycle |
| Pinegrass Ridge (44) | 110 | June 1975 | All sheets, 1st and 2nd cycles |
|  | 111 | August 1973 | All sheets, 2nd and 3rd cycles |
|  | 112 | August 1973 | All sheets, all cycles |
|  | 911 | August 1973 | All sheets, 3rd cycle |
| Plateau (42) | 14220 | September 1984 | All sheets, 1st cycle |
| Poland Butte (50) | 6 | November 1985 | Two sheets, 1st cycle |
|  | 65012 | May 1986 | All sheets, 3rd cycle |
|  | 85020 | May 1986 | All sheets, 3rd cycle |
|  | 100 | May 1988 | All sheets, 2nd cycle |
| Potato Hill Salvage (62) | 16225 | October 1987 | One sheet, 2nd cycle |
| Residue I (54) | 112 | August 1974 | One sheet, 3rd cycle |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF UNLOCATED FILL THE GAP DOCUMENTATION FOR YAKAMA NATION

**Scale Sheets (Continued):**

| Logging Unit Number | Scaling Unit Number | Date | Documents |
|---|---|---|---|
| Satus Creek II (3) | 100 | May 1991 | All sheets, 3rd cycle |
| | 125 | October 1990 | One sheet, 2nd cycle |
| Shamrock Springs (53) | 146 | July 1974 | Three sheets, 3rd cycle |
| | 100 | August 1976 | All sheets, all cycles |
| | 1120 | August 1976 | All sheets, 3rd cycle |
| Smith Butte (2) | 325 | June 1990 | All sheets, all cycles |
| Soda Springs Canyon (63) | 1142 | July 1976 | One sheet, 1st cycle |
| South Fork (47) | 479 | November 1974 | All sheets, 1st and 2nd cycles |
| | 476 | June 1973 | Three sheets, 2nd cycle |
| | 479 | June 1973 | One sheet, 2nd cycle |
| | 474 | June 1973 | All sheets, 1st cycle |
| | 992596 | June 1973 | One sheet, 2nd cycle |
| | 993047 | November 1974 | All sheets, 2nd cycle |
| | 993048 | November 1974 | All sheets, 1st cycle |
| | 992988 | October 1975 | All sheets, 1st and 3rd cycles |
| | 993142 | October 1975 | All sheets, 1st and 2nd cycles |
| South Fork II (65) | 36504 | May 1980 | Five sheets, 3rd cycle |
| Spring Creek (25) | 12503 | January 1983 | All sheets, all cycles |
| Surprise Creek (66) | 1142 | February 1976 | One sheet, 2nd cycle |
| Surveyors Creek (40) | 405 | November 1972 | One sheet, 3rd cycle |
| Toppenish Ridge Allotment (4) | 993085 | May 1990 | One sheet, 2nd cycle |
| Twenty Day Camp (33) | 331 | July 1972 | All sheets, 3rd cycle |
| | 338 | July 1972 | All sheets, 3rd cycle |
| | 339 | July 1972 | All sheets, 3rd cycle |
| | 992705 | August 1973 | One sheet, 2nd cycle |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF UNLOCATED FILL THE GAP DOCUMENTATION FOR YAKAMA NATION

**Scale Sheets (Continued):**

| Logging Unit Number | Scaling Unit Number | Date | Documents |
|---|---|---|---|
| Wahtum Creek (39) | 111 | October 1974 | One sheet, 2nd cycle |
| White Creek (55) | 1130 | November 1975 | All sheets, 1st cycle |
| | 11311 | November 1975 | All sheets, 2nd and 3rd cycles |
| | 994481 | November 1975 | All sheets, 1st cycle |
| Yatama Creek Blowdown (46) | 461 | September 1972 | All sheets, 2nd and 3rd cycles |
| | 463 | September 1972 | All sheets, 2nd and 3rd cycles |
| | 465 | September 1972 | All sheets, 2nd and 3rd cycles |
| | 993027 | September 1972 | All sheets, 3rd cycle |
| | 994006 | September 1972 | All sheets, 3rd cycle |
| | 994012 | September 1972 | All sheets, 3rd cycle |

**Miscellaneous:**

| Logging Unit Number | Scaling Unit Number | Date | Documents |
|---|---|---|---|
| Dry Creek Falls (11) | 65304 | July 1987 | Truck ticket #809790, 2nd cycle |
| Kinney Creek (07) | 125 | September 1990 | Wood log dimensions, 3rd cycle |

Note:   Although we were unable to tie volumes to the documents listed above, prices and calculated revenues were verified (i.e., traced and agreed) to log scale records.

**Unsupported Scale Charges:**

| Logging Unit Number | Scaling Unit Number | Date | Amount |
|---|---|---|---|
| Beauty Camp (51) | 112 | September 1974 | $      291.97 |
| Clearwater (36) | 100 | July 1975 | 10.14 |
| Deer Butte (34) | 341 | September 1972 | 864.11 |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF UNLOCATED FILL THE GAP DOCUMENTATION FOR YAKAMA NATION

**Unsupported Scale Charges (Continued):**

| Logging Unit Number | Scaling Unit Number | Date | Amount |
|---|---|---|---|
| Dry Logy Blowdown II (11) | 1019 | July 1978 | $ 492.24 |
| Grayback Mountain (27) | 12718 | October 1985 | 222.87 |
| | 12725 | November 1985 | 503.44 |
| Lakebeds (49) | 140 | November 1974 | 233.35 |
| Lakebeds (49) | 146 | July 1973 | 363.21 |
| Pileup Creek II (11) | 101 | July 1992 | 437.82 |
| Pileup Creek II (11) | 101 | October 1991 | 1,441.82 |
| Piscoe Creek II (13) | 101 | December 1991 | 3,352.69 |
| Poland Butte (50) | 6 | February 1987 | 34.90 |
| Satus Creek II (3) | 125 | September 1989 | 1,457.07 |
| Satus Creek II (3) | 125 | January 1990 | 1,544.05 |
| Section Corner Creek (30) | 13008 | August 1984 | 2,109.12 |
| Toppenish Ridge #4 (9) | 101 | August 1992 | 2,705.09 |
| Toppenish Ridge #4 (9) | 301 | August 1992 | 2,716.87 |
| Tract "D" (14) | 1195 | September 1978 | 2,134.83 |
| Twin Buttes (2) | 20213 | December 1980 | 653.03 |
| Yatama Creek (64) | 1154 | December 1975 | 244.61 |

### SURFACE LEASES

| Lease Number | Fiscal Year | Documents |
|---|---|---|
| 1-0097 | 1982 | Lease Agreement |
| 1-4020 | 1989 | Lease Agreement |
| 1-4187 | 1990 | Lease Agreement |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF FILL THE GAP RESULTS FOR ALL TRIBES

We verified (i.e., traced and agreed), on a sample basis, receipt amounts posted to the general ledger to original lease agreements, sales agreements, contracts, permits or other documentation as appropriate, to the extent provided, to determine that the amounts received and the allocation of such amounts to general ledger accounts were properly recorded based on such documentation.

### Summary of Fill the Gap Results for All Tribes

| Type of Receipts | Number of Leases/ Contracts | Number of Production Periods | Tribal Trust Amounts Due (1) | Amounts Verified (2) | Difference (3) | Percent Verified (4) |
|---|---|---|---|---|---|---|
| Surface Leases | 1,614 | N/A | $ 187,307,350 | $ 185,449,370 | $ 1,857,980 | 99.01% |
| Timber Sales | 409 | 714 | 341,894,047 | 340,846,006 | 1,048,041 | 99.69 |
| Oil and Mineral Sales | 227 | 490 | 79,317,929 | 74,513,874 | 4,804,055 | 93.94 |
| Totals | 2,250 | 1,204 | $ 608,519,326 | 600,809,250 | $ 7,710,076 | 98.73% |

(1) **Tribal Trust Amounts Due** - In the case of surface leases, amount represents rental amounts, bonus payments, administrative fees and/or late fees due in accordance with the contractual terms of the lease agreements. In the case of timber sales and oil and minerals sales, amount represents royalties due per our calculation of net sales value (i.e., volume verified to source documents X value verified to source documents).

(2) **Amounts Verified** - Represent the Tribal Trust Amounts Due that were verified (i.e. traced and agreed) to the general ledger.

(3) **Difference** - Represents amounts for which the collection or the posting of the amount due could not be verified due to inadequate audit trail and/or inadequate documentation.

(4) **Percent Verified** - Represents the percent of the amounts due for the specific leases selected and tested that were verified (i.e traced and agreed) to the general ledger.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DISBURSEMENT ACTIVITY FOR JUDGMENT AWARDS

### PROCEDURES

We reviewed disbursement transactions for judgment award accounts to verify (i.e., trace and agree) they were authorized by the Award Fund Distribution Plan (the Plan) and were posted to the proper account based on the purpose identified on the Tribal request and/or resolution.

For years prior to Fiscal Year 1977, judgment award accounts were established in the 7XXX accounts. During Fiscal Year 1977, activity accounts (9XXX/26XX) were established in the general ledger for tracking judgment award transactions by designated Plan purposes.

### SUPPLEMENTAL INFORMATION

The Yakama Nation received five (5) judgment awards based on review of the general ledger detail account transactions. The total disbursements from these judgment award accounts were $5,093,578. Following is a summary of the judgment award activity for years reviewed, as historically reported in Bureau accounts.

**DOCKETS 161, 222, 224, 47A and 162**
**Accounts 7127, 7627, 7399, 7899, 9362, 9862, 9401 and 9901**

Plan Narrative: The Indian Claims Commission on April 5, 1965, entered a Final Award in Dockets 161, 222 and 224, which were for the Yakama Nation and the Confederated Tribe of the Colville Reservation (Colville Reservation) in the amount of $3,446,700, less attorney's fees, for the benefit of the Yakama Nation as it was created by the Yakama Treaty of June 9, 1855. The award was appropriated by the Act of April 30, 1965. The Act of March 30, 1968, authorized the U.S. Court of Claims to divide the funds between the Tribes. On April 24, 1974, the Court ruled the funds to be divided as follows: Yakama Nation 49.63% and Colville Reservation 50.37%. The award issued to the Yakama Nation was to be disbursed for the following:

| | |
|---|---|
| Per Capita | 100% |

Along with these amounts, Docket 47A and 162 were also added. The Superintendent's letter dated June 10, 1976, indicates that the monies awarded June 25, 1965, (Docket 47A) and August 31, 1965, (Docket 162), a total of $110,991.40, were never paid out and were available for distribution. The net amount, less attorney's fees of 10% ($11,099), plus accrued interest as of August 10, 1976, was $192,949. This amount also was to be disbursed as per capita payments.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DISBURSEMENT ACTIVITY FOR JUDGMENT AWARDS

**DOCKETS 161, 222, 224, 47A and 162**
**Accounts 7127, 7627, 7399, 7899, 9362, 9862, 9401 and 9901 (Continued)**

| | | | |
|---|---|---|---|
| Receipts: | | | |
| Balance as of July 1, 1972 | | $ 2,285,853 | |
| Other Receipts (i.e., interest, etc.) | | 889,112 | |
| Total Receipts | | | $ 3,174,965 |
| Disbursements: | | | |
| Supported (1) | | | |
| Per Capita | $ (3,175,000) | | |
| Returned Per Capita | 19,000 | | |
| Total Supported | | (3,156,000) | |
| Unsupported (2) (see page 3 of 7) | | | |
| Interfund Transfer to Proceeds of Labor | | (18,178) | |
| Total Disbursements | | | (3,174,178) |
| Balance as of September 30, 1992 | | | $ 787 |

(1) Disbursements supported with Tribal requests/resolutions/other documentation determining that the purpose of the disbursement was in accordance with the Plan.

(2) Disbursements which were unreconciled or did not have sufficient documentation (i.e., signed SF1034/Tribal resolution, etc.) to determine that the purpose of the disbursement was in accordance with the Plan.

## Findings

Based on original award documentation and docket historical summary, the original award amount that should have been posted to the account was $1,539,537. The actual amount posted was $1,539,637. Approximately $100, in favor of the Yakama Nation, from the time of award to the time of posting could not be accounted for. No adjustment has been proposed.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DISBURSEMENT ACTIVITY FOR JUDGMENT AWARDS

**DOCKETS 161, 222, 224, 47A and 162**
**Accounts 7399, 7899, 9362, 9862, 9401 and 9901 (Continued)**

Total disbursements of $3,156,000 were for a documented purpose that is in accordance with the Plan. We verified (i.e., traced and agreed) the disbursement postings to the general ledger noting these disbursements were designated for the purpose identified on the Tribal request and/or resolution. Disbursements of $18,178 did not have adequate documentation (i.e., signed SF1034/Tribal resolution, etc.) to determine that the disbursements were in accordance with the Plan. The following represents individual disbursement that did not have adequate documentation:

| Date | Account Number | Amount | Document Number |
|------|---------------|--------|-----------------|
| 7/28/77 | 94012610 | $ 17,504 | BB07P0240 |
| 7/28/77 | 99012610 | 674 | BB07P0240 |
| | Total | $ 18,178 | |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DISBURSEMENT ACTIVITY FOR JUDGMENT AWARDS

**DOCKET 310-74**
**Accounts 9418 and 9918**

Plan Narrative:  On May 1, 1981, the U.S. Court of Claims ruled in favor of the Yakama Nation in the amount of $1,306,390.  The Plan became effective on May 12, 1982 and reads as follows:  "The funds appropriated on May 20, 1981, in satisfaction of the award granted to the Yakama Nation in Docket 310-74 before the U.S. Court of Claims, including all interest and investment income accrued, less attorney fees and litigation expenses, shall be distributed as herein provided":

|  |  |  |  |  |
|---|---|---|---|---|
| Per Capita | | 80% | | |
| Heirship Land | | 20 | | |
| | | 100% | | |
| **Receipts:** | | | | |
| Initial Award | | $ 1,306,390 | | |
| Other Receipts (i.e., interest) | | 309,329 | | |
| Total Receipts | | | $ 1,615,719 | |
| **Disbursements:** | | | | |
| Supported (1) | | | | |
| Attorney's Fees | $ (130,639) | | | |
| Per Capita | (1,145,704) | | | |
| Heirship Land Purchase | (286,338) | | | |
| Returned Per Capita | 3,116 | | | |
| Per Capita (Supplemental Payments) | (2,952) | | | |
| Total Supported | | (1,562,517) | | |
| Unsupported (2) (see page 5 of 7) | | | | |
| Litigation Expenses | (9,588) | | | |
| Total Unsupported | | (9,588) | | |
| Total Disbursements | | | (1,572,105) | |
| Balance as of September 30, 1992 | | | $ 43,614 | |

(1)  Disbursements supported with Tribal requests/resolutions/other documentation determining that the purpose of the disbursement was in accordance with the Plan.

(2)  Disbursements which were unreconciled or did not have sufficient documentation (i.e., signed SF1034/Tribal resolution, etc.) to determine that the purpose of the disbursement was in accordance with the Plan.



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DISBURSEMENT ACTIVITY FOR JUDGMENT AWARDS

**DOCKET 310-74**
**Accounts 9418 and 9918 (Continued)**

### Findings

Based on Tribal resolution T-9-83, the distribution of the judgment award was allocated to per capita and heirship land in accordance with the Plan. Total disbursements of $1,562,517 were for a documented purpose that is in accordance with the Plan. We verified (i.e., traced and agreed) the disbursement postings to the general ledger noting these disbursements were designated for the purpose identified on the Tribal request and/or resolution. Disbursements of $9,588 did not have adequate documentation (i.e., signed SF1034/Tribal resolution, etc.) to determine that the disbursements were in accordance with the Plan. The following represents individual disbursement that did not have adequate documentation:

| Date | Account Number | Amount | Document Number |
|------|----------------|--------|-----------------|
| 10/15/81 | 99182601 | $    6,597 | VD10V4065 |
| 10/13/82 | 99182601 |      2,991 | VD10V0851 |
|          | Total    | $    9,588 | |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DISBURSEMENT ACTIVITY FOR JUDGMENT AWARDS

**DOCKETS 47 and 164**
**Accounts 7033 and 7533**

Plan Narrative: On November 14, 1968, the Indian Claims Commission entered a final judgment in consolidated Dockets 47 and 164 in the amount of $2,160,000, less attorney fee of $210,000, and a credit of $60,000 due to the United States in Docket 161 to reimburse the United States for the payment of Tract D lands in Docket 161. The claim in Docket 164 is for the value of lands allegedly lost to the Tribes as a result of allotments by the United States to persons not members of the Tribes and for reimbursement of Tribal funds paid to such allottees. The claims in Docket 47, for which the Yakama Nation received compensation, consisted of the value of 97,908.97 acres of patented lands within the Tract D area and the value of 27,647.71 acres of patented lands within the Cedar Valley area of the Yakama Reservation. In allowing the Tract D claim, the Commission held that the area was intended to be included within the area reserved for the Yakama Indians under the June 9, 1855, treaty and due to erroneous interpretations of the treaty descriptions, it had been excluded from the reservation as surveyed. The Cedar Valley claim involved lands that had been patented to white settlers within the present boundaries of the reservation. In addition, as part of the compromise settlement, the parties agreed to dismiss claims in Dockets 147 and 160. The judgment award allotted to the Tribes was to be disbursed as follows:

| | |
|---|---|
| Authorized Disbursement | 100% |

The above 100% may be advanced, deposited, expended, invested or reinvested for any purpose authorized by the Tribal governing bodies and approved by the Secretary of the Interior.

| | | | | |
|---|---|---|---|---|
| **Receipts:** | | | | |
| Balance as of July 1, 1972 | | $ 339,188 | | |
| Other Receipts (i.e., interest) | | 8,107 | | |
| Total Receipts | | | $ | 347,295 |
| **Disbursements:** | | | | |
| Supported (1) | | | | |
| Education Programs | $ (278,811) | | | |
| Per Capita | (62,751) | | | |
| Total Supported | | (341,562) | | |
| Unsupported (2) (see page 7 of 7) | | | | |
| Per Capita | | (5,733) | | |
| Total Disbursements | | | | (347,295) |
| Balance as of September 30, 1992 | | | $ | - |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF DISBURSEMENT ACTIVITY FOR JUDGMENT AWARDS

**DOCKETS 47 and 164**
**Accounts 7033 and 7533 (Continued)**

(1) Disbursements supported with Tribal requests/resolutions/other documentation determining that the purpose of the disbursement was in accordance with the Plan.

(2) Disbursements which were unreconciled or did not have sufficient documentation (i.e., signed SF1034/Tribal resolution, etc.) to determine that the purpose of the disbursement was in accordance with the Plan.

### Findings

Total disbursements of $341,562 were for a documented purpose that is in accordance with the Plan. We verified (i.e., traced and agreed) the disbursement postings to the general ledger noting these disbursements were designated for the purpose identified on the Tribal request and/or resolution. Disbursements of $5,733 did not have adequate documentation (i.e., signed SF1034/Tribal resolution, etc.) to determine that the disbursements were in accordance with the Plan. The following represents individual disbursement that did not have adequate documentation:

| Date | Account Number | Amount | Document Number |
|------|----------------|--------|-----------------|
| 10/07/74 | 7033 | $ 5,700 | BB10P0056 |
| 03/24/75 | 7533 | 33 | BB03P0256 |
| | Total | $ 5,733 | |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## BUREAU/TRIBAL MEMORANDUM OF UNDERSTANDING
## SUMMARY OF TIMBER PAYMENTS/TIMBER DEPOSITS

We performed the procedures described below at the request of the Bureau as a result of the
Memorandum of Understanding between the Bureau and Yakama Nation.

## PROCEDURES

We reviewed, on a sample basis, the timeliness of timber payments received from the loggers in
accordance with the provisions of the contracts. We reviewed the timeliness of the deposit of these
receipts into interest-bearing accounts. We judgmentally selected fifty (50) advance deposit
payments from ten (10) contractors and captured information (i.e., amounts and dates) in order to
calculate the number of days between Date Due and Date Collected as well as number of days
between Date Collected and Date Posted to Special Deposit Account (SDA) (see page 2 of 3).

## SUPPLEMENTAL INFORMATION

The Yakama Nation Agency bills the contractor (i.e., logger) in advance of future timber sales based
on the balance in their respective SDA and future production. The following procedures (i.e., in
place during Fiscal Years 1990 through 1992) outline this process.

- Forestry faxes the deposit request to the contractor's bank to transfer the requested amount
  electronically.
- Contractor's bank electronically transfers the requested amount to the Federal Reserve Bank of
  New York.
- Bureau retrieves the daily deposit listing from the U.S. Treasury Deposit database. The receipt is
  posted to the IIM 206.70 control account in the Finance System using the Electronic Fund
  Transfer (EFT) number assigned by the Yakama Forestry. The EFT number identifies the specific
  logging unit/contractor of the deposit.
- The Finance System generates a daily "99 listing" which lists all transactions entered for the
  Yakama Agency. This listing was available to the Agency on a daily basis.
- The IIM clerk of the Agency retrieves the daily "99 listing" from the Finance System. A collection
  voucher is prepared by the cashier office based on the daily output from Finance System. The
  receipt was posted to the special deposit account in the IIM System upon receipt of the collection
  voucher by the IIM clerk.

The following are brief descriptions of the columns on the attached schedules.

- Logging Unit - Contractor
- Amount Billed for Advance Deposit - represents the amount billed to the contractor based on the
  balance in their SDA and future production (i.e., next month/quarter/etc.)
- Date Due - date due for the advance deposit request faxed to the contractor.
- Date Collected - date received by the Federal Reserve Bank as indicated on the EFT.
- Date Posted to SDA - date the funds are posted to the SDA (i.e., specific to contractor) within the
  IIM System.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### BUREAU/TRIBAL MEMORANDUM OF UNDERSTANDING
### SUMMARY OF TIMBER PAYMENTS/TIMBER DEPOSITS

| Logging Unit | Amount Billed for Advance Deposit | Date Due | Date Collected | Date Posted to SDA | Number of Days from Date Due to Date Collected | | Number of Days from Collection to Posting |
|---|---|---|---|---|---|---|---|
| **Icksix II** | | | | | | | |
| 2P110003 | $320,000 | 10/29/91 | 10/29/91 | 11/6/91 | 0 | | 8 |
| 2P110018 | 320,000 | 11/22/91 | 11/22/91 | 11/26/91 | 0 | | 4 |
| 2P110028 | 320,000 | 12/9/91 | 12/11/91 | 2/26/92 | 2 | ** | 77 |
| 2P110033 | 320,000 | 12/24/91 | 12/24/91 | 3/4/92 | 0 | | 70 |
| 2P110038 | 320,000 | 1/21/92 | 1/22/92 | 2/10/92 | 1 | ** | 19 |
| **Kinney Creek** | | | | | | | |
| 1P110078 | 270,000 | 9/4/91 | 9/4/91 | 2/20/92 | 0 | | 169 |
| 1P110067 | 270,000 | 8/13/91 | 8/13/91 | 8/20/91 | 0 | | 7 |
| 1P110046 | 540,000 | 5/8/91 | 5/8/91 | 5/14/91 | 0 | | 6 |
| 1P110017 | 540,000 | 11/6/90 | 11/6/90 | 11/9/90 | 0 | | 3 |
| 1P110083 | 540,000 | 10/2/90 | 10/3/90 | 10/9/90 | 1 | ** | 6 |
| **Graham Springs II** | | | | | | | |
| 0P110023 | 45,000 | 2/9/90 | 2/1/90 | 2/8/90 | 0 | | 7 |
| 0P110031 | 45,000 | 4/27/90 | 4/27/90 | 5/7/90 | 0 | | 10 |
| 0P110043 | 90,000 | 5/23/90 | 5/30/90 | 6/5/90 | 7 | ** | 6 |
| 0P110051 | 90,000 | 7/18/90 | 7/19/90 | 7/24/90 | 1 | ** | 5 |
| 0P110063 | 45,000 | 8/8/90 | 8/8/90 | 8/13/90 | 0 | | 5 |
| **Satus Creek II** | | | | | | | |
| 0P110005 | 260,000 | 10/26/89 | 10/26/89 | 11/6/89 | 0 | | 11 |
| 0P110018 | 260,000 | 12/22/89 | 12/22/89 | 1/3/90 | 0 | | 12 |
| 0P110020 | 520,000 | 1/12/90 | 1/12/90 | 1/17/90 | 0 | | 5 |
| 0P110024 | 260,000 | 2/9/90 | 2/9/90 | 2/15/90 | 0 | | 6 |
| 0P110060 | 260,000 | 8/18/90 | 8/8/90 | 8/13/90 | 0 | | 5 |
| **Yatama Creek II** | | | | | | | |
| 2P110064 | 990,000 | 4/29/92 | 4/29/92 | 5/5/92 | 0 | | 6 |
| 2P110067 | 990,000 | 5/20/92 | 5/20/92 | 5/22/92 | 0 | | 2 |
| 2P110078 | 990,000 | 6/24/92 | 7/7/92 | 7/9/92 | 13 | ** | 2 |
| 2P110081 | 330,000 | 6/29/92 | 6/30/92 | 7/6/92 | 1 | ** | 6 |
| 2P110065 | 330,000 | 5/12/92 | 5/12/92 | 5/15/92 | 0 | | 3 |
| **Pileup Creek** | | | | | | | |
| 2P110096 | 290,000 | 9/2/92 | 9/2/92 | 10/19/92 | 0 | | 47 |
| 2P110094 | 290,000 | 8/19/92 | 8/25/92 | 9/9/92 | 6 | ** | 15 |
| 2P110087 | 750,000 | 7/29/92 | 7/29/92 | 8/10/92 | 0 | | 12 |
| 2P110071A | 580,000 | 6/10/92 | 6/15/92 | 6/18/92 | 5 | ** | 3 |
| 2P110058 | 290,000 | 4/22/92 | 4/27/92 | 4/30/92 | 5 | ** | 3 |

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## BUREAU/TRIBAL MEMORANDUM OF UNDERSTANDING
## SUMMARY OF TIMBER PAYMENTS/TIMBER DEPOSITS

| Logging Unit | Amount Billed for Advance Deposit | Date Due | Date Collected | Date Posted to SDA | Number of Days from Date Due to Date Collected | | Number of Days from Collection to Posting |
|---|---|---|---|---|---|---|---|
| **Jungle Butte** | | | | | | | |
| 1P110071 | $350,000 | 8/21/91 | 8/21/91 | 8/26/91 | 0 | | 5 |
| 1P110048 | 350,000 | 5/22/91 | 5/22/91 | 5/30/91 | 0 | | 8 |
| 1P110036 | 700,000 | 12/27/90 | 12/27/90 | 3/22/91 | 0 | | 85 |
| 1P110031 | 350,000 | 11/27/90 | 11/27/90 | 12/3/90 | 0 | | 6 |
| 1P110001 | 350,000 | 10/10/90 | 10/10/90 | 10/19/90 | 0 | | 9 |
| **Cedar Valley** | | | | | | | |
| 0P110004 | 720,000 | 10/26/89 | 10/26/89 | 11/6/89 | 0 | | 11 |
| 0P110011 | 720,000 | 11/22/89 | 11/22/89 | 1/8/90 | 0 | | 47 |
| 0P110033 | 240,000 | 5/7/90 | 5/8/90 | 5/14/90 | 1 | ** | 6 |
| 0P110037 | 240,000 | 5/14/90 | 5/10/90 | 5/15/90 | 0 | | 5 |
| 0P110081 | 240,000 | 9/18/90 | 9/18/90 | 9/25/90 | 0 | | 7 |
| **Poland Butte** | | | | | | | |
| CVP1188039 | 420,000 | 10/11/88 | 10/10/88 | 10/17/88 | 0 | | 7 |
| CVP1188106 | 420,000 | 10/28/88 | 10/31/88 | 11/3/88 | 3 | ** | 3 |
| CVP1188170 | 210,000 | 11/10/88 | 11/10/88 | 11/15/88 | 0 | | 5 |
| CVP1188204 | 420,000 | 12/21/88 | 11/21/88 | 11/23/88 | 0 | | 2 |
| CVP1188354 | 420,000 | 12/14/88 | 12/12/88 | 12/14/88 | 0 | | 2 |
| **Smith Spring** | | | | | | | |
| 7P110045 | 320,000 | 10/20/87 | 10/20/87 | 10/23/87 | 0 | | 3 |
| 7P110046 | 320,000 | 12/10/87 | 12/10/87 | 12/28/87 | 0 | | 18 |
| 8P110042 | 320,000 | 1/13/88 | 1/13/88 | 1/21/88 | 0 | | 8 |
| 8P110078 | 320,000 | 5/25/88 | 6/6/88 | 6/9/88 | 12 | ** | 3 |
| 8P110106 | 320,000 | 8/30/88 | 8/29/88 | 9/6/88 | 0 | | 8 |

Average number of days from collection to posting*      16*

\* The average number of days from collection of advanced deposits into the Treasury (per EFT/
collection voucher) to the posting of the collection to its appropriate SDA (per IIM statement)
is sixteen (16) days.

\*\* Thirteen (13) payments have been noted as being delinquent (i.e., date collected was subsequent to date due).

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

### BUREAU/TRIBAL MEMORANDUM OF UNDERSTANDING
### FOREST MANAGEMENT DEDUCTION (FMD)

We performed the procedures described below at the request of the Bureau as a result of the Memorandum of Understanding between the Bureau and Yakama Nation.

### PROCEDURES

We reviewed documentation of the history, policies and procedures relating to the implementation of the Forest Management Deduction (FMD). In addition, we determined the amount of the FMD that was returned to the Treasury.

### SUPPLEMENTAL INFORMATION

The Forestry Department of the Bureau prepares, and the Tribal Council approves, a budget and use plan based upon expected expenditures for the coming fiscal year. The funds available for this budget and use plan are determined by calculating the anticipated timber revenues to be receipted to FMD from the upcoming fiscal year, and adding this sum to the unspent FMD's from the previous fiscal year(s) (called carryover), together with the interest that these funds have and will generate. The budget and use plan is prepared with the intent to spend the carryover and interest earnings, but not the anticipated calculated FMD for the coming year, even though this is allowable.

### FINDINGS

For all timber sales substantively tested (see Attachment G-2 "Summary of Timber Sales Testing"), we noted FMD was collected in accordance with CFR 25 (§163.18). These fees are placed in special deposit accounts set up for the Forestry Department's allowable expenditures. We reviewed detail transaction statements for these accounts and noted that a total of $554,044 of unused fees was returned to the Treasury during Fiscal Years 1973 through 1979 and $0 during Fiscal Years 1980 through 1992.



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF LAWS AND REGULATIONS COMPLIANCE TESTING

### PROCEDURES

We performed tests of compliance with laws and regulations with the 1992 Code of Federal Regulations (CFR), Volume 25, for a sample of income producing surface leases and timber sales active during Fiscal Year 1992. The laws and regulations tested may or may not be applicable to the leases and sales tested because they may have changed since the inception of the various leases and sales.

We tested the Agency's compliance with selected parts and sections of the 1992 Code of Federal Regulations (CFR), Volume 25, Parts 162 and 163, Leasing and Permitting and General Forest Regulations. In addition to our detail testing of timber sales and surface lease revenue, we judgmentally selected twenty (20) surface leases and all fourteen (14) active timber sales for specific testing.

### FINDINGS

The following are summaries of compliance findings for each CFR part and section tested for surface leases and timber sales:

**SURFACE LEASES**

| CFR Part and Section Tested | Section Title | Number of Leases with Compliance Findings |
|---|---|---|
| 162.5(a) | Special Requirements and Provisions | 0 |
| 162.5(b) | Special Requirements and Provisions | 0 |
| 162.5(c) | Special Requirements and Provisions | 20 |
| 162.6(a) | Negotiation of Leases | 0 |
| 162.8(a) and (c) | Duration of Leases | 0 |
| 162.12(a) | Subleases and Assignments | 0 |
| 162.13 | Payment of Fees and Drainage and Irrigation Charges | 1 |

**TIMBER SALES**

| CFR Part and Section Tested | Section Title | Number of Sales with Compliance Findings |
|---|---|---|
| 163.3 | Objectives | 0 |
| 163.4 | Sustained Yield Management | 0 |
| 163.7(c) | Timber Sales from Unallotted and Allotted Lands | 0 |
| 163.8 | Advertisement of Sales | 0 |
| 163.10(a) | Deposit with Bid | 1 |
| 163.11(a) | Acceptance and Rejection of Bids | 0 |



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF LAWS AND REGULATIONS COMPLIANCE TESTING

| CFR Part and Section Tested | Section Title | Number of Sales with Compliance Findings |
|---|---|---|
| 163.12 | Contracts Required | 0 |
| 163.13(a) | Execution and Approval of Contracts | 0 |
| 163.13(b) | Execution and Approval of Contracts | 0 |
| 163.14 | Bonds Required | 1 |
| 163.15(a) | Payment for Timber | 0 |
| 163.15(b) | Payment for Timber | 0 |
| 163.16(a) | Advance Payment for Allotment Timber | 2 |
| 163.17 | Time for Cutting Timber | 0 |
| 163.18 | Deductions for Administrative Expenses | 0 |

## SURFACE LEASES

The following parts and sections were tested in connection with the surface lease file review:

### §162.5(a)    SPECIAL REQUIREMENTS AND PROVISIONS

This section states that all leases made pursuant to the regulations in this part shall be in the form approved by the Secretary and subject to his written approval.

We noted that leases were signed by the Superintendent.

### §162.5(b)    SPECIAL REQUIREMENTS AND PROVISIONS

This section requires that no lease shall be approved or granted at less than the present fair annual rental.

We noted all leases approved were at annual rentals above the fair annual rental for the property with the exception of one (1) lease. This lease was approved by the Secretary at less than the fair annual rental. This treatment is consistent with the stipulations in the CFR.

### §162.5(c)    SPECIAL REQUIREMENTS AND PROVISIONS

This section requires that all leases have a satisfactory surety bond from the lessee.

We noted that the leases tested did not have surety bonds within the lease files.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF LAWS AND REGULATIONS COMPLIANCE TESTING

**§162.6(a)          NEGOTIATION OF LEASES**

This section requires that leases of individually owned land or Tribal land may be negotiated by those owners or their representatives.

We noted that Land Committee Action forms and negotiation requests were negotiated and/or approved and signed by the owner or the proper representative.

**§162.8(a) and (c)     DURATION OF LEASES**

These sections require that leases for public, religious, educational, recreational, residential or business purposes shall not exceed twenty-five (25) years. In addition, farming leases not granted for the purpose of growing specialized crops shall not exceed five (5) years for dry-farming lands or ten (10) years for irrigable land.

We noted that the duration of the leases did not exceed the allowable years described above.

**§162.12(a)          SUBLEASES AND ASSIGNMENTS**

This section requires that any assignment, amendment or encumbrance of any lease may be made only by the approval of the Secretary or his assigned representative and the written consent of all parties.

We noted that applicable leases that were modified or assigned were signed by the Superintendent and the appropriate parties.

**§162.13          PAYMENT OF FEES AND DRAINAGE AND IRRIGATION CHARGES**

This section requires that fees based upon annual rent shall be collected on each lease. In addition, fees shall be collected for each assignment, sublease, transfer, renewal, extension and modification of the contract.

We noted that an execution fee was collected on leases that were granted to the lessees. We noted that an incorrect execution fee was collected for one (1) of the leases tested. In addition, $100 was collected for applicable leases that were assigned or modified.

**TIMBER SALES**

The Code of Federal Regulations Volume 25, part §163, specifies the General Forest Regulations which must be adhered to by the Bureau as it applies to the management of forest lands and resources. We tested the Bureau's compliance with these regulations.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF LAWS AND REGULATIONS COMPLIANCE TESTING

§163.3                OBJECTIVES

Eight objectives are stated in this section. These objectives identify the basic standards by which the Bureau should ensure that the Indian forest lands are continually kept productive through the application of "sound forest management practices" [§163.3 (a) and (b)]. In attaining these standards, a method must be achieved whereby the forests are harvested evenly and a "perpetual forest business" is maintained [§163.3(c)]. In so doing, management must preserve the forest "whenever the authorized Indian representatives determine that the recreational . . . or traditional values of the forest represent the highest and best use of the land to the Indians" [§163.3(f)]. The effects of water run off, soil erosion, wildlife and aesthetic protection are among a list of essential guidelines which must be observed when making production decisions.

It is instrumental that "the development of Indian forests (be) by Indian people to promote self-sustaining communities, so that Indians may receive from their own property not only the stumpage value, but also the benefit of whatever labor and profit (the resources) are capable of yielding" [§163.3 (d)]. The objectives also call for the "sale of Indian Timber on the open market when the volume available and/or utilized for harvest is in excess of that which is being developed by the local Indian forest enterprise(s)" [§163.3 (e)].

We observed during our discussion and observation work at the Agency, as well as our review of timber sale files, that the Agency appears to be meeting these objectives. The Agency prepares the following documents to meet the objectives: The Forest Management Plan is used as a guideline in the management of the forest. Second, an Environmental Assessment for each logging unit is prepared to evaluate the effects of alternative management practices on the physical, social and economic environment. Third, a Silvicultural Prescription for each logging unit is prepared and makes recommended guidelines for harvesting the area. Lastly, a Tribal Employment Rights Ordinance (TERO) compliance plan which requires the logger to hire Indian laborers, is signed by the logger before the contract is approved.

§163.4                SUSTAINED YIELD MANAGEMENT

This section states that timber harvest from Indian forest lands will not be authorized until practical methods of harvest, based on sound economic, silvicultural and other forest management principles have been prescribed. Furthermore, "on all Indian reservations with commercial forest lands, appropriate management and operating plans shall be prepared and revised as needed."

We noted that the Agency functions under a programmatic Environmental Assessment (EA) and Forest Management Plan (FMP). Both of these documents cover the planned management activities that are to occur on the reservation over a ten-year period and are approved by the Area Director and the Tribal Council. These documents contain all of the planning information contained in this section. Specifically, goals and objectives, action plans to accomplish these goals and objectives, harvest schedules, silvicultural planning, economic analysis, plans for salvaging diseased, fire or insect damaged timber and short/long term effects.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF LAWS AND REGULATIONS COMPLIANCE TESTING

**§163.7(c)          TIMBER SALES FROM UNALLOTTED AND ALLOTTED LANDS**

This section states that unless authorized by the Secretary, sales of timber from unallotted/allotted lands having stumpage value greater than $10,000 will not be approved until (1) an examination has been made and (2) a report with all pertinent information has been submitted to the authorized officer to approve the contract. Sales will be appraised and sold at stumpage rates not less than those established by the Secretary.

We reviewed the Forest Officers Report signed by the forest manager. This report contains all pertinent information regarding the sale of timber. In addition, we reviewed correspondence and contracts to ensure that the stumpage rates were approved by the Secretary's authorized representative.

**§163.8          ADVERTISEMENT OF SALES**

Open market timber sales are to "be made only after advertising." These sales are to be conducted through the employment of sealed bids, or at a public auction, or a combination of the two. Logging units with stumpage values exceeding $200,000 must be advertised no less than sixty (60) days.

We reviewed signed advertisement order forms noting that timber sales were advertised less than sixty (60) days as there was no practical advantage in the advertisement of the sales over sixty (60) days. This treatment is consistent with the stipulations in the CFR.

**§163.10(a)          DEPOSIT WITH BID**

A minimum deposit shall be made with each proposal according to guidelines stipulated in the CFR.

We reviewed signed proposal sheets noting competitive bids were received accompanied by a minimum deposit. We also reviewed signed receipts to ensure that deposits from losing bids were returned.

We noted one (1) instance in Wildhorse logging unit which did not comply with this section. The deposit with bid should have been at least $138,052. However, only $138,000 was obtained from the logger.

**§163.11(a)          ACCEPTANCE AND REJECTION OF BIDS**

The high bid shall be accepted unless other conditions apply as described in the remainder of this section.

We reviewed sheets used at the auction and ensured that the highest bidder was awarded the contract and that the price per bid was the price per contract.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF LAWS AND REGULATIONS COMPLIANCE TESTING

**§163.12**         **CONTRACTS REQUIRED**

"In sales of timber with an appraised stumpage value exceeding $10,000, the contract forms approved by the Secretary must be used . . ."

We reviewed the contract files noting that all contracts were approved by the Superintendent or Area Director.

**§163.13(a)**         **EXECUTION AND APPROVAL OF CONTRACTS**

All contracts for the sale of Tribal timber shall be executed by the proper Tribal representative and accompanied by a resolution authorizing the sale [163.13 (a) and (b)].

We reviewed contracts to ensure that all logging units had valid contracts signed by the proper Tribal representative, Superintendent and logging company representative.  Approved resolutions existed for the executed leases.

**§163.13(b)**         **EXECUTION AND APPROVAL OF CONTRACTS**

Contracts for the sale of allotted timber shall be executed by the Indian owners or the Secretary acting pursuant to a Power of Attorney from the Indian owner.  In addition, the contract must be approved by the Secretary.

We reviewed for the Power of Attorney for sale of allotment timber to ensure that allotment sales were approved by the owners of the land.  We also reviewed allotment contracts noting that they were approved by the Superintendent or acting Superintendent.

**§163.14**         **BONDS REQUIRED**

Performance bonds are required in connection with sales of Indian timber unless otherwise approved.

We reviewed the contracts noting that bonds were obtained from the loggers and were in accordance with stipulations regarding estimated stumpage values.

We noted one (1) instance in Wildhorse logging unit where the performance bond did not comply with this section.  The performance bond should have been at least $230,086.  However, only $230,000 was obtained from the logger.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## SUMMARY OF LAWS AND REGULATIONS COMPLIANCE TESTING

**§163.15(a)          PAYMENT FOR TIMBER**

The basis for timber sold shall be the Scribner Decimal C log rules, cubic volume, lineal measurement, piece count, weight, etc.

We reviewed contract files noting that the basis of volume determination is Scribner Decimal C log.

**§163.15(b)          PAYMENT FOR TIMBER**

"Each advance payment shall be at least 10% of the value of the minimum volume of timber required to be cut annually, figured at the appraised stumpage rates."

We reviewed contracts and reports noting that minimum advance payments were a minimum of 10% of the value of the timber required to be cut annually.

**§163.16(a)          ADVANCE PAYMENT FOR ALLOTMENT TIMBER**

Advance payments of up to 25% of the stumpage value must be received within thirty (30) days of approval and before cutting begins.

Two (2) of four (4) allotted contracts were exceptions, as the advance payments were not received within the thirty (30) days stipulated in the CFR. Twenty-five (25) percent of the stumpage value from the allotted land was received as advance payment.

**§163.17          TIME FOR CUTTING TIMBER**

Maximum period for harvesting shall be five (5) years from contract date unless otherwise approved by the Secretary.

We noted that none of the contracts exceeded the maximum period of time specified in §163.17 of five (5) years in duration during testing performed on timber.

**§163.18          DEDUCTIONS FOR ADMINISTRATIVE EXPENSES**

Unless authorized by the Secretary, a deduction of 10% of the gross amount received for timber sold shall be made for covering administrative expenses.

We noted that the required Forest Management Deduction was collected from each sale in the amount of 10% of the gross amount received, except for contracts approved during the period from July 6, 1979 through March 31, 1991, wherein 6% of the gross was collected as authorized by the Secretary.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

### PROCEDURES

We interviewed key Bureau personnel involved in relevant accounting functions and prepared process flowcharts with our understanding of the information obtained for the purpose of identifying internal control weaknesses.

### SUPPLEMENTAL INFORMATION

The purpose of this report is to assist the Bureau in identifying, simplifying and/or eliminating areas that are not providing value or service to the Yakama Nation. We selected key procedures and processes within the Yakama Agency to review. The following concerns and recommendations are to be used as tools for continuous improvement by the Bureau.

The process flowcharts are broken out into the following functions:

> *Surface Lease Contracting*
> *Billing*
> *Cash Receipts*
> *Timber Sales: Sales Contract Administration Process*
> *Timber Sales: Closing of Sale*
> *Timber Sales: Quarterly Pricing Adjustments*
> *Cash Disbursements*

**Total Quality Management and Best Practices**

The Bureau has attempted to adopt Total Quality Management concepts over the past year. The embracing of the concepts and implementation of ideas is still in the start-up stage. One avenue the Bureau should consider pursuing is Benchmarking or best practices.

One of the companies the Bureau should consider contacting is the Xerox Corporation, a global business in the document processing market, insurance and financial services business. Xerox Corporation (Xerox) is one of the few companies actually Benchmarked for its own Benchmarking expertise. It began Benchmarking in 1979, many years before most Western businesses saw the need or the benefits. David T. Kearns, Xerox Chief Executive Officer (CEO), defines Benchmarking as "the continuous process of measuring products, services and practices against the toughest competitors or those competitors recognized as industry leaders."

In his book, *Benchmarking: The Search for Industry Best Practices That Lead to Superior Performance*, Robert Camp says,

> *"Benchmarking is industrial research or information gathering that allows a manager to compare his or her function's performance to the performance of the same functions in other companies. Benchmarking identifies those management practices the function should use to attain superiority."*

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

Camp, the engineer responsible for Xerox's Benchmarking efforts, gives an action plan and examples of Benchmarking in his book.

The Bureau's billing, accounts payable and information systems strategy process are natural starting points for the Benchmarking process. Our firm's research indicates the Bureau could migrate toward the following global best practices that are used by other organizations worldwide.

### Recommendations

### Billing Process

#### Recommendation #1

Use a simple, easy to understand invoice with minimal invoice detail through the Integrated Records Management System (IRMS) (e.g., eliminate the detail of the property owners).

*Agency Response*

The IRMS System is anticipated to be used to print a separate Bill for Collection for each lease.

#### Recommendation #2

Use a billing mechanism and approach that meets individual customer needs and minimizes paper transactions.

*Agency Response*

This will be explored as we are changing or updating procedures for all Real Estate Services.

#### Recommendation #3

Provide real-time interaction between individuals responsible for customer inquiries, cashiering, and billing through an integrated system.

*Agency Response*

Proposal for Real Estate Services to network the computers. There is a feature which allows quick access to each lease payment information.

#### Recommendation #4

Automate and integrate the billing system with information systems throughout the Bureau.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

*Agency Response*

This is in motion - through IRMS.

**Accounts Payable Process**

*Recommendation #5*

Edit (check arithmetic extensions, approvals, signatures, and authorizations) only those vouchers which are significant in dollar amount or unusual in nature.

*Agency Response*

Plan is to have each billing checked - and to have a new billing prepared for each year. In the past, billings were prepared for each subsequent year that payment was due, and copies were used until changes were made. This caused many problems.

*Recommendation #6*

Set frequency of payments based on vendor relations, discount policy, and cash flow position.

*Agency Response*

This is a possibility. The individual owners like their lease funds in December. It may be acceptable to Yakama Nation to receive the rental in March, June or some other date. This would take some modifications of leases or allow short-term leases to expire and write new ones on a new schedule.

*Recommendation #7*

Centralize accounts payable processing, but decentralize accountability, error correction authorization and approval verification.

*Agency Response*

This is already in place.

*Recommendation #8*

Strive for paperless storage (records retention) and reporting.

*Agency Response*

This is an excellent suggestion. The State of Idaho Department of Transportation (DOT) operates in this manner.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Information Systems Strategy Process**

### Recommendation #9

The Bureau has many manual processes to initiate transactions, billings, receivables and payables. Manual systems are prone to human errors and require additional personnel to process and administer. The Bureau should develop an "Information Systems Strategy" that would identify and prioritize the areas that would have the greatest benefit from automation. Once a strategy has been developed, allocate monies to the implementation of the strategy.

### Agency Response

This Agency has been receptive to adapting Bureau of Indian Affairs IRMS "upload" and "download" of ownership and lease information so that the automated programs already set up in DBase and other software can be utilized locally.

On the following pages, we have documented the general workflows, through the use of flowcharts.

# Surface Lease Contracting Function



-158-





ATTACHMENT K
Page 6 of 23

Surface Lease Contracting Function (cont.)

-159-



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

### Recommendations

**Surface Lease Contracting**

*Concern*

The lease process is complex and requires the involvement of several parties including the Bureau, Yakama Tribal Committee and/or individual Yakama Nation members. The complexity depends on the number of landowners, whether or not a 90 day notice has been issued and whether or not the appropriate signatures can be gathered from the individual landowners. This causes additional effort by the parties to the lease and may cause delays in the execution of the lease. If the Contract negotiations fail, a "Trespass Fee" for use of the land not under Contract is assessed.

*Recommendation #10*

Hire a "Lease Broker" (possibly the Land Enterprise Manager) to act as an advocate for the individual Tribe and its members in the negotiation of the lease terms. The Lease Broker could be compensated on the basis of the Contract terms negotiated (i.e., percentage of annual lease amount). This would ensure that the most advantageous Contracts were negotiated.

The Tribal Land Committee and the individual landowners would be sent the Contract terms and have ultimate veto power within a predetermined time frame.

*Agency Response*

"Hiring" the Land Enterprise Manager as "Lease Broker" would not be acceptable. For one reason, he is already on salary. Also, many landowners have objected to Yakama Nation, as a landowner operating through the Land Enterprise, becoming involved in any of their leasing.

Currently, the Realty Specialist prepares an Information Sheet for the Land Enterprise Manager which he presents to the Land Committee for consideration.

In a multiple ownership tract, one or two of the landowners will usually accompany a Lessee to the office for negotiation purposes. After an acceptable offer has been received, Consents to Lease are mailed to all the landowners. The Act of 1940 is also used in cases where owners have not agreed and land is listed for sealed bid.

*Concern*

Leasing a parcel with multiple owners requires 51% of the landowners' signatures. Many parcels of land have multiple owners; which creates difficulties gathering sufficient signatures.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Surface Lease Contracting (Continued)**

The average parcel has over 20 owners and some parcels have more than 90 owners. A large percentage of clerical time is spent filing and following up on "Pending Lease" documents.

*Recommendation #11*

Each set of land owners should identify an individual to act as "General Partner." This person would have authority to sign and commit lease agreements on behalf of the other land owners. The General Partner would be present for the execution of the lease Contract. This person could be one of the land owners or a representative from Yakama Nation. This would avoid having a "Lease Pending File" and the delay between execution of the lease and recording.

*Agency Response*

This occurs already. However, the person present and taking part in negotiating does not have authority to commit other interests. This could be presented to owners of each allotment.

The other problem found in leases held in "pending" for a length of time is the lessee (farmer) feels he has finalized his lease with negotiation, and many times will be busy working the land, and other farm duties, and will not return to sign his leases. At times, this office has threatened to cancel before they will come back.

The plan to improve this and shorten the time is to use the computer lease program, print the lease while he is sitting in the office and obtain his signature immediately. Once we are operational on the IRMS download, this can be utilized.

*Concern*

Manual paper filing must be done for all "Pending Payments." This takes a large percentage of clerical time to file and follow-up on documents.

*Recommendation #12*

An automated Billing/Receivable system should be in place for a "Pending Payment File" because the allocations will be maintained in the accounting system. If the Land Owners assign a General Partner, then the leases can be executed without waiting for the remaining signatures. There would be no need for "Pending" files.

*Agency Response*

This is a good suggestion, especially if we can get these other items taken care of, the "appointed" General Partner or whatever, and the immediate printing and signing of the lease Contract. We may need authority in some manner, shape or form to allow this or assist with this type of approach.



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Surface Lease Contracting (Continued)**

*Concern*

All lease Contracts are hand typed.

*Recommendation #13*

Utilize a computerized word processor and standard Contract templates for new lease Contracts. This would replace manual re-typing of similar Contracts and minimize potential errors or extra reviews.

*Agency Response*

This is covered by the proposal to automate the entire leasing process. We are willing, however, it has taken time to get equipment in place, etc. The computerized lease forms need to get clearance through channels. We do not use computer generated leases, exhibits, etc. when preparing development leases.

*Concern*

The lease Contracts are reviewed multiple times. The Realty Specialist reviews the lease after it is typed and then again after it is signed. After the Realty Specialist's final review the Realty Officer reviews the lease.

*Recommendation #14*

The Realty Specialist should review the lease just prior to the execution. The Realty Supervisor can perform final review, prior to recording the lease in the Area Office.

*Agency Response*

Reviewing lease Contracts would be simpler if we could use the computer, to download and print the legal description (which would automatically be printed the same on each lease document requiring a legal description), the ownership and lease billing in the lease document process.

On the following pages, we have documented the general workflows, through the use of flowcharts.



-163-

ATTACHMENT K
Page 11 of 23

# Cash Receipts Function

```
Checks
received by
mail clerk
        │
        ▼
Mail Clerk opens
the mail and
prepares a
"Schedule of
Collections"
        │
        ▼
Schedule of
Collections   Checks
        │
        ▼
Cashier receives all
checks and both
copies of the Schedule
of Collections.
Cashier stamps and
signs one copy and
returns this copy to
the Mail Clerk
        │
        ├──────────────────────┐
        ▼                      ▼
Schedule of              Checks
Collections retained
by Mail Clerk
        │
        ▼
To Mail Clerk
```

```
Schedule of
Collections retained
by Cashier
        │
        ▼
To Cashier
```

```
Checks
        │
        ▼
For each check received by
the Cashier, an Official
Receipt is prepared and
assigned a Collection Voucher
(CV) # in sequential order
        │
        ▼
Official Receipt
Checks and/or
Cashier's Checks
        │
        ▼
To Area Office
```

```
Cashier receives at Cashier
window at Agency
        │
        ▼
Payor has copy of
billing statement?
   Yes │        │ No
       │        ▼
       │   Payor sent to obtain
       │   copy from issuer
       │        │
       │        ▼
       │   To Issuer
       ▼
Billing Statement
containing lease #,
Allotment #, Date mailed,
Date Due
        │
        ▼
Cashier receives
Billing Statement
from Realty or
from payor and
matches receipt
to Billing
Statement
        │
        ▼
Payment in
Cash?
   No │        │ Yes
      │        ▼
      │   Cash payments are
      │   summarized and
      │   taken to the bank
      │   where a cashier's
      │   check is purchased
      │        │
      │        ▼
      │   Cashier's
      │   Check
      │        │
      │        ▼
      │   For each cash receipt, the
      │   Cashier prepares an
      │   Official Receipt
```

-164-



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

### Recommendations

**Billing and Cash Receipts**

*Concern*

Payors must physically have a billing statement when making a payment in person to the Cashier. Payors without such statement are instructed to go to the Agency that issued the bill and obtain a photocopy of the billing before returning to the cashier. There is no software package in place to handle accounts receivable related to lease income. All tracking, billing and noticing are done manually.

*Recommendation #15*

The cashier should have an on-line accounts receivable software to look up balances due from individuals, whether or not they have a billing statement. A personal computer and property management or spreadsheet software can be used to track cash received, accounts outstanding and account adjustments. An accounts receivable package could age receivables and assist in the collection of delinquent accounts.

*Agency Response*

At this time, we have no comment. We realize that there needs to be some changes, and anticipate changes will be made in the near future. The IRMS lease distribution system has been updated and will be in use in the near future which will address many of the problems identified.

*Concern*

Payments must be made in cash, by cashier's check or by money order. The cashier mails a receipt to all payors approximately one week after receiving payment.

*Recommendation #16*

Receipts should be provided only for cash transactions, unless specifically requested by the payor. A canceled cashier's check or money order receipt can provide proof of payment in other circumstances. The receipt should be given immediately. It could be generated by a hand receipt, cash register receipt or from a software package.

*Agency Response*

At this time, we have no comment. We realize that there needs to be some changes, and anticipate changes will be made in the near future. The IRMS lease distribution system has been updated and will be in use in the near future which will address many of the problems identified.



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Billing and Cash Receipts (Continued)**

*Concern*

The Bureau bills for most rental property on an annual basis. Approximately 1,300 billings are sent out in mid-October and are due December 1. Bills are considered delinquent December 31. This creates a great deal of work for the cashier from November to February. The cashier indicated that she has very little to process the rest of the year.

*Recommendation #17*

Not all payments should be due on the same date. Payment dates should be altered for leases to be due in different months or quarters. The workload could be leveled over the year by processing approximately 8% of the billings each month or 25% of the billings each quarter. This will require a "stub-period" billing to change the billing cycle for the majority of the leases. It will result in the better use of employee time and even cash flow throughout the year.

*Agency Response*

At this time, we have no comment. We realize there needs to be some changes, and anticipate changes will be made in the near future. The IRMS lease distribution system has been updated and will be in use in the near future which will address many of the problems identified.

*Concern*

Cash receipts are summarized in a report each day and are mailed to the Portland Area Office. The Portland Area Office deposits the cashier's checks and money orders into the bank. The Bureau cashier buys a cashier's check from the local bank for cash received over the counter.

*Recommendation #18*

Cash should be deposited daily into a local bank. Amounts equal to the daily deposit can be wired to Portland for money management purposes on a regular basis.

*Agency Response*

At this time, we have no comment. We realize that there needs to be some changes, and anticipate changes will be made in the near future. The IRMS lease distribution system has been updated and will be in use in the near future which will address many of the problems identified.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Billing and Cash Receipts (Continued)**

*Concern*

The Bureau must manually calculate the distribution amounts for processing lease payments, manually type Cash Vouchers (CV's) and manually enter amounts into the various accounts for distribution. Because of the many manual processes, these transactions are susceptible to human errors.

*Recommendation #19*

Replace the Lease Control Card with an Automated Billing/Receiving System. In the short-term, spreadsheets could be set up to help automate some of the process.

*Agency Response*

At this time, we have no comment.

On the following pages, we have documented the general workflows, through the use of flowcharts.

# Timber Sales: Sales Contract Administration Process



-168-



ATTACHMENT K
Page 16 of 23

Timber Sales:  Sales Contract Administration Process (Cont.)



-169-

Timber Sales:  Sales Contract Administration Process (Cont.)



# Timber Sales:  Closing of Sale



-171-

Timber Sales:  Quarterly Pricing Adjustments



-172-

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Recommendation**

**Timber Bidding and Sales**

*Concern*

All bidders are required to have a cashier's check for the minimum bid amount to accompany their bid. Unsuccessful bidders pick up their checks after the auction and the successful bidder's check is deposited.

*Recommendation #20*

To reduce the risk of handling the checks from the bid, the Agency should require a cashier's check as a condition of Contract execution for the selected vendor. This also eliminates unnecessary procedures for all parties.

*Agency Response*

We already require a performance bond as a condition of Contract execution. The deposit with bid has the same functions "earnest money" when one purchases a home. It is to prevent or discourage a purchaser from backing out of a commitment. The deposit with bid and performance bond have two different functions.

On the following pages, we have documented the general workflows, through the use of flowcharts.



ATTACHMENT K
Page 21 of 23

Cash Disbursements Function

From Cashier → Schedule of Collections

From Portland → CT Deposit Ticket

Numerous accounts to be posted?

No → Manual Input → Enter account number, first name, last name and transaction date → System posts amounts that were entered manually

Yes → Automatic Input → Enter allotment number, distribution amount, IIM reference code, IIM reference and IIM date in Portland

Listing of proposed automatic postings

Cash disbursement compares printout of proposed posting to original billing statement

Documents agree?

No → Reconcile

Yes → Cash disbursements requests Portland to run Lease Distribution Update → System posts automatic postings to individual accounts using information in ownership and realty database

Proposed Posting

Schedule of Collections

CT Deposit Ticket

Checks printed in Portland

Daily Transaction Register to Yakama

Check Register to Yakama

Cash Disbursements creates manual control report

Checks released from Portland → Check → To Payee

In Balance?

Yes

No → Reconcile Postings → Create necessary journal voucher

-174-



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Recommendations**

**Cash Disbursements**

*Concern*

Certain pro rata shares of lease distributions are less than .0002, which, in some cases, equates to $0.09. The cost to administer and track the allocation does not justify the administering of the amount.

The Indian Land Consolidation Act of 1983 (amended in 1984) will eventually escheat those property interests of less than 2%. However, there were a number of ownership shares less than 2% on the lease cards.

*Recommendation #21*

Once the pro rata amount falls below 2%, it should be the responsibility of the individual landowner to allocate portions to their heirs.

Alternatively, once the pro rata share falls below 2%, the allocations could revert back to Yakama Nation in compliance with the Indian Land Consolidation Act of 1983. Yakama Nation would receive revenues and be responsible for general support of the community.

*Agency Response*

If this relates to land ownership interests which are 2% or less, the escheat of those properties falls under the Indian Land Consolidation Act of 1983, as amended in 1984, which is already in place (through the probate process administered through the branch of Real Estate Services).

*Concern*

When an IIM account reaches $10, a check is cut and sent to the individual. This small amount is not justified by the cost to administer, print and disburse the checks. We did not calculate the exact cost of processing a check at the Yakama location; however, the per check cost for many efficient companies ranges from $30 to $45.

*Recommendation #22*

Allow the IIM account to accumulate to $30 before disbursing the amounts, unless otherwise designated by the individual.

Allow the IIM accounts to act like a savings account. No disbursements should be made without the individual drawing the monies out. The amount could be actually deposited in a Credit Union in the name of the individual.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## REVIEW OF OPERATIONS

**Cash Disbursements (Continued)**

*Agency Response*

The Finance Officer, Portland Area Office, has set the limit of $15.00 to accumulate before a check is automatically issued. At the end of the month after interest is posted, anything over $1 is disbursed.

The recommendation is well received, and the people would actually like more say about how, when and why funds are released. If funds could be actually deposited to either a checking account or savings account (as salary of federal workers can be deposited), many landowners would probably be receptive to this proposal.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## OTHER FINDINGS/RECOMMENDATIONS

### Recommendations

*Concern*

Interest on late payments was not collected on various delinquent payments. In addition, interest received from the lessee does not match what should have been collected.

*Recommendation #23*

We recommend that standard procedures for calculation of interest on delinquent accounts be established, and the collection of this interest be strictly enforced.

*Concern*

There is a delay in posting of funds to interest-bearing accounts from the time they are received from the purchaser. This delay results in loss of interest that could have been earned on the funds.

*Recommendation #24*

We recommend that a procedure be established in order to ensure that funds are posted to interest bearing accounts as soon as they are received from the purchaser.

*Concern*

The statements currently provided do not segregate interfund transfers from receipts and disbursements to allow Yakama Nation to track the movement of funds between their accounts.

*Recommendation #25*

Reclassify interfund transfers from receipt and disbursement account statement classifications, and report such transactions separately in the summary account statements provided. This would be similar to what has been done on the accompanying Account Statements.

*Concern*

The statements currently provided do not segregate disbursements in transit, potentially understating cash balance and overstating disbursements in the Summarized Statement of Accounts.

-177-



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
TRIBAL TRUST FUNDS RECONCILIATION PROJECT
FIVE TRIBES FILL THE GAP/SPECIAL PROCEDURES

AGREED-UPON PROCEDURES AND FINDINGS REPORT
FOR
CONFEDERATED TRIBES AND BANDS OF THE YAKAMA INDIAN NATION
JULY 1, 1972 THROUGH SEPTEMBER 30, 1992

## OTHER FINDINGS/RECOMMENDATIONS

### Recommendation #26

Report disbursements in transit as a separate line item in the summary account statements provided, similar to what has been done on the accompanying Account Statements. This item may give a more accurate account of the cash balance and disbursements.

### Concern

The statements currently provided do not segregate funds that have been reclassified during the year in the Summarized Statement of Accounts, which would allow Yakama Nation to have a clear picture of changes in fund balance during the course of the year.

### Recommendation #27

Report reclassified funds as a separate line item in the summary account statements provided, similar to what has been done on the accompanying Account Statements. This will allow Yakama Nation to track funds which have been reclassified through changes made by the Bureau (i.e., changes in account numbers, changes in Tribe numbers, changes in Area/Agency location codes, etc.).